Page 1

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL
CIRCUIT IN AND FOR PALM BEACH COUNTY, FLORIDA
CASE NO. 50 2009CA040800XXXXMB AG
Complex Litigation, Fla.R.Civ.Pro. 1201

JEFFREY EPSTEIN,
    Plaintiff,
-vs-        VOLUME I OF II

SCOTT ROTHSTEIN, individually,
BRADLEY J. EDWARDS,
individually, and L.M. individually,

    Defendants.
_____

VIDEOTAPED DEPOSITION OF BRADLEY J. EDWARDS, ESQUIRE

Tuesday, March 23, 20010
10:00 - 5:07 p.m.

2139 Palm Beach Lakes, Boulevard
West Palm Beach, Florida  33401

Reported By:
Cynthia Hopkins, RPR, FPR
Notary Public, State of Florida
Prose Court Reporting
Job No.: 1333

---

Page 2

1  APPEARANCES:
2  On behalf of the Plaintiff:
3    ROBERT D. CRITTON, JR., ESQUIRE
    BURMAN, CRITTON, LUTTIER & COLEMAN, LLP
4    303 Banyan Boulevard
    Suite 400
5    West Palm Beach, Florida  33401
    Phone: 561.842.2820
6
7  and
8    JACK ALAN GOLDBERGER, ESQUIRE
    ATTERBURY, GOLDBERGER & WEISS, P.A.
9    250 Australian Avenue South
    Suite 1400
10   West Palm Beach, Florida  33401-5012
    Phone:  561.659.8300
11
12 and
13 On behalf of the Plaintiff:
14   ALAN M. DERSHOWITZ, ESQUIRE
    HARVARD LAW SCHOOL
15   Hauser 520
    Cambridge, Massachusetts  02138
16   Phone:  617.496.2020
17 On behalf of the Defendant:
18   JACK SCAROLA, ESQUIRE
    SEARCY, DENNEY, SCAROLA,
19   BARNHART & SHIPLEY, P.A.
    2139 Palm Beach Lakes Boulevard
20   West Palm Beach, Florida  33409
    Phone:  561.686.6300
21
22 ALSO PRESENT:
23 Jeffrey Epstein
24 Joseph Kozak, Videographer
25 Prose Reporting Services

---

Page 3

1          - - -
2        I N D E X
3          - - -
4
5  EXAMINATION    DIRECT   CROSS   REDIRECT
6
   BRADLEY J. EDWARDS, ESQUIRE
7
   BY MR. CRITTON    5
8
9
10
11       E X H I B I T S
12         - - -
13
14 EXHIBIT     DESCRIPTION     PAGE
15
   PLAINTIFF'S EX. 1  ALFREDO RODRIGUEZ   211
16     CRIMINAL COMPLAINT
   PLAINTIFF'S EX. 2  COMPLAINT    239
17    PLAINTIFF'S EX. 3  JULY 22, 2009   276
    FACSMILE
18
19
20
21
22
23
24
25

---

Page 4

1      P R O C E E D I N G S
2        - - -
3     Deposition taken before Cynthia Hopkins,
4  Registered Professional Reporter and Florida
5  Professional Reporter, and Notary Public in and for
6  the State of Florida at Large, in the above cause.
7        - - -
8     THE VIDEOGRAPHER:  We are now on video
9  record.  This is Media Number One in the
10 videotaped deposition of Bradley Edwards in the
11 matter of Jeffrey Epstein versus Scott
12 Rothstein, Bradley J. Edwards, and L.M.
13    Today is Tuesday, March 23rd, 2010 at
14 10:00 a.m.  We're here in the law offices
15 of Searcy, Denney, Scarola, Barnhart &
16 Shipley, 2139 Palm Beach Lakes Boulevard,
17 West Palm Beach, Florida.
18    My name is Joe Kozak.  I am the
19 videographer.  The court reporter is Cindy
20 Hopkins from Prose, Prose Court Reporting
21 Agency.
22    Will counsel please introduce
23 yourselves, and then the court reporter
24 will swear in the witnesses.
25    MR. CRITTON:  Bob Critton on behalf of the

---

Page 5

1    Plaintiff, Jeffrey Epstein.
2        MR. GOLDBERGER:  Jack Goldberger on behalf
3    of the Plaintiff, Jeffrey Epstein.
4        MR. DERSHOWITZ:  Alan Dershowitz on behalf
5    of the Plaintiff, Jeffrey Epstein, of counsel.
6        MR. SCAROLA:  The record should reflect
7    that Mr. Epstein is also personally present.
8    My name is Jack Scarola.  I am counsel on
9    behalf of the Defendant/Counter-Plaintiff, Brad
10   Edwards.
11   Thereupon,
12       (BRADLEY J. EDWARDS, ESQUIRE)
13   having been first duly sworn or affirmed, was
14   examined and testified as follows:
15       THE WITNESS:  Yes.
16           DIRECT EXAMINATION
17   BY MR. CRITTON:
18       Q.  Would you please tell us your full name
19   and home your home address.
20       A.  Bradley James Edwards, 1109 Northeast Second
21   Street, Hallandale Beach, Florida, 33009.
22       Q.  Date of birth, please.
23       A.  11/16/75.
24       Q.  Mr. Edwards, have you ever had your
25   deposition taken before?

Page 6

1        A.  No.
2        Q.  Okay.  But you've counseled, you've
3    obviously taken a number of depositions both as a
4    Plaintiff and as a Defendant.  You're familiar with
5    all the rules?
6        A.  I know the rules.
7        Q.  All right.  Again if I ask you a question
8    you don't understand, if you would ask me or if you
9    want me to rephrase it, I will be happy to do that.
10       A.  Yes.
11       MR. SCAROLA:  Mr. Edwards, Mr. Edwards,
12   knows the rules.  You can skip the
13   preliminaries.
14       MR. CRITTON:  Is that a form objection?
15       MR. SCAROLA:  No.
16       MR. CRITTON:  Just a talk.
17       MR. SCAROLA:  It's a, it's a request that
18   you not waste our time.
19       MR. CRITTON:  I am not wasting your time.
20   And if we hadn't gone through that, we would
21   have been done with them, Jack.
22   BY MR. CRITTON:
23       Q.  Mr. Edwards, are you currently employed?
24       A.  Yes.
25       Q.  And by whom are you currently employed?

Page 7

1        A.  I don't understand the question.
2        Q.  For whom do you work at the current time?
3    Are you an employee?
4        A.  I am a partner in the law firm of Farmer,
5    Jaffe, Weissing, Edwards, Fistos & Lehrman.
6        Q.  Is that a professional association?
7        A.  Yes.
8        Q.  And you said you're a partner.  Do you
9    have your own P.A. or is the only the Farmer -- what
10   was the second name, Jaffe?
11       A.  Correct.
12       Q.  And I will refer to it as Farmer, Jaffe,
13   if that's all right with you.  Is Farmer, Jaffe
14   itself a P.A.; that is, are you a partnership of
15   P.A.'s?
16       A.  Yes.
17       Q.  Do you have your own professional
18   association?
19       A.  Yes.
20       Q.  Okay.  What's it called?
21       A.  Law Office of Brad Edwards, LLC.
22       Q.  You are the sole member of that LLC?
23       A.  Yes.
24       Q.  And then your LLC is a partner of the
25   Farmer, Jaffe firm?

Page 8

1        A.  Correct.
2        Q.  And do you hold yourself out to the public
3    as being a partner of that firm; that is you
4    individually?
5        A.  What do you mean by hold myself out to the
6    public?
7        Q.  If I got your letter would your letter
8    say, if I received a letter from you would it say
9    Brad Edwards, partner, or something to that effect?
10       A.  I don't think so.
11       Q.  Okay.  What does your card say?  Do you
12   have a business card?
13       A.  I do.
14       Q.  Okay.  What does your business card--
15       A.  Attorney.
16       Q.  -- reflect?  And when you introduce
17   yourself to clients or other attorneys for the first
18   occasion, do you introduce yourself as a partner of
19   that firm if asked?
20       A.  If asked are you a partner; is that your
21   question?
22       Q.  Correct.
23       A.  Would I say yes?  The answer is yes.
24       Q.  When did you start -- I want to strike
25   that.  Do you consider yourself an employee of the

Page 9

```
 1   partnership?
 2       A.  What do you mean by that?
 3       Q.  Do you understand what an employee is?
 4       A.  I work for the firm.
 5       Q.  You are certainly not --
 6       A.  I am employed there, so, yes.
 7       Q.  When did you start your association with
 8   the Farmer, Jaffe firm?
 9       A.  Sometime during the month of November, 2009.
10       Q.  And is that when the firm was incorporated
11   as a professional association?
12       A.  I believe so.
13       Q.  The attorneys who are in the current firm,
14   are they all former Rothstein Rosenfeldt Adler
15   attorneys; that is, the professional staff?
16       A.  Yes.
17       Q.  Is there anyone -- Let me strike that.
18           Do you have paralegals as well that
19   work there?
20       A.  Yes.
21       Q.  Are any of the paralegals former, and if I
22   refer to Rothstein Rosenfeldt Adler as RRA, or RRA,
23   is that all right with you?
24       A.  I understand what you mean.
25       Q.  Are there any other, are any of the
```

Page 10

```
 1   paralegals that are currently employed by Farmer,
 2   Jaffe in any capacity whether they are independent
 3   contractors -- well, let me strike that.
 4           As employee's, I probably should ask
 5   this question:  Does the firm, Farmer, Jaffe have
 6   employees --
 7       A.  Yes.
 8       Q.  -- separate and apart from the partners?
 9       A.  Yes.
10       Q.  And they are actually employed by the
11   P.A., correct?
12       A.  Correct.
13       Q.  Does the firm have any paralegals that
14   came over from the RRA firm, RRA?
15       A.  Yes.
16       Q.  Who are they?
17       A.  Maria and Beth.
18       Q.  Does Maria have a last name?
19       A.  Yes.
20       Q.  What is it, please?
21       A.  I believe it's pronounced Kelljian.
22       Q.  Can you spell it?
23       A.  I can give it my best shot, K-E-L-L-J-I-A-N.
24       Q.  And Beth's last name is what, please?
25       A.  Williamson.
```

Page 11

```
 1       Q.  She's your current secretary/paralegal, or
 2   do you have a secretary as well?
 3       A.  I don't understand your question.
 4       Q.  Do you have -- is Beth Williamson your
 5   paralegal?
 6       A.  She's a paralegal at the law firm of Farmer,
 7   Jaffe, Weissing, Edwards, Fistos & Lehrman.
 8       Q.  Does she primarily work for you?
 9       A.  No.
10       Q.  Do you have a secretary as well?
11       A.  The law firm?  Yes.
12       Q.  The secretary who works primarily for
13   you --
14       A.  No.
15       Q.  You just use whoever is available from a
16   secretary standpoint?
17       A.  No.
18       Q.  Who do you primarily use for secretary
19   services?
20       A.  There is nobody who could fall into the
21   category of who I primarily use.
22       Q.  Ms. Williamson, who, by whom, who, who was
23   the attorney at RRA with whom she primarily worked?
24       A.  I believe it was several attorneys, and I
25   can't tell you who the attorneys were that she worked
```

Page 12

```
 1   for or with.
 2       Q.  Did she work with you at all at RRA?
 3       A.  In some limited capacity, maybe.
 4       Q.  Did she ever work on any of the -- you
 5   have three cases that you ever filed -- or let me
 6   strike that.
 7           There are three cases that are in
 8   existence at the current time.  One is Jane Doe
 9   versus Mr. Epstein which is, is a federal court case
10   and the Plaintiff's name is Jane Doe.  That is one
11   of your cases, correct?
12       A.  Correct.
13       Q.  Or one of the firm's cases at the current
14   time?
15       A.  Correct.
16       Q.  There is another case versus L.M. Versus
17   Jeffrey Epstein and a third called E.W. versus
18   Jeffrey Epstein, correct?
19       A.  Yes.
20       Q.  And as a result all three of those cases
21   currently now are firm cases, the Farmer, Jaffe firm
22   cases?
23       A.  Yes.
24       Q.  Did Mrs.  Williamson work on any of those
25   cases?
```

1      A.  In what time period?  What's your question?
2      Q.  I'm sorry.  During the time that you were
3  associated with RRA, did Mrs. Williamson work on
4  those cases?
5      A.  Without you needing to ask 20 different
6  questions to get to your answer, I will tell you her
7  involvement was that after federal motions were drafted,
8  she was the person to literally file the motion.  That
9  is her only involvement with the cases while at RRA
10      Q.  She basically filed them through the Pacer
11  system?
12      A.  Exactly.
13      Q.  Prior to you working at Farmer, Jaffe by
14  whom were you employed?  And by employed I mean in
15  in a broad sense.  You could have been an
16  independent contractor.  You could have been a
17  partner.  You could have been an employee.
18      A.  The law firm of Rothstein Rosenfeldt Adler.
19      Q.  When did you start working for RRA?
20      A.  I believe April of 2009.
21      Q.  Beginning of April?
22      A.  Yes.
23      Q.  I saw a pleading that was filed yesterday
24  and it was either E.M., I am sorry, L.M. or E.W.
25  that looked like there was a change of -- I'm sorry,

1  notice of appearance or something by RRA  Would
2  that, in any way, if I asked you to assume that
3  that's correct, would that refresh your recollection
4  that it may have been at the end of March?
5      A.  I don't understand that question at all.
6      Q.  I saw a pleading that was filed or --
7      A.  Yesterday you said.
8      Q.  -- a paper that was filed.  I was looking
9  at a pleading filed in either E.W. or L.M., and I
10  saw a paper that was basically a notice of
11  appearance on behalf of RRA  And it looked like it
12  was dated around March 30 of 2009.
13      A.  Okay.
14      Q.  Is it possible that you started your
15  association with RRA at an earlier date than April
16  of '09?
17      A.  Assuming that what you said is true, if that
18  document says that, then it's possible that is an
19  accurate reflection of when I began.
20      Q.  Did you start working with RRA before you
21  filed any documents representing that RRA or that
22  you had now an affiliation with RRA?
23      A.  No.
24      Q.  Where the -- again, I don't remember,
25  whether there was a notice of additional counsel or

1  substitution of counsel.  Did you, were the
2  substitution of counsel's filed the exact date that
3  you started with RRA?
4      A.  I don't remember.
5      Q.  When did your association with RRA
6  terminate or end?
7      A.  The end of October 2009 or the beginning of
8  November 2009.
9      Q.  And how did it terminate?  How did your
10  relationship with RRA terminate?
11      A.  The firm closed.
12      Q.  Did you get, notification -- when you say
13  closed, meaning what?
14      A.  Meaning what everybody in this entire room
15  knows is that the firm went from operating to no longer
16  operating.
17      Q.  And how did you receive notice; that is,
18  did you receive some sort of notice that told you
19  that RRA now is a defunct firm?  Did you receive
20  notification that was in bankruptcy?  What, if
21  anything, did you receive?
22      A.  I didn't receive anything.
23      Q.  And then how did your relationship with
24  RRA end?
25      A.  Came to work on a Monday morning, and there

1  was a meeting that was held informing all the employees
2  including myself that the firm no longer was financially
3  able to survive and therefore would be immediately
4  closing down.
5      Q.  Who was the spokesperson at the meeting,
6  the main individual who advised those assembled in
7  the room that that's what was going to occur?
8      A.  I don't remember.
9      Q.  Was it -- did Rosenfeldt speak at all at
10  that meeting?
11      A.  I, I can't remember.
12      Q.  Do you remember the date of the meeting?
13      A.  I remember that it was a Monday.
14      Q.  Do you remember it being in October or
15  November?
16      A.  Either the very end of October or the very
17  beginning of November.
18      Q.  Did anyone -- well, let me strike that.
19  Do you remember whether the person -- let me strike
20  that.
21          At the meeting who was present, and I
22  don't mean individual names.  Who did it, by groups,
23  who did it include?
24      A.  The meeting was held in a cafeteria type room
25  in the building where RRA maintained its offices.  And

Page 17

```
 1    the room was completely full to capacity with as many
 2    employees of the Rothstein, Rosenfeldt Adler firm as
 3    were in attendance at work that day.
 4         Q.  And included lawyers, paralegals, support
 5    staff, investigators?
 6         A.  Literally --
 7         Q.  -- everyone, I mean everyone who obviously
 8    showed up at the meeting?
 9         A.  I don't know.
10         Q.  Did you see other lawyers there?
11         A.  Yes.
12         Q.  Did you see staff there?
13         A.  Yes.
14         Q.  Did you see paralegals there?
15         A.  Yes.
16         Q.  Did you see investigators there?
17         A.  I can't necessarily remember whether or not I
18    saw investor -- investigators there.
19         Q.  And did more than one person speak at the
20    meeting?
21         A.  I don't remember.
22         Q.  Okay.  What else were you advised at the
23    meeting, if anything?
24         A.  It was -- I stayed for very little of that
25    meeting.  I don't know what was advised to others, but
```

Page 18

```
 1    what I heard was, firm is closing down.  That's all I
 2    needed to hear and I left.
 3         Q.  Did you subsequent -- well, let me strike
 4    that.  Did you, were you able to gain, gain access
 5    to the building that day?  I am sorry, access to
 6    your, to the offices of the Rothstein firm that day?
 7         A.  Yes.
 8         Q.  And were you able to access any of your
 9    files or your e-mail at that time?
10         A.  What time?
11         Q.  That same day, that Monday that you were
12    advised that the firm was shutting down.
13         A.  Yes.
14         Q.  And were you able to print documents?
15    Well, let me strike that.  Were you able to take
16    documents relating to matters on which you worked
17    from the firm?
18         A.  What do you mean by was I able to?
19         Q.  Were you able to access and take with you
20    documents that related to files on which you were
21    working the preceding Friday when you were at RRA?
22         A.  I believe so.
23         Q.  Did you take, did you actually remove
24    documents, papers that were related to files that
25    you had on which you were working from RRA that day?
```

Page 19

```
 1         A.  I don't believe so.
 2         Q.  Okay.  Was anyone preventing you from
 3    taking anything?
 4         A.  No.
 5         Q.  Okay.  Did you print out any documentation
 6    from your server or from the firm's server that day
 7    to take with you?
 8         A.  Not that I recall.
 9         Q.  Do you recall taking anything from
10    RRA'office that day, that day being that same
11    Monday?
12         A.  No.
13         Q.  Obviously Scott Rothstein was not there?
14         A.  Correct.
15         Q.  Have you ever spoken, excuse me, have you
16    ever seen Mr. Rothstein since that Monday at the
17    meeting?
18         A.  What do you mean have I seen him?
19         Q.  Seen him in person, I'm sorry.
20         A.  No.
21         Q.  Okay, have you spoken with him at any time
22    since the Monday meeting at which time you were
23    advised that the firm was shutting down?
24         A.  No.
25         Q.  Have you spoken on any, with anyone on his
```

Page 20

```
 1    behalf; that is, who purports to represent
 2    Mr. Rothstein since you left the firm that day?
 3         A.  No.
 4         Q.  Do you know Mr. Nurik?
 5         A.  Yes.
 6         Q.  Do you recog -- are you aware that he
 7    represents Mr. Rothstein?
 8         A.  Yes.
 9         Q.  Okay.  Have you spoken with him since that
10    Monday?
11         A.  He called me on a morning before a hearing to
12    ask me where Judge Crow's courtroom was.  And I told
13    him, and that was the extent of that conversation.
14    Otherwise, I have had zero communication with Marc
15    Nurik.
16         Q.  With regard to the firm being advised that
17    the firm was shutting down on that Monday, did you
18    subsequently return to the firm's offices?  Let me
19    strike that.  How long did you stay at the firm that
20    day?
21         A.  I don't remember.
22         Q.  Did you stay all day?
23         A.  I believe so.
24         Q.  Were you able to work on your files?
25         A.  I don't understand the question.
```

5 (Pages 17 to 20)

1    Q.  Were you able to do legal work on the
2  matters that wherein you represent individuals?
3    A.  Was I able to?  Yes, I was physically able to
4  do that.
5    Q.  Did you work on legal matters that day?
6    A.  No.
7    Q.  Did you subsequently, after that date, did
8  you return to the RRA offices?
9    A.  Yes.
10    Q.  And where are those offices or where were
11  those offices located?
12    A.  Las Olas.
13    Q.  The address, please?
14    A.  I don't remember.
15    Q.  With regard to the --
16    A.  401.
17    Q.  Las Olas?
18    A.  (Witness nods head.)
19    Q.  Did you, did you after that Monday did you
20  return to the offices at 401 Las Olas, the RRA
21  offices?
22    A.  Yes.
23    Q.  And did you return every day thereafter
24  for a period of time?
25    A.  No.

1    Q.  Was there a point in time that you were
2  prevented from entering your office or the offices
3  of RRA?
4    A.  Yes.
5    Q.  At what point in time were you prevented
6  from going into the offices?
7    A.  I don't remember.
8    Q.  How many days were you able to access the
9  offices before you were prevented?
10    A.  I don't remember.
11    Q.  You don't know whether it was a day or
12  three days or five days that you were allowed to go
13  into the office?
14    A.  The period of time that I was able to go into
15  the office encompasses all of those things that you just
16  said, one day, three days, five days, yes.  I can
17  definitely say with certainty I was able to do that.
18    Q.  During the month of October were you
19  allowed to go into the office more than ten days?
20    A.  Yes.
21    Q.  Did they put -- well, let me strike that.
22  Did someone put restrictions on what your access was
23  to the office, the RRA office?
24    A.  Yes.
25    Q.  Okay.  Who put the restrictions on the

1  entry to the office?
2    A.  I don't know.
3    Q.  Well, who would, who would monitor whether
4  you came in or couldn't go into the office?
5    A.  I don't know.
6    Q.  Was there someone there?
7    A.  Was there someone where?
8    Q.  The impression I got is that there was
9  some limitation on your ability to access the RRA
10  offices after the Monday at which time you were
11  advised that the firm was shutting down.  Did I
12  misunderstand you?
13    A.  No, that's correct.
14    Q.  Okay.  Who then, if you know, or what, if
15  it was an entity, placed any restrictions on your
16  access to RRA offices?
17    A.  I don't know.
18    Q.  When you would go to the office -- well,
19  let me strike that.  After how many days -- well,
20  let me strike that.
21       The very day, the same day that you
22  were advised that the office was closing down, were
23  there any individuals that were monitoring what, if
24  anything, was to be removed or not removed from the
25  office, like a security force, Broward County

1  Police, U.S. Marshals.
2    A.  From my recollection there were at some point
3  in time, there were people in the office monitoring
4  activity in the office.
5    Q.  Was that the first week after the Monday?
6    A.  I don't recall.
7    Q.  Did you ever, did you receive any
8  guidelines either at the Monday meeting or
9  thereafter as to what you could or could not remove
10  from the file, from the, I'm sorry from the RRA
11  offices?
12    A.  I believe so.
13    Q.  And who put those guidelines out, do you
14  recall?
15    A.  No.
16    Q.  Were they in a written form?
17    A.  No.
18    Q.  Okay.  Was given in what form, how did you
19  learn what you could and could not take from the
20  office?
21    A.  More rumor than anything else is what I
22  remember.
23    Q.  Did you discuss that with other
24  individuals or other attorneys who were working at
25  RRA?

Page 25

1    A.  Possibly.
2    Q.  Did you ever attempt to remove something
3  from the office of the RRA offices and someone
4  prevented you?
5    A.  No.
6    Q.  Did you ever -- and when I say remove I
7  mean in the sense of physically remove; that is,
8  take out boxes or take out files or something of
9  that nature.
10    A.  I understand the definition of remove.
11    Q.  With regard to, there were also, I
12  understand you had an e-mail server at the office?
13    A.  Okay.
14    Q.  Is that correct?
15    A.  Yes.
16    Q.  And I have seen something, there is
17  something that's called Qtask.  Are you familiar
18  with Qtask?
19    A.  Yes.
20    Q.  And what do you understand Qtask or what
21  did you understand that Qtask did; that is, as an
22  electronic service?
23    A.  A web based network to store files and other
24  materials.
25    Q.  In terms of electronic storage, or

Page 26

1  electronic data at the RRA firm, in addition to,
2  excuse me, the e-mail server was and Qtask, was
3  there anything else from an electronic storage or
4  communication means through RRA?
5    A.  Yes.
6    Q.  What else was there?
7    A.  That stored electronic materials?
8    Q.  Right, or that you could communicate with
9  someone else either inside or out of the firm.  You
10  had the server, e-mail server.  You had Qtask.  What
11  else did you have?
12    A.  To communicate with others, e-mail and Qtask.
13    Q.  And how about within the confines of the
14  firm, was there another electronic mail system or
15  electronic system either for storage or for
16  communication?
17    A.  To the best of my recollection, none for
18  communication.  Storage, yes.  There were electronic
19  paperless storage case management systems in place.
20    Q.  And with regard to the electronic case
21  management system, were your files, including the
22  three cases involving Mr. Epstein, were those cases
23  on the electronic case management system?
24    A.  Yes.
25    Q.  And could you access the electronic case

Page 27

1  management system; that is, did you utilize the
2  software that was available?
3    A.  Yes.
4    Q.  And had you ever used a system like that
5  before you came to the RRA firm, RRA?
6    A.  I don't understand.
7    Q.  Okay.  Had you ever used an electronic
8  case management software system before you came to
9  RRA?
10    A.  Yes.
11    Q.  Was yours the system that you had used
12  before was that were you able to integrate that with
13  RRA, with the RRA file or system when you got there,
14  or did your files have to be put on the new RRA
15  system?
16    A.  The latter.
17    Q.  In addition, so we had the e-mail server,
18  Qtask, and electronic case management system.  Was
19  there any other type of electronic storage or system
20  that was available for communication or storage at
21  RRA?
22    A.  Not that I recall.
23    Q.  With regard to the e-mail system, well,
24  with regard to the e-mail system, Qtask, and
25  electronic case management, did you require, was

Page 28

1  there a password required to use or access each one?
2    A.  No.
3    Q.  Was there a password required to use any
4  of the three?
5    A.  I don't believe so.
6    Q.  As I saw in an order that with the Qtask
7  system that there was some sort of access code that
8  was required to get into Qtask.
9    A.  I saw that too.
10    Q.  Did you ever have, did you ever have such
11  a code or a password with regard to Qtask?
12    A.  I don't remember.
13    Q.  Has the receiver and/or it's, Mr. Seton or
14  his attorneys asked for you to provide any passwords
15  or information to access any of your files?
16    A.  I don't think so.
17    Q.  Do you understand that you have a
18  requirement or you're required to give the password
19  if requested by Mr. Seton?
20    A.  I don't know the password to give to anybody.
21  I never knew there was a password.
22    Q.  Did you --
23    A.  I don't believe.
24    Q.  Did you use Qtask?
25    A.  I have used Qtask.

Page 29

1      Q.  With regard to your, the files
2  specifically, specifically the -- well, let me
3  strike that.  During the time you were at RRA, of
4  the three files, Jane Doe, L.M., and E.W. or in
5  addition to those three files, did you represent any
6  other individuals who were potential claimants
7  against Mr. Epstein?
8      A.  I don't believe so.
9      Q.  All right.  I received notification from
10  you as to a Ms. N.R.?
11      A.  N.R.
12      Q.  N.R. and Ms. D.F. I believe is her name?
13      A.  Correct.
14      Q.  Were either of those individuals, had
15  either of those individuals contacted you prior to
16  leaving the RRA firm?
17      A.  I don't believe so.
18      Q.  Is it your testimony then that none,
19  neither Ms. N.R. nor Ms. D.F. would have had a fee
20  agreement or representation agreement with the RRA
21  firm because they hadn't contacted you prior to your
22  departure from that firm; is that correct?
23      A.  I'm not sure.
24      Q.  Is it possible that Ms., either Ms. N.R.
25  or Ms. D.F. contacted you before you left the RRA

Page 30

1  firm but you just didn't sign them up before you
2  left?
3          MR. SCAROLA:  Objection, calls for
4      speculation.
5          THE WITNESS:  Yes.
6  BY MR. CRITTON:
7      Q.  Is there a reason that you would not have
8  signed them up during the time you were with -- or
9  let me strike that.  Prior to the implosion, prior,
10  prior to that Monday when you were advised that the
11  RRA firm was closing down, had you made any plans to
12  leave the RRA firm, that is the RRA firm?
13      A.  No.
14      Q.  Okay.  Had you discussed with any other
15  attorneys in RRA departing from RRA or the RRA firm
16  prior to that Monday meeting at which time you were
17  advised that the firm was shutting down?
18      A.  No.
19      Q.  You indicated it's possible that Ms. N.R.
20  or Ms. D.F. may have contacted you prior to your
21  departure or prior to that Monday meeting.  What
22  makes you believe that?
23      A.  I don't remember exactly the timing of any
24  communications between myself and Ms. D.F. or Ms. N.R
25  And it seems to me that it was around the time period

Page 31

1  either just before or just after I do believe I spoke
2  with one or maybe both of them on at least one occasion
3  before the disbandment of RRA
4          And I know for a fact I signed each
5  one of the clients up after the disbandment of RRA
6  I can't tell you with any degree of certainty
7  whether they signed a fee agreement with RRA prior
8  to the disbandment.
9      Q.  Have you been able to do any transfers of
10  your, of -- let me strike that.  With regard to the
11  e-mail server at RRA, have you had occasion to
12  access that since that Monday; that is, the Monday
13  meeting that you referred to in either late October
14  or early November of '09?
15      A.  Yes.
16      Q.  All right.  And have you had full access,
17  at some point did you get full access to all of your
18  e-mail that, that existed at least, that you had not
19  removed -- let me start again.
20          Under an e-mail server you, you have
21  the ability, obviously, to delete what you, what you
22  choose, correct?
23      A.  As do you.
24      Q.  As do I, right.  And were you using like a
25  Microsoft Outlook program?

Page 32

1      A.  I don't remember.
2      Q.  Okay.
3      A.  I am now.
4      Q.  Well, with the program that you did have,
5  could you delete it and then you would have to go
6  into the delete it and further delete it to clean it
7  out?
8      A.  I don't remember.
9      Q.  You don't remember back to October or
10  September of '09 at this point?
11      A.  That's just not what I do.  I mean, I don't
12  just delete e-mails.  So I don't know what you had to
13  do.  You take me for somebody more e-mail savvy than
14  am about that.
15      Q.  Do you basically save all your e-mails or
16  had you in the past when you were at RRA?
17      A.  I don't intentionally save or delete.  They
18  are just there.
19      Q.  And when you, when you, at some point
20  after the Monday meeting, were you able to transfer
21  whatever e-mails you had from RRA to your current
22  program?
23      A.  At Farmer, Jaffe, Weissing?
24      Q.  Correct.
25      A.  No.

8  (Pages 29 to 32)

Page 33

1     Q.  Were you at some point given access to all
2  your e-mails so it could be downloaded either on a
3  disk, hard disc, floppy disk, or some other storage
4  medium so that you had access to all your prior
5  e-mails when you were at RRA?
6     A.  I don't know.
7     Q.  Did you ever make that request to someone,
8  either the receiver or anyone else associated with
9  RRA?
10     A.  I don't remember if I made that request.
11     Q.  I thought you indicated earlier,
12  Mr. Edwards, that you had access to some of your
13  e-mails.
14     A.  I had access to all of my e-mails on that
15  Monday of the meeting, on the next day, on that Tuesday,
16  right, the immediately following the meeting.  32:46 at
17  some point in time it was cutoff and since that time,
18  when it was cutoff, I don't believe I have ever had
19  access back to my entire e-mail system.
20     Q.  Okay.  Have you had access to portions of
21  your e-mail system?
22     A.  Not that I remember.
23     Q.  Have you attempted to obtain access or
24  requested that you obtain access or information from
25  your e-mail, from the RRA e-mail server?

Page 34

1     A.  I don't remember.
2     Q.  You say you don't remember.  Would there
3  have been a reason that you either requested or
4  didn't request access to your prior e-mail?  When I
5  say prior I mean at RRA
6     A.  Usually you read all of your e-mails and there
7  shouldn't be anything that I had not read.  However,
8  there are some e-mails that you would like to keep
9  around.  So there may have been reason for me to have
10  requested.  However, I don't believe I was ever granted
11  access to those e-mails, and I can't specifically
12  remember requesting the e-mails.
13     Q.  Within, within the e-mails you would have
14  corresponded with or communicated with people
15  outside of the firm and as well as people within the
16  firm, true?
17     A.  Ever, yes.
18     Q.  During the time you were RRA
19     A.  Did I ever communicate with somebody outside?
20  I communicated with you.
21     Q.  Correct.
22     A.  So you know that to be true.  Yeah, of course.
23     Q.  I know that to be true.  And my question
24  is as well within the server or e-mail system with
25  RRA, did you ever also communicate with other

Page 35

1  paralegals, other staff at RRA?
2     A.  Yes.
3     Q.  And would you see, receive, if it was
4  something from one of the other partners at RRA
5  would you receive; that is, did you get firm-wide
6  e-mails from time to time about specific topics?
7     A.  Yes.
8     Q.  All right.  When you, during the time that
9  you went back to RRA, did you printout, and up until
10  the time you were denied access to the e-mail
11  server, did you ever print, printout any e-mails or
12  transfer any e-mails that you can recall?
13     A.  Not that I can recall.
14     Q.  All right.  With regard to the Qtask
15  system, have you been, since that Monday have you
16  been able to use that system in any fashion?
17     A.  What do you mean by that?
18     Q.  Have you been able to access Qtask either
19  to look to see what was there or in the alternative
20  pull information from so that you could printout
21  information from Qtask?
22     A.  I don't know.  Probably.
23     Q.  Okay.  Have you attempted since that
24  Monday -- well, after that Monday meeting -- let me
25  strike that.

Page 36

1     Since the meeting that occurred on
2  that Monday at which time you were advised the firm
3  was shutting down, have you accessed Qtask for any
4  reason?
5     A.  I don't believe so.
6     Q.  What kind of -- you said, you described
7  earlier that Qtask was a web based network of files
8  for files and other materials.  And in what fashion
9  did you use Qtask during the time you were with RRA,
10  RRA?
11     A.  Qtask is a project centric web-based program.
12  So projects could be created.  The project would
13  normally be a case, and that case discussed with lawyers
14  the way that you may gather around a table and discuss
15  it.  And at times I was invited to projects on various
16  cases and utilized that system.
17     Q.  Is that the only fashion that you would
18  have used Qtask during the time you were with RRA?
19     A.  Yes.
20     Q.  And when you say a project, as an example,
21  Jane Doe versus Jeffrey Epstein, if that had been
22  put, just this is hypothetically and then I will ask
23  you later whether that was in the system but if you
24  wanted or let me strike that.
25     Could Jane Doe versus Jeffrey Epstein

Page 37

1    been put in the Qtask program for, for purposes of
2    creating a project?
3        A.   Repeat it again.
4        Q.   Okay.  Could a case like Jane Doe versus
5    Jeffrey Epstein been put in the Qtask system as a
6    project so that you and others could look at it?
7        A.   You mean is, is, is the project capable of
8    holding such a project?
9        Q.   Yes, just generically.
10       A.   Yes, yes.
11       Q.   And in terms of the RRA system, did the
12   RRA system ever have as, as a project Jane Doe
13   versus Jeffrey Epstein?
14       A.   I don't believe so.
15       Q.   Did you ever look in the Qtask, Qtask
16   system to determine whether you or anyone on your
17   behalf or any other person in the firm had ever put
18   Jane Doe versus Jeffrey Epstein into the Qtask
19   system?
20       A.   Yes.
21       Q.   Okay.  And what did you find or not find?
22       A.   I, I don't remember if that was the name of
23   any project in the system.  It could have been, but it
24   may not have been.  I don't remember that as a specific
25   project in the system.

Page 38

1        Q.   When you say a specific project, if I
2    understand you correctly, Mr. Edwards, that would
3    have been, as an example, it could be any case.  It
4    could be a real estate case, it could be a labor
5    case, it could be Jane Doe versus Jeffrey Epstein,
6    but someone could, someone whether it was you or
7    someone else could put in facts and information
8    about the case?
9        A.   Similar to any case management system that's,
10   it just happens to be web based, but you have the right
11   concept.
12       Q.   Is the concept the same concept for an
13   electronic, for the third electronic system, you had
14   the electronic case management system?
15       A.   I suppose at full capacity it, it may.  I just
16   wasn't that adept at Qtask to know all of the
17   capabilities of Qtask.
18       Q.   With regard to the third item which I am
19   going to come back to Qtask in just a minute, the
20   electronic case management software, what was the
21   name of that software?
22       A.   I believe it's called Fortis.
23       Q.   F-o-r-t-i-s?
24       A.   I think so.
25       Q.   I may have asked you, have you ever used a

Page 39

1    Fortis system before you came to Rothstein --
2        A.   Had I ever used Fortis before I came to RRA?
3        Q.   Yes.
4        A.   No.
5        Q.   Now, back to Qtask.  Did you, do you have
6    a recollection -- let me strike that.  Did you ever
7    personally ever put any information into the Qtask
8    system for a project --
9        A.   Yes.
10       Q.   -- on your cases?
11       A.   Yes.
12       Q.   Did you ever put, and I think you just
13   testified as to the best of your recollection, Jane
14   Doe versus Jeffrey Epstein was never put into the
15   Qtask system, correct?
16       A.   As the name of a project?
17       Q.   Yes, sir.
18       A.   No.  I don't believe so.
19       Q.   Well, was, when you say the name of a
20   project, could, could information about Jane Doe
21   versus Jeffrey Epstein have gotten into the system
22   but not identified as a, quote, unquote, project?
23           MR. SCAROLA:  Calls for speculation.
24           MR. CRITTON:  Do you understand the
25   question, sir?

Page 40

1            THE WITNESS:  I don't understand.
2            MR. SCAROLA:  Are you asking whether that,
3    that capability existed?
4            MR. CRITTON:  Sure.
5            THE WITNESS:  Did the capability exist?
6            MR. CRITTON:  Right.  Again Mr. Scarola
7    didn't want to let me go through the
8    explanation because he thought you understand
9    it and I know you did, Brad.  I know you
10   understand.
11           THE WITNESS:  I don't know that I
12   understand that question.  I want to make sure
13   that I answer your question accurately.
14           MR. CRITTON:  See, cut me off too early,
15   earlier.
16           MR. SCAROLA:  No, too late.
17   BY MR. CRITTON:
18       Q.   Mr. Edwards, what I am trying to get is
19   you described the Qtask as being project centric.
20   And as I understood it, the project may be given a
21   label or a title?
22       A.   Correct.
23       Q.   So, it could be Jane Doe versus Epstein;
24   it could be Jane Doe; it could just be assault case;
25   is that correct, whatever you wanted to call or

Page 41

1   someone wanted to call the project?
2        A.  You have the right idea.
3        Q.  And if I understand it correctly is in
4   terms of the project, is if it was, if it was as an
5   example the Jane Doe case, you could, you or anyone
6   else could put information in about Jane Doe, might
7   not call it Jane Doe, but whatever amount of
8   information you or anyone else wanted to put in,
9   could put it into the Qtask so that other attorneys,
10  staff, investigators, paralegals, anyone who could
11  access the Qtask system, could see that project; is
12  that correct?
13       A.  So that the people that were invited to the
14  project could see the project and those people only.
15       Q.  And when you say invited to the project,
16  is, would, would, assuming you're the person who
17  created the project --
18       A.  Okay.
19       Q.  -- would you then set the parameters as
20  to, or the guidelines as to who could come into the
21  project?
22       A.  Maybe.
23       Q.  Okay.  If, again, if it wasn't you, who
24  else could have set the parameters; that is, who
25  else can access the file?

Page 42

1        A.  Let's say I am the lead on a project:  I
2   believe that is what it was called the, I believe that
3   was the title given to the person that initiates the
4   project, if I want to then invite one or two or three or
5   100 other attorneys to that project to help work on
6   various aspects, I could do that.
7            And if I didn't choose to add
8   somebody, and another attorney said make me a lead
9   so that I can add somebody, that's another way that
10  that other lead could have invited somebody else to
11  the project.
12           And when you open up the interphase
13  of Qtask, you're immediately shown a portfolio of or
14  a photograph of the people that are invited to the
15  specific project and those people can access it.
16       Q.  So, if it was, as an example, if it was,
17  if you were the lead person and you invited
18  Mr. Adler and you invited Mr. Berger in and
19  Mr. Rothstein in there, when you punched up the
20  Qtask on the screen, I would see Mr. Rothstein's
21  picture.  I would see yours.  I would see
22  Mr. Berger's and Mr. Adler's?
23       A.  Correct.
24       Q.  As an example.
25       A.  Yes.

Page 43

1        Q.  Would I only see pictures or would I see
2   names as well?
3        A.  I don't remember that.
4        Q.  Would it be a correct statement that
5   during the time you were at RRA, you did use Qtask?
6        A.  Yes.
7        Q.  And did you ever put projects; that is,
8   did you ever as the lead create projects through the
9   Qtask system?
10       A.  Yes.
11       Q.  Would someone else, would, assuming that
12  you were the lead and you created the project, would
13  only you be able to add information to Qtask?
14       A.  No.
15       Q.  Okay.  Was, was any invitee or person
16  allowed access, was he or she allowed to add to
17  Qtask?
18       A.  Correct.
19       Q.  Okay.  Would he or she also be able to
20  delete from Qtask if they were an invitee?
21       A.  I don't know that.
22       Q.  Were you ever, did you ever -- in any -- I
23  assume that you were not only the lead but from time
24  to time you were invited into Qtask; is that
25  correct?

Page 44

1        A.  That's correct.
2        Q.  And during the time that you did, you,
3   when you were the lead, are you the one who chose
4   what went into the file, to the Qtask file?
5        A.  No.
6        Q.  Who would have made that decision?
7        A.  Everybody in the, anybody that's invited can
8   add.  I'm not the one that does it.  Nobody has to come
9   to me to insert anything in the Qtask.  You can add if
10  you're invited.
11       Q.  Well, let's assume that you are, you're
12  the lead but you don't invite anyone; that is, you
13  create the 45:01 time project.  You're the person
14  doing the adding, not staffwise but you're the
15  person that puts the information in.
16       A.  I understood the question until you added the
17  segment about maybe some staff member helps you add the
18  Qtask.  That just doesn't make sense with the program.
19       Q.  Well, with Qtask, if you're the lead and
20  you don't invite anyone in because you're creating
21  the project itself, are you the person who chooses
22  exactly what goes in?
23       A.  I am the person who puts in what goes in.
24       Q.  All right.  Are you, are you responding to
25  questions within Qtask where you put, you describe

Page 45

1    the case. You describe the facts. You describe the
2    witnesses, things of that nature, or are you
3    actually, can you -- well, first of all can you do
4    that?
5         A.  Can you describe the case and describe the
6    facts? Yes, you can.
7         Q.  And is that, when you say project centric,
8    is that what you're doing very much like the
9    electronic, much like the Fortis program?
10        A.  It's not very much like the Fortis program in
11   my mind, but it's, it is what you are doing, you're
12   inputting information about a specific project.
13        Q.  Can you put in the facts about a case,
14   again just generically, can you put in facts about a
15   particular case and then ask someone in your
16   invitees to comment on what they think, might think
17   the value of the case is or is not and give
18   suggestions as to discovery and things of that
19   nature? Is that all true?
20        A.  Yes.
21        Q.  And with regard to -- and once those
22   invitees show up and they're photographed, then each
23   of those individuals can have access to the file and
24   add their thoughts or opinions --
25        A.  Repeat it.

Page 46

1         Q.  -- or suggestions. Let me strike that.
2              With regard to the Qtask, once,
3    once -- assuming that you're the lead, you create
4    the project and then you, you say, okay, now it's in
5    a form that I want to get some invitees involved.
6    Do you then send that project; that is, you then on
7    Qtask you list the invitees and those people would
8    be, get some sort of cue that they had been invited
9    to the project up to the Qtask system?
10        A.  I don't remember the exact process for
11   inviting, but there is a way to invite. And to the best
12   of my recollection, they do receive a notification that
13   they have been invited so that they can accept.
14        Q.  Okay. Can, can someone who has not been
15   invited also access the system?
16        A.  No.
17        Q.  Okay. And how do you know that?
18        A.  That's just not how the system works.
19        Q.  Well, it may not be how the system works,
20   but say if Mr. Rothstein wanted to access when he
21   was the head person at the RRA firm, he wanted to
22   access the Q, Qtask system, do you believe that he
23   would have been able to access the system whether
24   you invited him or not?
25        A.  No.

Page 47

1         Q.  And why do you believe that to be true?
2         A.  It's not how the system works.
3         Q.  Well, at least as you understand the
4    system?
5         A.  Well, if you want to tell me that it works a
6    different way, then maybe you can persuade me but that's
7    how I understand the system.
8         Q.  I am not, I'm not arguing with you.
9              MR. SCAROLA:  Actually you are.
10             THE WITNESS:  Assuming you had been on
11   Qtask, it would help to get past all of these
12   questions. If you had been on Qtask it would
13   help to get past all of this and you would see
14   exactly what I am trying to describe to you.
15             MR. CRITTON:  I would like to get on
16   Qtask.
17             THE WITNESS:  Qtask.com.
18   BY MR. CRITTON:
19        Q.  Okay. I'll remember that. With regard
20   to, so as to whether or not Mr. Rothstein could have
21   accessed it or Mr. Rosenfeldt or anyone else who was
22   not an invitee at least from your knowledge, you
23   believe they cannot access it?
24        A.  Correct.
25        Q.  Can you as well on Qtask, can you as well

Page 48

1    post documents like an attachment?
2         A.  I believe it has that capability. I think the
3    answer is yes.
4         Q.  Now, with regard to the three cases that
5    you -- well, with regard to Jane Doe versus Jeffrey
6    Epstein, I think you already told me you don't
7    recall whether you put that in Qtask; is that
8    correct?
9         A.  I didn't tell you that.
10        Q.  Okay. Let me ask you then:  Did you ever
11   use Qtask, you personally create a project as it
12   related to Jane Doe's case against Mr. Epstein?
13        A.  No.
14        Q.  To your knowledge did you direct anyone --
15   well, let me strike that. Did you direct anyone to
16   create a project on Qtask for the Jane Doe case
17   against Mr. Epstein?
18        A.  No.
19        Q.  Okay. Do you know have you ever have
20   looked at the Qtask system -- let me strike that.
21             From what you were able to access of
22   the Qtask system, did you ever go online on the
23   Qtask system to determine whether anyone else had
24   ever put the Jane Doe case against Mr. Epstein on
25   Qtask?

Page 49

1    A.  No.
2    Q.  And therefore as you sit here today, you
3  don't know whether someone else, whether it was
4  another attorney, whether it was an investigator or
5  a staff person ever put the Jane Doe versus Epstein
6  case on Qtask?
7    A.  Or whether it was you, right.
8    Q.  Right.  As to L.M., did you ever put
9  L.M.'s case or direct -- well, let me strike that.
10  Did you ever create a project for L.M. on Qtask?
11    A.  No.
12    Q.  Did you ever direct that someone else
13  create a project in Qtask for the L.M. case, L.M.
14  versus Jeffrey Epstein case?
15    A.  No.
16    Q.  Do you have any knowledge as to whether --
17  let me strike that.  Did you ever go on Qtask or
18  have you been able to determine whether anyone else
19  within the RRA firm put the L.M. versus Jeffrey
20  Epstein case or any aspects of it on Qtask?  Have
21  you looked or do you know?
22    A.  I don't know.
23    Q.  Has anyone told you that the L.M. case
24  against Jeffrey Epstein was on Qtask?
25    A.  No.

Page 50

1    Q.  Okay.  And so it's your testimony as far
2  as you know the L.M. versus Jeffrey Epstein case was
3  not ever on the Qtask system; is that correct?
4    A.  To the best of my recollection today.
5    Q.  When I describe both the Jane Doe versus
6  Jeffrey Epstein case and the L.M. versus Jeffrey
7  Epstein case being on Qtask, I don't necessarily
8  mean just the pleadings.  I mean any aspect of it,
9  not necessarily the pleadings or the fact that the
10  case was there but the factual circumstances
11  surrounding either case.
12    A.  I am not going to get into what my
13  work-product privilege, I am not going to allow you to
14  pierce that privilege.  I am not going to tell you what,
15  regarding those cases, was or was not on Qtask.
16    Q.  Well, let me ask a specific question.  So
17  if you want to claim some sort of privilege so the
18  record is clear.
19    A.  Sure.
20    Q.  With regard to, and let me go first to
21  the, finally to the E.W. case.  With regard to the
22  E.W. versus Jeffrey Epstein case or any aspect of
23  it, did you ever put E.W. into the Qtask system?
24    MR. SCAROLA:  Let us save you some time.
25  Why don't you ask whether the answers with

Page 51

1  regard to E.W. would be any different than the
2  answers given with respect to the other two
3  cases.
4    MR. CRITTON:  I would have rather have it
5  specific.  Oftentimes judge want to see that.
6  So I understand that if I want something broad
7  later on, I would be glad to accept that, but
8  thank you.  Do you remember my question, sir.
9    THE WITNESS:  No.
10  BY MR. CRITTON:
11    Q.  Okay.  With regard --
12    MR. SCAROLA:  For the record let me
13  observe I believe that your insistence upon
14  asking the individual questions that you have
15  now asked twice with regard to the other
16  claims, and your refusal to ask the blanket
17  question in the way in which I have suggested
18  is an annoyance and embarrassment and a
19  harassment of this witness which does nothing
20  but unnecessarily consume his time.
21  BY MR. CRITTON:
22    Q.  Mr. Edwards, with regard to E.W., did you
23  ever put any aspects of that case; that is, not just
24  the pleadings but any aspects of the E.W. versus
25  Jeffrey Epstein case onto Qtask?  Did you ever

Page 52

1  create a project?
2    MR. SCAROLA:  You may answer.
3    THE WITNESS:  There was never a project
4  entitled to my recollection E.W. versus Jeffrey
5  Epstein, L.M. versus Jeffrey Epstein, Jane Doe
6  versus Jeffrey Epstein.  And you're asking was
7  any information about those cases ever put onto
8  Qtask?
9    MR. CRITTON:  I didn't ask that question.
10    THE WITNESS:  Okay.
11    MR. CRITTON:  But I will in just a minute.
12    THE WITNESS:  And my answer is no, those
13  titles are not, I don't believe were ever on
14  Qtask.
15  BY MR. CRITTON:
16    Q.  Now, separate and apart from -- let me
17  strike that.  Let me just stay with E.W. with regard
18  to E.W.  Did anyone else at your direction put any
19  information regarding E.W. into the Qtask system, an
20  attorney, staff person, or secretary or another
21  lawyer?
22    A.  What do you mean by information?
23    Q.  Any information about E.W. into the Qtask
24  system?
25    A.  I don't remember.

13 (Pages 49 to 52)

Page 53

1    Q.  Okay.  So we don't -- you gave a broader
2  response to a question or that is you rephrased the
3  question.  So, let me ask it in a broader sense.
4        Was any information about the, your
5  three clients put into the Qtask, about your three
6  clients, Jane Doe, E.W., and L.M. versus Jeffrey
7  Epstein, or against Jeffrey Epstein, was any
8  information ever put into the Qtask system?  I don't
9  want to know the information, just whether you put
10 information into the Qtask system.
11   A.  Yes.
12   Q.  Did you do it yourself or did you do it in
13 conjunction with someone else?
14   A.  Explain to me what you mean by did I do it in
15 conjunction with somebody else.
16   Q.  Well, is, you may have typed in the
17 information yourself.
18   A.  I strike one key; somebody else strikes
19 another?
20   Q.  No, you may have input all the information
21 you want, whatever information you want to put into
22 Qtask, you may have made the decision to do that.
23 All right.  My question is someone else, a
24 secretary, or a paralegal may have helped you, an
25 investigator may have put some information in, at

Page 54

1  least at your direction regarding these three
2  individuals' claims against Mr. Epstein?
3    A.  Information that I put into Qtask is
4  information that was inputted into Qtask by me.
5    Q.  Did you ever direct anyone else to put any
6  additional information in with regard to those three
7  claims against Mr. Epstein?
8    A.  I don't believe so.
9    Q.  And what type of information did you put
10 into Qtask regarding the claims against Mr. Epstein?
11   MR. SCAROLA:  Read that back, please.
12   (The requested portion of the record was
13 read by the reporter.)
14   MR. SCAROLA:  We're going to object and
15 that I will instruct you not to answer on the
16 basis of both attorney-client and work-product
17 privileges.
18   MR. CRITTON:  I assume if Mr. Scarola
19 asserts an objection, you're adopting that and
20 you would assert it.  So, we don't have to do
21 that as A repetitious project here?
22   MR. SCAROLA:  Correct.
23   MR. CRITTON:  And that's correct.
24   MR. SCAROLA:  You can, you can assume that
25 my instructions to Mr. Edwards will be followed

Page 55

1  by Mr. Edwards unless we expressly tell you
2  otherwise.
3    MR. CRITTON:  All right.
4    MR. SCAROLA:  So, when I instruct him not
5  to answer, he will follow that instruction.
6    MR. CRITTON:  And you will do that,
7  correct?
8    THE WITNESS:  That's correct.
9  BY MR. CRITTON:
10   Q.  With regard to the, the generic, and if I
11 understood you correctly that there was generic or
12 there was information put in on one, two, or three
13 of your clients' claims again Mr. Epstein, did you
14 have or identify individuals who were invitees to
15 that Qtask file?
16   A.  I'm sorry, what's your question?
17   Q.  Did you designate individuals who could be
18 invitees to that file?
19   A.  Did I invite anybody into the project?
20   Q.  Sure.
21   A.  Yes.
22   Q.  Okay.  Who did you invite into the Qtask?
23 And let me ask you this first, Mr. Edwards:  With
24 regard to the claims against Mr. Epstein, the only
25 three -- well, and I probably need to step back.

Page 56

1        Would it, would it be a correct
2  statement during the time that you with RRA that the
3  only claims that you had against Mr. Epstein were
4  Jane Doe, E.W, and L.M.?
5    A.  The only clients I represented, yes.
6    Q.  And not necessarily in a lawsuit but those
7  are the only people that, that you and RRA
8  represented in any, in any existing or potential
9  claims against Mr. Epstein during the time you were
10 with RRA?
11   A.  I believe so.
12   Q.  By the way, could, could an outside
13 person, that is a person outside the firm access
14 Qtask as well?
15   A.  You can access it right now.
16   Q.  Can -- did you ever allow someone who was
17 not associated with RRA to access the Qtask file
18 relating to Mr. Epstein?
19   A.  No.
20   Q.  Okay.  Was there more than one file that
21 was created associated with the claims against
22 Mr. Epstein?
23   A.  I don't remember.
24   Q.  Did anyone to your knowledge -- well, let
25 me strike that.  Did anyone other than you create a

Page 57

1    Qtask file relating to claims again Mr. Epstein?
2        A.  To the best of my knowledge, no.  I take that
3    back.  I don't know who created the project, but I am
4    only aware of the project that I participated in related
5    to Mr. Epstein and his molestation of many children,
6    period.
7        Q.  And what did you call the project; that is
8    how it was identified on the Qtask system?
9        A.  I don't remember.
10       Q.  Do you recall when it was created?
11       A.  No.
12       Q.  Do you recall whether it was created
13   within a month of your coming to RRA?
14       A.  I don't remember.
15       Q.  Do you recall whether it was, I think you
16   said approximately the beginning of April of '09 you
17   came to RRA, correct?
18       A.  Correct.
19       Q.  All right.  And is it, just so the record
20   is clear it's, your testimony is you don't recall
21   whether you created the project in April, May, June,
22   July, August, September or October relating to the
23   claims against Mr. Epstein?
24       A.  I don't remember if I created the project,
25   period.

Page 58

1        Q.  Separate and apart from whether -- well,
2    let me strike that.  If you didn't create the
3    project, who would have?
4        A.  I don't know.
5        Q.  Well, do you remember -- let me strike
6    that.  Do you know whether with regard to the
7    project, and for purposes of at least this question,
8    let me just call it the Epstein project, are you
9    okay with that designation?
10       A.  Yes.
11       Q.  Okay.  With regard to the Epstein project
12   that was created in the Qtask system, if I am
13   understanding correctly, you don't remember whether
14   you created it or someone else did, correct?
15       A.  Correct.
16       Q.  Who would have had access to your files
17   that could have created the Epstein project other
18   than you?
19       A.  That question makes no sense.
20       Q.  Okay.
21           MR. SCAROLA:  And it also assumes facts
22       not in evidence and does not have a prior
23       proper predicate.
24           THE WITNESS:  That's why it doesn't make
25       sense.

Page 59

1    BY MR. CRITTON:
2        Q.  During the time that you were at RRA, did
3    a number of people have access to the Epstein files
4    either, either in a paper form or in an electronic
5    form?
6        A.  Either/or, yes.
7        Q.  And maybe I should get a definition of,
8    with regard to the Epstein files, you had three
9    cases, Jane Doe, E.W., and L.M., correct?
10           MR. SCAROLA:  Excuse me.  You used Epstein
11       file as a defined term earlier.  Are you now
12       using it generically?
13           MR. CRITTON:  I am going to use it
14       genically and when I come back to Qtask, I am
15       off Qtask for just a minute.  So that I have an
16       understanding of how your filing was kept.  And
17       I will come back to Qtask.  So, right now I am
18       using the Epstein files in a generic form.  Not
19       using Qtask.  Okay.
20           MR. SCAROLA:  Okay.
21   BY MR. CRITTON:
22       Q.  With regard to the Epstein files or
23   matters, I know you had -- we know you have three
24   cases that were filed that we have already
25   identified, Jane Doe?

Page 60

1        A.  That's good.
2        Q.  E.W. and L.M., correct?
3        A.  Correct.
4        Q.  Were all materials relating to Jeffrey
5    Epstein kept, kept under, at least for filing, for
6    filing purposes at RRA, were they kept under the
7    Epstein designation or, or some other designation?
8        A.  Yes.
9        Q.  Okay.  And what was the designation?
10       A.  I don't remember but it was either under
11   Epstein or some other designation.
12       Q.  And at RRA, were there both paper files or
13   paper information as well as electronic information
14   that was stored or kept regarding the Epstein files?
15       A.  Correct.
16       Q.  Was RRA supposed to be or at least
17   designed to be a paperless office?
18       A.  Yes.
19       Q.  And would every document that came that
20   was associated with the Epstein files, again in the
21   generic sense, was that scanned in or put into the
22   system in some fashion at RRA?
23       A.  To the best of my knowledge.
24           MR. CRITTON:  Just two minutes.
25

Page 61

BY MR. CRITTON:

Q.   With regard to the scanned system; that is, to store the electronic records, was that put in through the, through the Fortis program?

A.   Yes, I believe so.

Q.   And did you as well -- let me strike that. Prior to coming to RRA had you ever worked in a paperless file or in a paperless office?

A.   I don't understand.

Q.   Had you ever been working in an office prior to coming to RRA that was designed to be paperless?

A.   No, but as I mentioned earlier, I have worked with case management software that stores electronic versions of files, so therefore there is a paperless system.

Q.   Did you as well when you came to RRA with regard to the Epstein related matters or the content of your Epstein investigation and files, had you placed any of that on a prior, a previous paperless system or did you have the paper itself or both?

A.   Both.

Q.   And during the time that you operated at RRA, did you operate both with a, you individually with regard to the Epstein files, did you operate

Page 62

both in a paper and a paperless manner?

A.   No.

Q.   Did you operate only in a -- well, in what way did you operate?

A.   Paperless.

Q.   Okay.  So if, if as an example I sent you correspondence or answers to interrogatories or a response to a pleading and it came in the mail, would that document be scanned and then you would toss away the paper?

A.   I don't know.

Q.   So, you may well have had paper in addition to -- well, let me strike that.  Do you even know whether the document was scanned?

A.   If you're telling me you sent correspondence in the mail and I would later see that correspondence in my virtual mailbox, I make the logical assumption that it was scanned.  I never observed anything being scanned.

Q.   Okay.  And do you, if something came to you by mail, whether it was some form of discovery or request, and I will be in the state cases, where, which is not a paperless system and you don't file through Pacer, would you ever see the paper that actually came to your office or would you only see

Page 63

it electronically?

A.   For the most part I would see it electronically, but I can't say that I have never seen a piece of paper come in.

MR. CRITTON:  Okay.  Let me take a few minute break.

MR. SCAROLA:  Well, wait a second.  Do you want to break at this point?

THE WITNESS:  Not really.

MR. SCAROLA:  Okay.  We would like to keep going.

MR. CRITTON:  Can I just go to the rest room for two minutes?

MR. SCAROLA:  Yes.

THE VIDEOGRAPHER:  We're now off video record.  The time is 11:21 a.m.

(A brief recess was held.)

THE VIDEOGRAPHER:  We're now on video record.  The time is 11:28 a.m.

BY MR. CRITTON:

Q.   Couple, few more questions in Qtask.  Did you ever allow Mr. Rothstein, was he an invitee on the Epstein-related projects?

A.   I don't believe so.

Q.   With regard to the third electronic, the

Page 64

Fortis system where you, if I understand you correctly, you input various information into that Epstein regarding Epstein files; is that correct?

A.   No.

Q.   You never used those systems with regard to Epstein files?

A.   I used the systems.  I never input anything into the system.  I think it gets scanned in.

Q.   And could anyone in the firm access the Fortis system?

A.   I don't know.

Q.   Could you access other files that weren't necessarily yours within the Fortis system if you wanted to?

A.   I don't know.

Q.   Mr. Edwards, with regard to your employment with RRA, did you know any of the RRA partners prior to coming to that firm in approximately April of '09?

A.   What do you mean by know them?

Q.   Did you know them?

A.   Yes.

Q.   As either an acquaintance or a friend?

A.   Yes.

Q.   Did you have any friends at the RRA firm

Page 65

1  before joining them?
2      A.  People that I would consider to be my friend,
3  yes.
4      Q.  Who.
5      A.  Russell Adler.
6      Q.  And how did you know Mr. Adler?
7      A.  We worked out at the same gym for about,
8  approximately four or five years.
9      Q.  What were you doing, prior to your
10  association with RRA, what was your employment?
11     A.  What?
12     Q.  Were you working as a solo practitioner?
13  Were you working with another firm prior to coming
14  to RRA in April of 09?
15     A.  Solo practitioner.
16     Q.  How long had you been a solo practitioner?
17     A.  Approximately two years.
18     Q.  During the time you were a solo
19  practitioner, did you ever have any associates
20  working for you, solo imply that you're the only
21  one, is that true, or did you have associates that
22  actually worked for you?
23     A.  Various times I had clerks, law school clerks,
24  but that was it.
25     Q.  But no other lawyers?

Page 66

1      A.  Right.
2      Q.  Did you ever have an investigator work for
3  you?
4      A.  Yes.
5      Q.  Okay.  Do you know an individual by the
6  name of Fisten, F-i-s-t-e-n?
7      A.  I know an individual whose last name is
8  Fisten.
9      Q.  All right.  What's his first name, the one
10  you know?
11     A.  Mike.
12     Q.  Michael Fisten?
13     A.  Yes.
14     Q.  Mike Fisten ever do any work for you when
15  you worked as a solo practitioner at any time prior
16  to you joining RRA?
17     A.  No.
18     Q.  Did you know of Michael Fisten or Mike
19  Fisten prior to joining RRA?
20     A.  No.
21     Q.  With regard to the investigators that you
22  used prior to joining RRA, did you use, or were any
23  of those individuals ever employed by RRA during the
24  time you were there?
25     A.  No.

Page 67

1      Q.  How did it, how did it happen that you
2  came to be employed by RRA?
3      A.  I was offered a job.
4      Q.  And how did that come, how did that come
5  about?
6      A.  Talking with Russell Adler.
7      Q.  Had you ever had a case against Mr. Adler
8  or with Mr. Adler, either you were on the same side
9  or against?
10     A.  Yes.
11     Q.  On how many occasions?
12     A.  I can't recall.
13     Q.  Okay.  Did Mr. Adler approach you or did
14  you approach him?
15     A.  We worked out at the same gym.  It wasn't
16  about approaching somebody.
17     Q.  How did the topic come up?
18     A.  He works at this law firm Rothstein Rosenfeldt
19  Adler, and would talk about it in a positive way for
20  years before I joined the firm.
21     Q.  And how did it come up that you would be
22  interested in possibly working there; that is did he
23  say gee, Brad, you should come talk to me or did you
24  say I am interested in working for the firm?
25     A.  He would ask if I would be interested in

Page 68

1  joining the firm.
2      Q.  Okay.  And what happened then?  What
3  ultimately happened that you, that you went from
4  just having an interest to actually contemplating or
5  being offered a position?
6      A.  I didn't say I had an interest.
7      Q.  So, what happened?  How did you then end
8  up at RRA?
9      A.  Numerous conversations with Russell Adler and
10  him telling me about some of the other people there that
11  I believed to be good lawyers, respected, ethical
12  lawyers, and that this is a good place to work, great
13  comradery, you have a team, I know you handle big cases;
14  this will be something that will be good for you.  And
15  that was something I talked to him about seriously for
16  four months maybe before joining RRA before finally
17  agreeing to meet Scott Rothstein.
18     Q.  All right.  Had, did Mr. Adler ever
19  discuss with you parameters or potential income or
20  salary or whatever the compensation package would
21  be --
22     A.  Not specifically.
23     Q.  -- before you first met with
24  Mr. Rothstein?
25     A.  Not specifically.

Page 69

1    Q.  How many times did you meet with Scott
2  Rothstein prior to accepting a position with RRA?
3    A.  Once.
4    Q.  Where did the meeting take place?
5    A.  The restaurant BOVA.
6    Q.  Did you understand Mr. Rothstein had an
7  interest in BOVA?
8    A.  At the time?
9    Q.  Yes, sir.
10    A.  No.
11    Q.  Did you learn that during the time that
12  you worked for RRA?
13    A.  Yes.
14    Q.  Okay.  Who was present other than
15  Mr. Rothstein when you met with him at BOVA?
16    A.  Nobody.
17    Q.  Who had set up the meeting?
18    A.  Russell.
19    Q.  And had anything been discussed at least
20  as of that time with regard to what your opportunity
21  was or in terms of compensation?
22    A.  Specifically, no.
23    Q.  How long did the meeting with
24  Mr. Rothstein last?
25    A.  Ten minutes.

Page 70

1    Q.  Did you have lunch with him or you just
2  sat down and talked with him at the table at the
3  restaurant?
4    A.  Sat down and talked to him.
5    Q.  Had you submitted any kind of a resume to
6  Mr. Adler as to what your experience was?
7    A.  No.
8    Q.  So, you, at that time you are a solo
9  practitioner.  Mr. Adler calls you and says, or you
10  express an interest.  Mr. Adler says we have an
11  interest in talking to you, and you set up a meeting
12  with Mr. Rothstein.  Is that pretty much it?
13    A.  You're now making things up that is totally
14  inaccurate, and doesn't reflect what I have been telling
15  you at all.  I didn't express any interests.  I wasn't
16  looking for a job.  I wasn't seeking him out.  In fact,
17  that is the exact opposite of what I have just gone
18  through explaining to you about conversations at the gym
19  that ultimately lead to him convincing me this is a good
20  place to come into and me agreeing to this meeting with
21  Scott Rothstein.
22    Q.  Okay.  When you went to meet with Mr!
23  Rothstein did you have any interest or was this just
24  a throw-away meeting.  Maybe I misunderstood.  What
25  did you -- let me strike that.  What was the purpose

Page 71

1  of the meeting if you had no interest in considering
2  an opportunity with RRA?
3    A.  For the most part placate Russell Adler.
4    Q.  Did Mr. Adler know the type of cases you
5  had?
6    A.  Of course.
7    Q.  And was he aware as of that date you had
8  filed the three cases against Mr. Epstein?
9    A.  I don't believe so.
10    Q.  Had you -- is it your belief that the
11  three cases against -- well, let me strike that.  Do
12  you recall when the first meeting was or the only
13  meeting that you had with Mr. Rothstein prior to
14  joining the firm?
15    A.  It was prior to joining the firm.
16    Q.  All right.  When was that?
17    A.  I don't remember.
18    Q.  Was it within a month of your joining RRA,
19  two months, three months, six months?
20    A.  Definitely within six months of joining the
21  firm.  Definitely within three months of joining the
22  firm.  Within that three month period, I don't recall.
23    Q.  So, sometime between January and April of
24  '09, you would have met with Mr. Rothstein for ten
25  minutes?

Page 72

1    A.  I believe so.
2    Q.  Okay.  What did you talk about; that is,
3  what was the substance of the meeting?
4    A.  Russell says you would be an asset to the
5  firm.  I will treat you fairly.  How much do you
6  expect to make?  Okay.  I can't do that, but as soon as
7  you show your worth here, your salary is exponentially
8  increased because at this firm we operate under a system
9  of fairness.  That was the gist of the meeting.
10    Q.  Did he ask you how much you were making at
11  that time or how much you had made the preceding
12  year, '08?
13    A.  I believe so.
14    Q.  What did you tell him?
15    MR. SCAROLA:  Objection.  Instruct you not
16  to answer on the basis of economic privacy.
17  BY MR. CRITTON:
18    Q.  Did you tell him what you had made, total
19  compensation for the year 2008?
20    A.  I don't remember.
21    Q.  Well, if I, if I understood you correctly,
22  I thought he said is I can't meet that salary or
23  that level of compensation, so you must have told
24  him something.
25    A.  Yeah.  I answered his question, what did you

Page 73

```
 1   expect.
 2       Q.  What did you tell him that you expected?
 3       MR. SCAROLA:  Objection, economic privacy.
 4   BY MR. CRITTON:
 5       Q.  All I am interested now, not necessarily
 6   what you were earning but what you told him, i.e.,
 7   Mr. Rothstein that you wanted to get or expected to
 8   earn if you considered a job at RRA
 9       MR. SCAROLA:  Objection.  Economic
10       privacy, instruct you not to answer.  It's
11       neither relevant nor material nor reasonably
12       likely to lead to relevant material information
13       and invades the economic privacy of the
14       witness.
15       MR. CRITTON:  Is that form?
16   BY MR. CRITTON:
17       Q.  Mr. Edwards, you gave him a number, is
18   that correct?  Him meaning Mr. Rothstein.
19       A.  I believe so.
20       Q.  And was the number that you gave him more
21   than you had earned for the year 2008 or less?
22       MR. SCAROLA:  Same objection.
23       MR. CRITTON:  Or the same?
24       MR. SCAROLA:  Same objection, same
25       instruction.
```

Page 74

```
 1   BY MR. CRITTON:
 2       Q.  Did you tell him that you -- did you tell
 3   him that you wanted to make more money than you had
 4   in the proceeding year?
 5       MR. SCAROLA:  Same objections and
 6       instructions.
 7   BY MR. CRITTON:
 8       Q.  Did he tell you how much you would be paid
 9   if you came to work at RRA; that is, did he mention
10   a number:  This is what your salary would be if you
11   come and work here?
12       A.  I believe so.
13       Q.  And what number did he say to you?
14       MR. SCAROLA:  Objection and same
15       instruction.
16   BY MR. CRITTON:
17       Q.  Did he also tell you that you would get an
18   economic incentive; that is, at the, at sometime
19   during the course of the year based upon your
20   production?
21       A.  I would be compensated fairly.
22       Q.  And that was it?
23       A.  That was the gist.
24       Q.  Okay.  Did he talk about any benefits that
25   you would receive?
```

Page 75

```
 1       A.  Possibly.
 2       Q.  Do you recall what he said?
 3       A.  What do you mean by benefits?
 4       Q.  I mean would you get health insurance and
 5   those types of things as well?
 6       A.  I believe that was discussed.  I'm not sure.
 7   I can't tell you I got them but I don't know.
 8       Q.  Did you discuss any of your cases that you
 9   had with him?
10       A.  No.
11       Q.  Okay.  Did you sign an employment
12   agreement at any time with RRA?
13       A.  No.
14       Q.  After the -- let me go back.  Did you say
15   you did or did not discuss any of your current cases
16   with him?
17       A.  Did not.
18       Q.  Okay.  Were you aware, had you discussed
19   your cases -- I think you said you had discussed
20   your cases or Russell Adler had an idea of the type
21   of cases you had?
22       A.  Over the years Russ and I are friends; we
23   talked about cases.
24       Q.  Did you say you had discussed the Epstein
25   cases with him?  Him, meaning Adler.
```

Page 76

```
 1       A.  I, I don't believe I discussed the Epstein
 2   cases with Russell Adler until after I was employed at
 3   RRA
 4       Q.  Did you mention Mr. Epstein at your
 5   meeting with Mr. Rothstein?
 6       A.  No.
 7       Q.  Did you mention any of your three clients
 8   who were suing Mr. Epstein at the meeting with
 9   Mr. Rothstein?
10       A.  No.
11       Q.  With regard to the, did you, did you
12   discuss with him if you came to work with RRA that
13   the cases -- well, let me strike that.  Did he
14   mention that if, if you came and worked for the firm
15   that those cases would become the property of RRA?
16       A.  No.
17       Q.  Did you understand that to be true?
18       A.  I mean, I suppose so.
19       Q.  Okay.  Did --
20       A.  I understood that I was going to be an
21   employee of the firm, of course.
22       Q.  Well, did, did you, at the conclusion of
23   the meeting did you say, yes, I would like to work
24   here or how did you leave it?
25       A.  Think about it.
```

Page 77

1    Q.  And how long did you think about it?
2    A.  I don't remember.
3    Q.  Did you, and who did you contact?  Well,
4  let me strike that.  At some point did you make a
5  decision --
6    A.  Yes.
7    Q.  -- to go work for RRA, correct?
8    A.  Correct.
9    Q.  Did Mr. Rothstein at the initial meeting
10  tell you whether you would be a partner?
11    A.  No.
12    Q.  Did he describe that you would be at least
13  to the public at large you would be described as a
14  partner?
15    A.  No.
16    Q.  Did you understand who the partners
17  were -- well, let me trick that.  Is RRA, was RRA a
18  PA?
19    A.  I don't know.
20    Q.  Did you ever find out during, up through
21  today's date do you know whether RRA was a PA or an
22  LLC or an LLP?
23    A.  No.
24    Q.  Did you ever go online to look at who the
25  officers and directors were or had members if it was

Page 78

1  an LLP?
2    A.  During the initial, initial meeting with Scott
3  Rothstein, he told me there are only two equity partners
4  of this law firm, and it will always be that way; myself
5  and Stuart Rosenfeldt, period.
6    Q.  And did he say that they each own
7  50 percent, or did he say, they were just partners?
8    A.  Did not say.
9    Q.  Prior to your -- let me strike that.  I
10  think as you said at some point you made a decision
11  to join RRA?
12    A.  Right.
13    Q.  And who did you convey that to?
14    A.  Russell.
15    Q.  And what happened thereafter?  That is,
16  how did you go from then being a solo practitioner
17  into RRA?  How did you integrate yourself?  What was
18  the timing and what did you do?
19    A.  At some point in time I was no longer working
20  in my Hollywood office and was working at RRA on Las
21  Olas.  So, physically I showed up to work at a different
22  location.
23    Q.  And did someone -- well, let me strike
24  that.  From the time that you announced that you
25  would go, you told Mr. Adler up until the time you

Page 79

1  ended up at RRA, how much timed passed?
2    A.  I don't know.
3    Q.  Prior to starting at RRA, did you have any
4  further conversations with Mr. Rothstein; that is,
5  up until the day that you showed up at that office?
6    A.  No.
7    Q.  And in terms of the cases; that is, the
8  cases with L.M., with L.M., Jane Doe and E.W. those
9  are cases that you had signed up when you were a
10  sole practitioner; is that correct?
11    A.  Correct.
12    Q.  And with each of those cases there was a,
13  there is also another lawyer that was involved --
14  well, let me strike that.  In one or more of those
15  cases is Mr. Howell involved, or was he at the time
16  you were a solo practitioner?
17    A.  What do you mean by involved?
18    Q.  Involved, was he a referring lawyer?
19    A.  Yes.
20    Q.  Was he the referring lawyer on all three
21  of those cases?
22    A.  He was at least the referring lawyer directly
23  on one.
24    Q.  Which one?  I'm sorry.  I didn't mean to
25  interrupt you.

Page 80

1    A.  I'm finished.
2    Q.  Which case was he the referring lawyer,
3  Mr. Howell?
4    A.  E.W.
5    Q.  And he may be the referring lawyer on Jane
6  Doe, and L.M., you just don't know as you sit here,
7  or he is?
8    A.  He referred E.W.'s case.
9    Q.  And the other two cases is he is shown as
10  the referring lawyer?
11    A.  Yes.
12    Q.  There is also a person named Cassell who I
13  think is an attorney from Utah?
14    A.  Okay.
15    Q.  Do you recognize the name?
16    A.  Yes.
17    Q.  Okay.  And what's his first name?
18    A.  Paul.
19    Q.  All right.  Is he in any way a referring
20  lawyer, considered a referring lawyer with regard to
21  any of the three cases against Mr. Epstein?
22    A.  No.
23    Q.  What's his role?
24    A.  Handles certain appellate issues.
25    Q.  Okay.  Is he, is he involved in as part

Page 81

1    of, as a potential recipient of any contingency fee
2    or is he paid on an hourly basis, either when you
3    were a sole practitioner during the RRA stages or at
4    the current time?
5        A.   Contingency.
6        Q.   Does he get part, at least as it was set
7    up as a sole practitioner was Mr. Cassell also on
8    the contract with each of the three individuals?
9        A.   I don't believe so.
10       Q.   You don't -- he is not on any of the
11   contracts, Mr. Cassell?
12       A.   There is a contract that he is on but your
13   question is when the cases were first signed up, was he
14   on the initial contract.  And I believe the answer to
15   that is no.
16       Q.   Prior to the time or during the time that
17   you were in sole practice before you went to RRA was
18   Mr. Cassell ever on any of the contracts with the
19   three Plaintiffs?
20       A.   Yes.
21       Q.   Okay.  When you moved to RRA, was a new
22   fee agreement signed with each of the individuals,
23   each of the three Plaintiffs?
24       A.   No.
25       Q.   Was there some form of an assignment?

Page 82

1        A.   Well, not to my knowledge.  I don't want to
2    say no, but I don't know of any fee agreement that was
3    signed with the client.
4        Q.   As a -- from the time that the original --
5    let me strike that.  If I understood you correctly
6    is as an example E.W. was your first case?
7        A.   First client.
8        Q.   First client, right.  Mr. Howell would
9    have referred the case, so he would have shown up as
10   a referring order.  And at some point Mr. Cassell
11   also came on the contractor or a contract; is that
12   correct?
13       A.   A contract, yes.
14       Q.   So, there was at least two contracts with
15   regard to E.W.?
16       A.   That I remember.
17       Q.   And with regard to E.W., Jane Doe, and
18   L.M., you don't recall any new contract being signed
19   between those individuals and RRA; is that correct?
20       A.   That is correct.
21       Q.   And with regard to the, whatever the
22   contingency fee was in each of those three
23   contracts, was that to be split?  When you went to
24   RRA, how was it to be determined what RRA would
25   receive versus what you would receive or Mr. Cassell

Page 83

1    or Mr. Howell, assuming there had been some
2    resolution?
3        A.   RRA would be standing in my shoes.
4        Q.   And if I understand it correctly, there
5    was never an assignment of your contracts; that is,
6    as a solo practitioner to RRA; is that correct?
7        A.   Correct.
8        Q.   Okay.  And it was your intent just
9    whatever the contract said when you went from solo
10   practitioner to RRA, if those cases had resolved
11   during that time period, RRA, you would have paid
12   RRA that portion to which you were been entitled and
13   Howell and a Cassell would have gotten their
14   percentage?
15       A.   Correct.
16       Q.   And with regard to, with the new firm, the
17   Farmer, Jaffe firm, where those new fee agreements
18   have been signed with your three clients?
19       A.   Yes.
20       Q.   And are Mr. Cassell and Mr. Howell still
21   on those contracts?
22       A.   Yes.
23       Q.   Has the receiver made a claim against the
24   proceeds of these three cases; that is, he filed,
25   Mr. Seton on behalf of or as trustee, has he filed a

Page 84

1    lien again those cases?
2        A.   No.
3        Q.   Has he sent you any correspondence
4    indicating that he intends to assert a lien against,
5    for attorney fees and/or costs that were incurred
6    during the time those cases were at RRA?
7        A.   Not specifically related to those cases, but
8    in general, that concept is something that has been
9    communicated by a receiver or a trustee to us at Farmer
10   Jaffe, Weissing.
11       Q.   Have you at any time; that is, have you
12   acknowledged, has anyone at Farmer, Jaffe
13   acknowledged their responsibility to repay monies to
14   RRA?
15       A.   I don't understand the question.
16       Q.   If the case is settled, does Farmer, Jaffe
17   intend to repay the receiver a portion of the fees
18   at costs?
19       A.   That issue has not been resolved.
20       Q.   With regard to, with regard to the
21   third-party --
22            (Interruption at the door.)
23   BY MR. CRITTON:
24       Q.   Other than the attorneys is there -- with
25   regard to the, other than the attorneys, is there

Page 85

1    anyone else other than, on any of these three cases;
2    that is, potentially RRA, potentially your new firm,
3    Mr. Cassell, Mr. Howell and the Plaintiff, does
4    anyone else stand to benefit from a recovery in any
5    of those cases?
6        A.  No.
7        Q.  Has anyone, has any interest in any of the
8    three cases been assigned to a, to a third party
9    other than a law firm or a lawyer or a law firm;
10   that is, to an outside service?
11       A.  No.
12       Q.  Okay.  Have any of the potential
13   settlements -- I'm sorry.  Have any of the potential
14   proceeds from any settlement or verdict been
15   assigned or sold to anyone to your knowledge?
16       A.  No.
17       Q.  Has E.W., Jane Doe, or L.M. sold,
18   assigned, exchanged for consideration, money, or
19   promises of money, any portion of their potential
20   settlements?
21       A.  No.
22       Q.  Or recoveries?
23       A.  No.
24       Q.  If I understood you correctly,
25   Mr. Edwards --

Page 86

1        MR. SCAROLA:  Let me interrupt for just a
2    moment.  I don't know whether the circumstance
3    applies but I want to be sure, does the scope
4    of your question include a letter of protection
5    to a health care provider?
6        MR. CRITTON:  No.
7        MR. SCAROLA:  I don't know whether that
8    has occurred in any of these cases, but I
9    assume that's not what you're looking for?
10       MR. CRITTON:  I wasn't, but no, I'm
11   looking for -- I think it would not be applied
12   to any of the three.
13           You understand I wasn't talking about
14       health care providers.  I am talking about
15       some independent person or entity that may
16       have purchased some interest or have been
17       assigned some interest in any of those
18       three lawsuits.  Do you understand that?
19       THE WITNESS:  I think I understood your
20       question, and my answer was responsive and I
21       was not thinking about letters of protection at
22       the time that I gave my answer.
23   BY MR. CRITTON:
24       Q.  With -- if I understood you correctly,
25   E.W. was your first case?

Page 87

1        A.  You understood me correctly.
2        Q.  All right.  And when did E.W. retain your
3    services, please?
4        A.  And by first case, just to clarify, she was my
5    first client --
6        Q.  I will rephrase it.
7        A.  -- related to the matter that we're all
8    familiar with that relates to things that happened to
9    E.W. when she was young.
10       Q.  Let me rephrase the question this way:  If
11   I understand your testimony is E.W., and I'm
12   interested in Epstein cases; I am not interested in
13   other portions of your practice.  You understand
14   that?
15       A.  I do.  And I think that you understand that
16   this case, E.W.'s case and L.M. case did not begin as a
17   case against Jeffrey Epstein.  You know that and I know
18   that, and that's why it's difficult for me to ask,
19   answer these questions related to these clients because
20   this began as a case against the United States
21   Attorney's Office.
22       Q.  All right.  With regard to the, at least
23   your first representation of any of your three
24   clients that relate to Mr. Epstein in some fashion,
25   your first client was E.W; is that correct?

Page 88

1        A.  That is correct.
2        Q.  Do you recall when you first -- well, let
3    me strike that.  She was referred to you by
4    Mr. Howell?
5        A.  That is correct.
6        Q.  Okay.  And how did Mr. Howell know you?
7        A.  I have known him for a long time.
8        Q.  Law school?
9        A.  No.  I have known him since, I'm from
10   Jacksonville Beach.  He's from Jacksonville.  I have
11   known him when I was probably ten years old.
12       Q.  Okay.  Has Mr. Howell, prior to E.W., had
13   he ever referred to you any other client?
14       A.  Yes.
15       Q.  Did it involve some sort of a sexual
16   assault or battery?
17       A.  Yes.
18       Q.  How many clients prior to E.W. had
19   Mr. Howell ever referred you?
20       A.  I don't know.
21       Q.  More than one?
22       A.  Yes.
23       Q.  When E.W. was referred to you, what was
24   your understanding as to the nature of the
25   representation, what would it be?

Page 89

1     A.  I don't understand.
2     Q.  Why did E.W. come, why did she hire you in
3  the first place?  What was the purpose?
4     A.  This is going to get into attorney-client
5  privileged information as to why she hired me which
6  would incorporate the things that she told me that
7  related to my representation, therefore, I am invoking
8  the privilege and not answering.
9     Q.  With regard to E.W. you filed a case --
10  well, let me ask you this:  Do you know how E.W came
11  to contact Mr. Howell?  Did he ever relate that to
12  you?
13        MR. SCAROLA:  If it's in information that
14     you obtained from your client, I instruct you
15     not to answer.  If it's information that you
16     obtained from Mr. Howell, I also instruct you
17     not to answer.  Both instructions are on the
18     basis of attorney-client and work-product
19     privileges.
20        THE WITNESS:  Attorney-client and
21     work-product privilege.
22  BY MR. CRITTON:
23     Q.  Did you, did Mr. Howell -- and I don't
24  want to know the information, at least right now --
25  did Mr. Howell give you any information about E.W.

Page 90

1  prior to her coming to see you or your seeing her?
2     A.  Yes.
3     Q.  Okay.  And did E.W. for the first, on the
4  first occasion come to your office or did you talk
5  to her by phone or did you go to her place?
6     A.  First time I talked to E.W?
7     Q.  Yes, sir.
8     A.  Was over the telephone.
9     Q.  All right.  And how long, how much time
10  transpired before E.W. retained your services; that
11  is, how many conversations did you have with her
12  before she ultimately retained your services?
13     A.  One conversation over the telephone and then
14  the next meeting was in person at my office.  That
15  meeting culminated with her retaining my services.
16     Q.  And the initial conversation you had with
17  her, what did she relate to you?
18     A.  That's attorney-client privilege information
19  that I am not going to divulge.
20     Q.  During the time that you have been
21  involved in this case on behalf of E.W., has
22  Mr. Howell participated in the case; that is, has he
23  done work on the case?
24     A.  Yes.
25     Q.  What kind of -- what has he done?

Page 91

1        MR. SCAROLA:  Objection, attorney-client
2     privilege and work-product.  Instruct you not
3     to answer.
4  BY MR. CRITTON:
5     Q.  Your second, your next client was whom
6  relating to Mr. Epstein or to the United States
7  Government?
8     A.  I don't remember.
9     Q.  You ultimately filed a case styled Jane
10  Doe 1 and 2 were petitioners versus the United
11  States of America in July of '08, correct?
12     A.  That's correct.
13     Q.  Okay.  Who was Jane Doe 1?
14     A.  E.W.
15     Q.  Who was Jane Doe 2?
16     A.  L.M.
17     Q.  At the time that suit was filed, were you
18  representing Jane Doe-L.M., I'm sorry, Jane Doe?
19     A.  I believe so, but I'm not sure.
20     Q.  In terms of the work that you did for,
21  that you have done for all three of the individuals
22  when you were a solo practitioner, did you keep
23  track of the time; that is, did you keep time
24  records?
25     A.  What's your question?

Page 92

1     Q.  During the time that you were a solo
2  practitioner working on E.W, Jane Doe, whichever of
3  the three cases that you had, did you keep time
4  records?
5     A.  Some.
6     Q.  Do you keep time records on contingency
7  cases generally, or did you during that time period?
8     A.  It's my intent to.
9     Q.  Okay.  Same would be true with, when you
10  were at RRA, did they have a time program?
11     A.  They did have a time program.
12     Q.  Did you input your time that you spent on
13  the Epstein related cases?
14     A.  That was a requirement of the firm.
15     Q.  Okay.  So, you would have been put down
16  whatever time you spent, whether it was a
17  contingency fee case or an hourly case; is that
18  correct?
19     A.  For the most part; that's correct.
20     Q.  During the time that Mr. Howell has been
21  associated with the case, does he provide you with
22  time records as to the work or the amount of work
23  that he has done on the case?
24     A.  No.
25     Q.  Okay.  Does he keep track of his time that

Page 93

1   he has spent on each of the cases?
2        A.  I do not know.
3        Q.  Did you -- has he prepared any pleadings
4   or documents associated with the cases?
5           MR. SCAROLA:  You can answer that
6   question.
7           THE WITNESS:  Define prepared.
8   BY MR. SCAROLA:
9        Q.  All right.  Prepared, prepared, start,
10  first of all, started from scratch; that is, has he
11  prepared any of the pleadings or papers that have
12  been filed in any of the three cases starting from
13  scratch that he would have been -- not because you
14  said this but he started with the complaint and you
15  may have changed it, but he started the preparation
16  of the document?
17       A.  Your question is has he started the
18  preparation of a document now, right?
19       Q.  Any document, any paper that's been filed
20  in the cases or I would say passed back and forth
21  between lawyers in any of the three cases?
22       A.  Has he had edited revised, I mean what --
23       Q.  Right now I am just asking did he start
24  the document such as a complaint or a similar type
25  document?

Page 94

1        A.  That was filed in the case?
2        Q.  Correct.
3        A.  No.
4        Q.  Okay.  Has he worked on documents, whether
5   it's editing, adding, deleting from pleadings that
6   you, pleadings or papers that you have prepared?
7        A.  Yes.  Bob, can you hand me that water?
8        Q.  Yes.
9        A.  Thanks.  Appreciate it.
10       Q.  You're welcome.  Has he continued, did he
11  continued to be involved not only when you were a
12  solo practitioner but during the time that you were
13  with RRA with regard to editing or working on the
14  cases?
15       A.  To an extent.
16       Q.  Okay.  Do you, how often on the cases have
17  you consulted with Mr. Howell?  By that I mean
18  before a decision is made as to how you want to do
19  discovery or proceed with the filing of the pleading
20  or how you're going to respond, does Mr. Howell, do
21  you consult with Mr. Howell during the time you were
22  both solo practicer and were at RRA?
23       A.  Is your question asking for the answer to be
24  in a percentage?  How often do I consult?  I am just not
25  sure how to quantify.

Page 95

1        Q.  Sure.  I am okay with that.  How often do
2   you consult with Mr. Howell with regard to those
3   three cases prior to the time that you started with
4   your current Farmer, Jaffe association?
5        A.  It is an impossible question for me to answer
6   accurately with a percentage that I have spoken with
7   Mr. Howell about any particular document or anything.
8        Q.  As to pleadings, do you discuss, do you
9   send it to him for his review, editing, before you
10  file a pleading?
11       A.  Typically no.
12       Q.  How often do you consult or have you
13  consulted with Mr. Howell during the time you were
14  with RRA?
15       A.  What type of an answer do you want in terms of
16  how often have I?
17       Q.  Do you do it once a day?
18       A.  Have I ever?  I have.
19       Q.  Is it a pretty common practice that when
20  you're going to file or do something that you would
21  contact Mr. Howell?
22       A.  Not at all.
23       Q.  So, do you --
24       A.  Not at all common I mean.
25       Q.  So, during the course of the month, say

Page 96

1   during the time that you were at RRA, how often
2   would you consult with Mr. Howell regarding the
3   cases?  And I recognize every day or every week
4   might be different.  Would you speak with him like
5   once a month, or two or three times a month, or
6   generally once every couple of months?
7        A.  Depending on what was going on in the cases at
8   the time, at sometimes more than others.
9        Q.  How did L.M. come to be a client of yours?
10       A.  She called me.
11       Q.  And how did she get your name?
12          MR. SCAROLA:  To the extent that your
13  response to that question would require that
14  you reveal either work-product or
15  attorney-client privileged information, I
16  instruct you not to answer.
17          THE WITNESS:  I simply don't know.
18  BY MR. CRITTON:
19       Q.  Did Ms. L.M. hire you in the or -- I'm
20  going to strike that.
21          How many conversations did you have
22  with and/or meetings did you have with Ms. L.M.
23  before you hired her, or before she hired you.  I'm
24  sorry.
25       A.  I don't remember.

Page 97

1    Q.  Did she ever come and meet you at your
2  office?
3    A.  From the beginning of time until today?
4    Q.  No.  Back at the time prior to retaining
5  your services.
6    A.  I don't remember.
7    Q.  Did you ever meet her at her residence or
8  place of work?  Let me ask you this:  Have you ever
9  met her at her place of business or a place of
10  business?
11    A.  No.
12    Q.  Have you ever met her at her home, whether
13  it's an apartment or home, whatever?
14    A.  Now, you're asking from the beginning of time
15  until now?
16    Q.  No.  Up until the time she hired you, did
17  you ever meet with her?
18    A.  Okay.
19    Q.  At her home or apartment.
20    A.  To the best of my recollection, no.
21    Q.  Did you -- did she sign, to the best of
22  your recollection did she sign a fee agreement?
23  Well, let me strike that.  There is a, there is a
24  written fee agreement between L.M. and you and
25  then --

Page 98

1    A.  Correct.
2    Q.  -- her originally?
3    A.  Correct.
4    Q.  Did you ever meet her prior to her signing
5  that fee agreement?
6    A.  Yes.
7    Q.  And do you remember where that meeting
8  took place?
9    A.  Generally, yes.
10    Q.  Okay.  Where?
11    A.  A park.
12    Q.  And what town?
13    A.  I don't know.
14    Q.  You don't know whether it was in Broward
15  County or Palm Beach County?
16    A.  I do know.
17    Q.  Which county?
18    A.  Palm Beach County.
19    Q.  Was that arranged by her to meet her
20  there?
21    A.  Yes.
22    Q.  And what, for what purpose did Ms. L.M.
23  originally hire you?
24        MR. SCAROLA:  I am going to object.  That
25    calls for attorney-client privilege

Page 99

1  information.
2  BY MR. CRITTON:
3    Q.  When you met Ms. L.M. at the park was
4  anyone else present?
5    A.  Yes.
6    Q.  Who?
7    A.  I don't know.
8    Q.  Male or female?
9    A.  I presume both.  It's a park.
10    Q.  No, no, no.  In the meeting that you had
11  with her -- my guess is there were probably a lot of
12  people in the park?
13    A.  Correct.
14    Q.  In the meeting that you had with Ms.L.M.
15  was anyone else present?
16    A.  For the conversations between myself and
17  Ms. L.M., no.
18    Q.  When you first met with E.W. was anyone
19  present for the conversations between that you and
20  Ms. E.W.?
21    A.  No.
22    Q.  I think you told me at the time that the
23  complaint was filed or at the time that the Jane Doe
24  1 and 2 sued the United States Government which was
25  in early July, it was July 8th of '08, you don't

Page 100

1  recall whether you were representing Jane Doe at
2  that time?
3    A.  I believe I was but I do not recall for sure.
4    Q.  At the time do you know whether, at the
5  time that you represented Jane Doe 1, do you know
6  whether her name, whether she was considered a
7  victim by the United States Attorney's Office?
8    A.  Ask your question again.
9    Q.  All right.  At the time you began
10  representing E.W. or at any time prior to the filing
11  of the lawsuit against the United States Government
12  in July of '08, did you learn whether she was listed
13  as a, or deemed to be a victim by the United States
14  Attorney's Office?
15        MR. SCAROLA:  If that is information that
16    you obtained in the course of the performance
17    of your responsibilities in representation of
18    any client, I would instruct you not to answer.
19        If that information was obtained
20        through some public source independent of
21        the work that you performed as counsel,
22        then you may respond.
23        THE WITNESS:  I cannot respond.
24  BY MR. CRITTON:
25    Q.  With regard to the question, I am not

25 (Pages 97 to 100)

Page 101

1    interested in what you learned from E.W.  All right.
2    Did you learn from either any correspondence or a
3    telephone call with any third party that whether
4    again prior to the -- let me start again.
5              Prior to the filing of the lawsuit
6    against Jane Doe 1 and Jane Doe 2 against the United
7    States Government, did you learn from any source,
8    maybe a document, maybe a telephone call or a
9    conversation that you had with a third party
10   separate from your client, that E.W. was a victim or
11   was deemed to be a victim by the United States
12   Government or the United States Attorney's Office?
13             MR. SCAROLA:  Same objection and
14        instruction.
15   BY MR. CRITTON:
16        Q.  Same question with regard to L.M. Miller.
17             MR. SCAROLA:  Same objection and
18        instruction.
19   BY MR. CRITTON:
20        Q.  And same question with regard to Jane Doe.
21             MR. SCAROLA:  Same objection and
22        instruction.
23   BY MR. CRITTON:
24        Q.  Prior to your filing the lawsuit with
25   United States Government, did you ever any

Page 102

1    conversations with the United States Attorney's
2    Office --
3              MR. SCAROLA:  I assume --
4    BY MR. CRITTON:
5         Q.  -- regarding, regarding, regarding the
6    subject of the lawsuit or Jeffrey Epstein?
7              MR. SCAROLA:  Same objection and
8         instruction.
9              MR. CRITTON:  These are third parties;
10        where is the work product?
11             MR. SCAROLA:  Work product has to do with
12        anything that was done in connection with the
13        representation of these three clients.  If he
14        had such conversations independent of his
15        representation of those clients, then he can
16        respond to the question.
17   BY MR. CRITTON:
18        Q.  Well, let me ask you a broader question.
19   After you filed the lawsuit against the United
20   States of America, were you aware that Marie
21   Villafana or the United States Attorney's Office
22   represented the USA, correct?
23        A.  Yes.
24        Q.  All right.  Did you ever speak with Marie
25   Villafana during, during the pendency of that

Page 103

1    litigation which is still pending today?
2              MR. SCAROLA:  And I assume that question
3    is qualified by inquiring as to whether such a
4    conversation occurred with regard to any of the
5    three individuals who he is representing claims
6    against Mr. Epstein or the U.S. Attorney's
7    Office, correct?
8              MR. CRITTON:  Say that again?
9              MR. SCAROLA:  Yes, sir.  Are you asking
10   whether such conversations occurred that were
11   relevant to his prosecution of the claims on
12   behalf of his three clients?
13             MR. CRITTON:  Sure.
14             MR. SCAROLA:  Then, then the instruction
15   remains the same.  The objection remains the
16   same.
17   BY MR. SCAROLA:
18        Q.  So, even if, do you -- even if you talked
19   about it with Mrs. Villafana, even if your client
20   Mr. Edwards spoke with Mrs. Villafana about a
21   scheduling issue, it's your position that that is
22   what, work-product?
23             MR. SCAROLA:  That's correct.  We are not
24   going to discuss anything that Mr. Edwards did
25   in the course of the prosecution of his claims

Page 104

1    on behalf of his clients.
2              MR. CRITTON:  So, any question that I ask
3    you with regard to conversations that
4    Mr. Edwards had with the U.S.A.O.'S office,
5    whether it was Mrs. Villafana or anyone else
6    from the time, with regard to the Jane Doe 1
7    and Jane Doe 2 versus U.S.A. case, you would
8    instruct Mr. Edwards not to answer those
9    questions?
10             MR. SCAROLA:  That is correct.
11             MR. CRITTON:  So if I --
12             MR. SCAROLA:  Obviously pending --
13             MR. CRITTON:  -- let me just finish.
14             MR. SCAROLA:  Obviously pending, obviously
15   pending some instructions or guidance from the
16   court with regard to how the court will
17   interpret the work-product privilege in this
18   context.  I might also add that it is our
19   position that any such inquiry exerts a
20   chilling effect upon the work that Mr. Edwards
21   continues to do on behalf of his three clients.
22             It is intended as a means to obtain
23        discovery that would not otherwise be
24        available in those pending claims.  It is
25        intended to annoy, harass, and embarrass

26 (Pages 101 to 104)

Page 105

1    Mr. Epstein in a lawsuit that has
2    absolutely no foundation whatsoever, and
3    was filed for purposes other than a
4    legitimate claim against Mr. Edwards based
5    upon any good faith belief that he engaged
6    in any form of improper or tortious
7    conduct and --
8        MR. CRITTON:  Done?
9        MR. SCAROLA:  -- those inquires are not
10   reasonably calculated to lead to the discovery
11   of admissible and relevant evidence.  So, for
12   all of those reasons, we object.
13       MR. CRITTON:  And let me just put on the
14   record very briefly so at least at this point
15   in time this is all information that clearly is
16   relevant to the complaint as it's alleged.
17       I have received a, my client and I
18   have both received a letter from you
19   asserting a motion for fees and costs and
20   certain sanctions under 57.105, by not
21   allowing us to ask what are clearly, I
22   believe, relevant material, basic
23   discoverable information are preventing
24   our ability to get all of the facts here
25   such that we can make a reasonable

Page 106

1    decision as to whether or not the 57.105
2    motion and letter which you sent to me was
3    filed in good faith or has any basis in
4    it.  We're unable then to, we'll be in
5    large part unable to evaluate our
6    position.
7        MR. SCAROLA:  And our position is that
8    those are decisions that should well have been
9    made, could have been made, and should have
10   been made before you ever filed the claim.
11       MR. CRITTON:  All right.  Are we done?
12       MR. SCAROLA:  Yes.
13       MR. CRITTON:  All right.
14       MR. SCAROLA:  At least for now.
15       MR. CRITTON:  I'm shocked.
16   BY MR. CRITTON:
17       Q.  With regard to, with regard to the claim
18   Jane Doe 1 and Jane Doe 2 that is currently
19   pending -- or let me strike that.  Jane Doe 2 --
20   Jane Doe 1 and Jane Doe 2 against the U.S.A. that
21   was filed in July of '08, that case is still
22   pending.
23       A.  Okay.
24       Q.  Is that correct?
25       A.  That was a question, yes.

Page 107

1        Q.  All right.  And have any, have you had any
2    discussions -- well, let me strike that.  What's the
3    status of that case?
4        A.  It's still pending.
5        Q.  Other than still pending is a, is there,
6    are there any outstanding motions?
7        A.  No.
8        Q.  I want to ask, to get back to one question
9    with regard to both the Qtask and with regard to the
10   Fortis system -- well, let me strike that.
11       With regard to the hard copies of the
12   files that you had that is any paper files that you
13   had associated with the Epstein files, where would
14   they have been kept at RRA?
15       A.  In a filing cabinet.
16       Q.  And were the filing cabinets in your
17   office or were they out in the general hallways?
18       A.  They were filing cabinets in my office and in
19   other locations in the office.
20       Q.  Okay.  With regard to the Epstein related
21   matters, where did you keep those if they were --
22   and by that that is the hard copies, did you keep
23   those solely in your office or would they have been
24   both in your office and in other places throughout
25   RRA?

Page 108

1        A.  There were times when they were in my office
2    and there were times when they were kept in filing
3    cabinets elsewhere on one of the RRA floors.  I believe
4    there were five or six floors of RRA
5        Q.  Okay.  Was there a central storage, say if
6    there were a number of files in this instance
7    relating to Mr. Epstein, could you send those to
8    basically central storage and if you wanted someone
9    could go down and pick them up and bring them up to
10   you?
11       A.  I don't know.
12       Q.  Well, if you wanted to access something
13   that was in an Epstein file, and it wasn't in your
14   office, how did you access it; that is, a hard copy?
15       A.  You're speaking specifically about
16   Mr. Epstein's cases or hypothetically with any cases?
17       Q.  No, Mr. Epstein's cases?
18       A.  As I sit here right now, I can't say with
19   absolute certainty that I ever had a piece of the hard
20   copy file requested for it to be brought to me.
21       Q.  Well, with regard to Mr. Epstein's files,
22   though, if they were in a location, would it be a
23   correct statement that those were not, wasn't a
24   locked location or a secure location within the
25   contents of within the confines of the firm?

Page 109

1    A.  I don't know that that's a correct statement.
2    Q.  You don't know one way or the other?
3    A.  The law firm was constantly expanding and
4  constantly under construction.  For the most part in the
5  beginning the cases were kept in a, in a filing cabinet
6  in my office and later were kept in a filing cabinet, I
7  believe, in a locked storage location in another area of
8  the office.
9    Q.  And did any attorney have access to that
10  storage area or do you know?
11    A.  I believe any attorney could have had access.
12    Q.  And if the attorney could have access, you
13  wouldn't necessarily know about it, true?
14    A.  Correct.
15    Q.  In the trustee's filing that they made in
16  response to my motion to preserve evidence, they
17  indicated that 13 boxes relating to Jeffrey Epstein
18  had been removed by the FBI or the government when
19  they came into the RRA offices.  Do you remember
20  seeing that pleading?
21    A.  No.
22    Q.  Okay.  Are you, were there, in fact, 13
23  boxes of material or at least 13 banker's boxes of
24  material that related to matters directed to,
25  whether, whatever the content related to Mr. Epstein

Page 110

1  that you were aware of; that is, hard copies?
2    A.  I don't know.
3    Q.  Okay.  Could have been more, could have
4  been less; you just don't know?
5    A.  Correct.
6    Q.  If I understood your testimony,
7  Mr. Rothstein, Mr. Rosenfeldt, any other attorney or
8  investigator could have accessed those files
9  depending or where they were within the firm, true?
10    A.  I am not sure exactly who could have accessed
11  it.  You asked me if the attorneys could and the
12  attorneys had swipe cards for various locked areas.
13  Each attorney I believe had access to any area where
14  those files were located.  I believe so.
15    Q.  Okay.  Well, during the time you were
16  there did an individual by the name of Ken Jenne
17  work there?
18    A.  Yes.
19    Q.  Okay.  Did an individual by the name of
20  Mike Fisten work for the firm --
21    A.  Yes.
22    Q.  -- for RRA?  Were they employees of the
23  firm or were they independent contractors?
24    A.  I don't know.
25    Q.  Okay.  During the time they were there,

Page 111

1  did they also have swipe cards so that they could
2  access different areas in the firm?
3    A.  I believe so.
4    Q.  With regard to when you joined RRA, did
5  you ever have any further meetings with
6  Mr. Rothstein; that is, from the day you started at
7  RRA, did you ever meet Mr. Rothstein again?
8    A.  By meet him again --
9    Q.  Did you ever have a meeting with him again
10  regarding your position in the firm?
11    A.  No.
12    Q.  Okay.  Did you ever meet with him and a
13  number of other individuals with regards to firm
14  business?
15    A.  No.
16    Q.  Firm cases?
17    A.  I don't believe so.
18    Q.  Was Mr. Rothstein ever present in any
19  meeting where any of your cases were discussed?  Let
20  me strike that.  Was Mr. Rothstein ever present
21  wherein at any meeting where any of the cases
22  against Jeffrey Epstein were discussed?  Don't tell
23  me content; just was he ever present.
24    A.  How would I know that?  I don't know.  He
25  could, he could be in a meeting right now where the case

Page 112

1  could be discussed for all I know.
2    Q.  I'm sorry.  Obviously, where you, where
3  you were present.  Where you ever present at a
4  meeting where Mr. Rothstein was also present where
5  the Epstein cases were discussed?
6    A.  No.
7    Q.  Did he ever call you to communicate with
8  you, call you either by phone, video conference, in
9  any fashion to discuss any act aspect of the cases
10  that you had against Jeffrey Epstein?
11    MR. SCAROLA:  You can answer that.
12    THE WITNESS:  He has communicated about
13  various, about legal issues related to the case
14  as well as commented about the case to me on
15  very few occasions but I would say less than
16  three times.
17  BY MR. CRITTON:
18    Q.  During the time that you, from April of
19  '09 through late October of '09, correct?
20    A.  In that time period, where, is that when
21  these --
22    Q.  Correct.
23    A.  -- things happened?
24    Q.  Well, that's the time you were there;
25  that's what I am asking.

Page 113

1    A.  When I was there.
2    Q.  And do you, can you remember the date, any
3  specific date that you spoke with him?
4    A.  No.
5    Q.  Do you remember any specific month that
6  you would have had one of the -- well, what did you
7  say something less than five conversations?  I don't
8  want to misquote you.
9    A.  I said less than three conversations.
10   Q.  All right.  So, something less then three
11  conversations you had with Mr. Rothstein regarding
12  Epstein cases, either legal issue or a comment, some
13  comment about the case to you, correct?
14   A.  Yes.
15   Q.  All right.  The first time that he ever
16  spoke to you, did he call you or did you call him?
17   A.  I, I never called Scott Rothstein about
18  anything.  Oh, take that back.  About anything related
19  to Jeffrey Epstein.
20   Q.  The first conversation that you can recall
21  where either a legal issue or a comment was made
22  about Jeffrey Epstein by Mr. Rothstein to you, he
23  obviously initiated the call?
24   A.  It wasn't a call.
25   Q.  What was it?

Page 114

1    A.  A comment in passing.  And I believe I was
2  sitting at a table in BOVA when he walked over to my
3  table and commented about Jeffrey Epstein.
4    Q.  Okay.  Who were you there with at the
5  time?
6    A.  I don't remember.
7    Q.  Were you with some friends?  Were you with
8  other lawyers?
9    A.  All right.  I am jogging my memory.  I, I have
10  no idea.
11   Q.  What did he say?
12      MR. SCAROLA:  To the extent that you can
13  answer that question without disclosing any
14  mental impressions with regard to the lawsuit
15  or any attorney-client privileged
16  communications, you can answer.
17      To the extent that it might invade
18  either the work-product or attorney-client
19  privilege, you should not respond.
20   THE WITNESS:  Can I talk to you?
21   MR. SCAROLA:  Sure.
22   (A brief recess was held.)
23   MR. SCAROLA:  Are we on?
24   THE VIDEOGRAPHER:  Yeah.
25   MR. SCAROLA:  The record should reflect

Page 115

1  that we have had an opportunity to consult and
2  I have advised Mr. Edwards that there is no
3  privilege protection for the particular
4  communications involved.
5  BY MR. CRITTON:
6    Q.  What did he say?
7    A.  He commented to me, I want you to get that
8  pedophile.
9    Q.  And your response was what?
10   A.  I didn't respond.
11   Q.  All right.  Second conversation that you
12  can remember, where were you?
13   A.  I had just come out of the conference room on
14  the main floor after taking a deposition in another
15  case.  And he walked by and said, did you get that F'ing
16  pedophile yet.
17   Q.  And your response?
18   A.  Again.
19   Q.  No response.
20   A.  Didn't respond.
21   Q.  On the first occasion when he came over
22  and if I understand correctly, all he said was the
23  comment that you referenced and then he left.  You
24  didn't respond and then he just made the comment and
25  then left?

Page 116

1    A.  Right.  He was walking by in his normal, loud,
2  ostentatious kind of way, greeting everybody in the
3  restaurant.  Came over to my table and he feels, at
4  least my impression was obliged to say something to
5  everyone.  And that's the comment he said to me.
6      And if you've ever seen him, he is
7  basically always just skipping around and he hoped
8  on over somewhere else.  So, yes, it was in,
9  literally in passing.
10   Q.  Okay.  How, how, how did he even know you
11  had cases involving Mr. Epstein?
12   A.  I don't know.
13   Q.  Because I think you testified earlier that
14  you had never discussed an Epstein case with
15  Mr. Rothstein one-on-one, correct?
16   A.  Absolutely, true.
17   Q.  You never discussed an Epstein case or
18  either of your three clients with Mr. Rothstein even
19  with a group of people around, correct?
20   A.  Correct.
21   Q.  All right.  Do you remember a third
22  occasion that he spoke to you regarding Epstein
23  related occasion, cases?
24   A.  Anything else that he ever spoke with me about
25  related to Epstein related issues is attorney-client and

Page 117

1  work-product privileged information that I am not going
2  to divulge.
3      Q.  Okay.  I am not -- I need to still ask the
4  last question though.  I thought you said earlier is
5  that you never had any substantive conversations,
6  maybe I misunderstood, with Mr. Rothstein about the
7  Epstein cases.  Did I misunderstand you?
8      A.  I don't believe that that was -- I had
9  conversations at a point about legal issues related to
10  Jeffrey Epstein and that's, that's it.
11     Q.  Was that a one conversation?  Was that a
12  number of conversations that you had where legal
13  issues were discussed as to, separate and apart from
14  the two comments he made about the case to you which
15  you were, you waived any privilege, work-product or
16  attorney-client privilege?
17     A.  I, I can't tell you.  If you and I this
18  morning had a conversation and then we took a bathroom
19  break, and we had the same continuing conversation, I
20  don't know if that's one conversation or two.  But I can
21  tell you the, the only time I remember Scott Rothstein
22  participating in any way, shape, or form in any
23  conversation related to anything substantive dealing
24  with, and not dealing with any specific client but a
25  legal issue, was on a particular one-day event, one-day

Page 118

1  conversation, if you want to call it.
2      Q.  And that's at what time?  At that time
3  legal issues were discussed?
4          MR. SCAROLA:  Legal issue was the
5  testimony, a particular legal issue.
6          MR. CRITTON:  Correct.  A legal issue.
7  BY MR. CRITTON:
8      Q.  When did that occur; that is, this one-day
9  discussion or a day discussion occur regarding a
10  specific legal issue?
11     A.  I don't know.
12     Q.  Was he present, he Mr. Rothstein and you
13  present at the same time?
14     A.  Yes.
15     Q.  Okay.  Was anyone else there with you?
16     A.  Yes.
17     Q.  Who else was present?
18     A.  Russ Adler, someone was on the telephone.  I'm
19  not remembering who that was.  I can't remember.  I will
20  tell you if I do remember.
21     Q.  Was Bill Berger there?
22     A.  No.
23     Q.  And, you don't.  So, there was you.  Well,
24  let me strike that.  Where did the conversation take
25  place?

Page 119

1      A.  Scott Rothstein's office.
2      Q.  Had you been called up to meet with
3  Mr. Rothstein?
4      A.  Yes.
5      Q.  Okay.  And who contacted you and told you
6  that Mr. Rothstein wanted to see you?
7      A.  His, his secretary or paralegal or something.
8      Q.  And did you get a call saying Mr.
9  Rothstein would like to see you right now, or was it
10  something that was scheduled?
11     A.  It was not scheduled.
12     Q.  So, you got a call and somebody told you,
13  come up, Scott, Scott wants to see you.
14     A.  I don't remember exactly what was used, but it
15  was I believe, Russell is discussing a legal issue with
16  Scott Rothstein; come to his office.
17     Q.  Okay.  Was the legal issue, did it involve
18  one of the Epstein cases or the Epstein cases?
19     A.  It, it was a legal issue related to -- yes.
20     Q.  Okay.  How long, how much time did you
21  spend -- well, let me strike that.  So, when you
22  went up to Mr. Rothstein's office, it's -- I
23  understand you had to go through some security to
24  get in?
25     A.  You've seen the video?

Page 120

1      Q.  I actually haven't.
2      A.  Oh, really.  Okay.  Yeah, it's --
3      Q.  In order to get into Mr. Rothstein's --
4      A.  It's like a compound.
5      Q.  Kind of concern you that this guy running
6  the firm had a compound?
7      A.  I -- at the time, no.  In retrospect, okay,
8  now that we all know how this whole thing unfolded, but
9  at the time, no.
10     Q.  Had you ever worked in an office?  And you
11  had worked at some big offices.  You worked at the
12  State Attorney's office in Broward County?
13     A.  True.
14     Q.  You worked for, I think for Kubicki
15  Draper?
16     A.  Correct.
17     Q.  Did Mr. Kubicki, Gene Kubicki ever have a
18  compound around his office that you had to go
19  through any type of security either people and/or
20  locked doors or secured doors in order to access
21  him?
22     A.  No.
23     Q.  Had you ever worked other than the Broward
24  County Sheriff's, at the Broward County State
25  Attorney's Office with, and with Kubicki Draper, had

Page 121

1   you ever worked for a large firm?
2        A.  No.  You just named all the places I have
3   worked.
4        Q.  All right.  Is this the first time then
5   that you had been to Mr. Rothstein's office that he
6   called you up there?
7        A.  No.
8        Q.  You had been in his office before?
9        A.  One time.
10       Q.  And what was that occasion?
11       A.  I was having back surgery, and I went there to
12  tell him I am having back surgery.  As you know I had
13  back surgery, and I was telling him I don't know how
14  long I'm going to be off because, you know, the recovery
15  time is different for everybody.
16       Q.  Is that the only thing you talked about,
17  the back surgery?
18       A.  That's the only thing we talked about.
19       Q.  Did the meeting you had with Scott, when
20  you went up, when you were called up to his office
21  that day, did that occur before your back surgery
22  episode or meeting or after?
23       A.  After.
24       Q.  So, you would, you had back surgery.  I
25  think you were out two or three weeks and then you

Page 122

1   returned to the office, and then that meeting would
2   have occurred?
3        A.  Yeah, that's correct.
4        Q.  When you, in order to get into the office
5   just as you have described it as a bunker, how many,
6   did you have to go through any security people to
7   get into --
8            MR. SCAROLA:  No, I think the description
9        was a compound.
10           MR. CRITTON:  I will use compound.  Are
11       you more comfortable with compound or a bunker?
12       I have seen it described it as a compound.  I haven't
13       seen the video, but I have seen it described
14       both ways.
15           THE WITNESS:  I will describe it for you.
16       Well, first I will answer your question.
17       Security people, I don't know if there was ever
18       a time where one would have to go through
19       security people to get to his office.  But on
20       the day or two days that I have been in his
21       office, I did not encounter any security
22       personnel.
23  BY MR. CRITTON:
24       Q.  Did you have to be buzzed into the office?
25       A.  It was more complicated than that.

Page 123

1        Q.  How many security, different security
2   levels did you have to go through in order to get,
3   to go have your meeting with Mr. Rothstein and
4   Mr. Adler?
5        A.  Two.
6        Q.  And to your recollection you don't
7   remember ever seeing a security person?
8        A.  Right.
9        Q.  Okay.  Who was in the office?
10       A.  Well --
11       Q.  I'm sorry.
12       A.  I do not remember seeing a security person
13  manning the door or granting access to his office.  I
14  saw security people every day in the office of RRA.
15       Q.  All right.  And when you got into the
16  office, Mr. Rothstein was there?
17       A.  Yes.
18       Q.  Mr. Adler?
19       A.  Yes.
20       Q.  There was someone on the telephone who you
21  don't recall?
22       A.  Yes.
23       Q.  Okay.  Was there anyone else present?
24       A.  Not that I remember.
25       Q.  Okay.  Was, were there any investigators,

Page 124

1   was Mr. Jenne or Mr. Fisten present?
2        A.  No.
3        Q.  So, it was, you, Rothstein, Adler, and
4   someone on the phone; that's it?
5        A.  From what I remember.
6        Q.  How long did the meeting last?
7        A.  I don't know how long the meeting lasted.
8        Q.  Five minutes or was it a substantially
9   long meeting?
10       A.  Do you want how long I was in the meeting, I
11  can give you an answer.  How long the meeting lasted, I
12  have no idea.
13       Q.  How long did the meeting last while you
14  were present?
15       A.  Less than five minutes.
16       Q.  Was the value of any of the three cases
17  discussed at all?
18       A.  No.
19       Q.  Did Mr. Rothstein, did Mr. Rothstein
20  appear to be knowledgeable about your cases?
21       A.  No.
22       Q.  Mr. Adler, was Mr. Adler someone that you
23  had discussed the cases with on a somewhat regular
24  basis --
25           MR. SCAROLA:  Objection, compound.

Page 125

1   BY MR. CRITTON:
2       Q. -- not content. Was Mr. Adler someone
3   that you had discussed these Epstein cases with
4   prior to that meeting?
5       A. Yes.
6       Q. Was he familiar with the cases, generally?
7       A. He attended Jeffrey Epstein's deposition, so
8   he heard the questions asked and heard the Fifth
9   Amendment invocation and so the adverse inferences and
10  was therefore informed --
11      MR. CRITTON: Move to strike as
12  nonresponsive.
13  BY MR. CRITTON:
14      Q. My question is was he familiar generally
15  with the subject matter of the litigation against
16  Mr. Epstein?
17      A. In that he read the newspaper articles about
18  molesting a bunch of children, yes, he was familiar with
19  the subject matter.
20      Q. And he read -- did you provide him with
21  copies of the pleadings in these cases when they
22  came to RRA?
23      A. No.
24      Q. What was the topic? What was the legal
25  issue that you discussed -- well, let me strike

Page 126

1   that. Who raised the legal issue, did
2   Mr. Adler raise it or did Mr. Rothstein?
3       A. I don't know.
4       Q. Okay. Well, how did the, who started the,
5   if you were there I think you said five minutes, who
6   did the talking?
7       A. When I came in the, in the office, it was in
8   the middle of a discussion.
9       Q. Was a question posed to you?
10      A. The question was on the table at least from my
11  perspective coming into the room and was then directed
12  at me, what's the answer to this particular legal issue.
13      Q. And what was the legal issue?
14      MR. SCAROLA: Let's talk for just a
15  second.
16      THE VIDEOGRAPHER: Are we going off the
17  record?
18      MR. SCAROLA: Actually, we don't even have
19  to go off the record. Stay right here.
20      If this was an issue that was
21  identified during the course of the legal
22  proceedings to opposing counsel, then I am
23  going to allow you to you identify the
24  issue without getting into any of the
25  substance of the discussion regarding that

Page 127

1   issue.
2       If it was not an issue that was
3   identified in the course of the
4   proceedings to opposing counsel, I am
5   going to object and instruct you not to
6   answer on the basis of the work-product
7   privilege.
8       THE WITNESS: Work-product privilege.
9   BY MR. CRITTON:
10      Q. Do you know an individual by the name of
11  Fandry, F-a-n-d-r-y?
12      A. That name doesn't ring a bell right now.
13      Q. Do you know him to be -- does that name
14  mean anything with regard to, as an investigator,
15  Fandry?
16      A. That's a male?
17      Q. Pardon?
18      A. That's a first name or a last name?
19      Q. Last name, Richard Fandry.
20      A. I know an investigator named Rick that did
21  work, was contracted out by RRA to do investigative
22  work. I don't know his last name but --
23      Q. Did, did Rick ever do any work on any of
24  the Epstein cases to your knowledge?
25      A. I believe so.

Page 128

1       Q. Do you know what the name of his business
2   was?
3       A. No.
4       Q. Is Rick still being employed at the
5   current time by your firm to do investigation?
6       A. No.
7       Q. Is Mr. -- I asked you earlier if you knew
8   Ken Jenne and Michael Fisten and you said yes and
9   you knew that they had an association with RRA; is
10  that correct?
11      A. Yeah, that's correct.
12      Q. And do you know whether they were
13  employees or whether they were independent
14  contractors?
15      A. You asked me that and I still have no idea.
16      Q. Did they have offices within RRA,
17  Mr. Jenne and Mr. Fisten?
18      A. They, Mr. Jenne definitely had an office
19  within RRA Mr. Fisten was normally in the field and I
20  assume he had a place to go in RRA I don't know if you
21  call it an office.
22      Q. Did you ever go --
23      A. That's it.
24      Q. Did you ever go meet with him within RRA?
25      A. Yes.

Page 129

1    Q.  Where did you go -- did you go to an
2  office to meet him?
3    A.  Well, I went to a particular area, a locked
4  area that I could get in with my swipe card and there
5  was a, a room like this.  Is this an office?
6    Q.  Sure.
7    A.  Okay.  Then yes.
8    Q.  If you wanted to contact Mr. Fisten, did
9  you, did you have a number; that is, an inside
10 number?
11   A.  I don't know.
12   Q.  Did Mr. Fisten do work on the Epstein
13 related cases?
14   A.  Yes.
15   Q.  Okay.  What kind of work did he do?
16   A.  Investigator.
17   Q.  Meaning what?
18   A.  Meaning investigative work.
19   Q.  Okay.  Has Mr. Fisten continued to do --
20 let me strike that.  When RRA imploded in early or
21 in late '09, in October of '09, did Mr. Fisten come
22 to work for your firm?
23   A.  Yes.
24   Q.  Farmer, Jaffe.  Is he an employee of your
25 firm?

Page 130

1    A.  Correct.
2    Q.  How about Mr. Jenne, is he currently
3  employed by your firm?
4    A.  No.
5    Q.  Do Mr. Jenne and Mr. Fisten, to your
6  knowledge, have any association at the current time?
7    A.  No.
8    Q.  Have, has Mr. Fisten continued to do work
9  on behalf of your firm; that is, investigative work
10 relating to Mr. Epstein?
11   A.  What do you mean has he continued to?
12   Q.  Has he continued, has Mr. Fisten done,
13 continued to do investigative work since he had been
14 with Farmer Jaffe relating to the Epstein cases?
15   A.  On, on many cases and Jeffrey Epstein's case
16 being one of them, yes, he's done some work.
17   Q.  Has he, has he as well -- well, let me
18 strike that.  Has Ken Jenne done any work for any
19 outside agency, investigative agency or entity, done
20 investigation work relating to Jeffrey Epstein here
21 in the State of Florida?
22   A.  I don't, I don't know.  I don't talk to him.
23   Q.  Have you had any contact -- well, let me
24 strike that.  Did you ever have any contact with
25 Mr. Jenne during the time you were at RRA?

Page 131

1    A.  Yes.
2    Q.  Did he ever do any work, or did you ever
3  direct him to do any work with regard to the Epstein
4  cases?
5    A.  No.
6    Q.  Did he know about the Epstein cases?
7    A.  Yes.
8    Q.  Okay.  And how did he know?  How did you
9  know he knew?  Well, let me strike that.  I think
10 you said you never directed him to do any work?
11   A.  Right.
12   Q.  Okay.  And how do you know he was
13 knowledgeable about the Epstein cases?
14   A.  I talked to him about it before.
15   Q.  Did you discuss the facts and
16 circumstances of the cases with him?
17   A.  Of L.M., E.W., and Jane Doe's specific
18 circumstances, no.  In fact, I would say, I would
19 highly, it's highly unlikely that he would even know
20 their names.
21   Q.  But you have discussed the Epstein cases
22 with him generically?
23   A.  Right.
24   Q.  And did he approach you about discussing
25 the Epstein cases or did you approach him?

Page 132

1    A.  He would have approached me.  I didn't know
2  him.
3    Q.  Do you recall why -- let me strike that.
4  Do you recall how long you were at the firm, RRA
5  before he approached you to talk about the Epstein
6  cases?
7    A.  My recollection is several months.
8    Q.  Okay.  On how many occasions did he
9  approach you to talk about the Epstein cases?
10   A.  I don't know.
11   Q.  More than once?
12   A.  Yes.
13   Q.  More than twice?
14   A.  Yes.
15   Q.  More than five times?
16   A.  Yes.
17   Q.  More than ten times?
18   A.  Possibly.
19   Q.  Okay.  And with regard to Mr. Jenne did
20 you ever give him, was he ever an invite person on
21 your Qtask?
22   A.  I do not believe so.
23   Q.  Did, did you ever ask Mr. Jenne why he was
24 interested in your Epstein cases?
25   A.  No.

Page 133

```
 1       Q.  Okay.  And on each occasion he approached
 2   you about talking about the Epstein cases?
 3       A.  On the first I occasion, definitely.  I can't
 4   say on every occasion that we had a conversation.
 5       Q.  And if I understood you correctly, you
 6   never assigned Mr. Jenne any tasks, any task; is
 7   that correct?
 8       A.  That's correct.
 9       Q.  Did you find it odd or strange that he
10   would want to talk to you about your Epstein cases?
11       A.  No.
12       Q.  Did you, did you -- Mr. Jenne reported to
13   whom as you understood?
14       A.  I didn't understand anything.
15       Q.  Do you know what his position with the
16   firm was?
17       A.  No idea.
18       Q.  Did he ever offer to help you with the
19   Epstein cases?
20       A.  In some respect, I guess so.  Generally, you
21   know, I, I can help.  This is basically a criminal
22   matter; I can help.  You know, that kind of thing.  I am
23   not saying those are his exact words but paraphrasing
24   the gist of it, that's what I remember.
25       Q.  Okay.  Mr. Edwards, did you ever contact
```

Page 134

```
 1   the media or the press when, that's located in New
 2   York City, the State of New York, about any of the
 3   Epstein cases?
 4       A.  I may have returned telephone calls that were
 5   initiated by press to me.
 6       Q.  My, my question to you was, did you
 7   initiate any telephone calls; that is, without
 8   returning a call to the, to any member of the media
 9   or press in New York regarding the Epstein cases?
10       A.  Meaning the first conversation --
11       Q.  Right.
12       A.  -- between -- yeah.  No, I did not.
13       Q.  Who contacted you from New York with
14   regard to any Epstein related matter?
15       A.  The press.
16       Q.  Who?
17       A.  I don't remember anybody's name.
18       Q.  Give me anybody's name that you can
19   recall.
20       A.  George Rush.
21       Q.  What media, what did you understand his
22   association?
23       A.  I believe New York Daily News.
24       Q.  Do you remember when Mr. Rush contacted
25   you?
```

Page 135

```
 1       A.  No.
 2       Q.  When Mr. Rush contacted you, do you know
 3   why he contacted you; that is, what -- well, let me
 4   strike that.  When he contacted you, did you take
 5   his call right away or was his a call that you had
 6   to return?
 7       A.  I don't remember.
 8       Q.  Do you remember speaking with a person
 9   named John Canally?
10       A.  Yes.
11       Q.  Okay.  What was Mr. Canally's association?
12       A.  I don't know.
13       Q.  Do you know who he was with at the time?
14       A.  No.
15       Q.  What did your discussion with Mr. Canally;
16   that is, what was Mr. Canally interested in and what
17   did you tell him?
18           MR. SCAROLA:  Objection, compound.
19           THE WITNESS:  I, I listened to him more
20   than told him anything.
21   BY MR. CRITTON:
22       Q.  Did you provide him any information?
23       A.  In the back and forth of the conversation, I,
24   you know, maybe general information that one could read
25   from the newspapers I talked to him about.
```

Page 136

```
 1       Q.  Did you speak with, other than -- on how
 2   many occasions did you speak with Mr. Canally?
 3       A.  I don't know.
 4       Q.  On how many occasion's have spoken with
 5   Mr. Rush?
 6       A.  I don't know.
 7       Q.  More than once with Mr. Rush?
 8       A.  I would say so, yes.
 9       Q.  More than five times with Mr. Rush?
10       A.  That's approximate, that's approximately
11   correct.
12       Q.  Okay.  Mr. Canally, did you speak with him
13   on more than one occasion?
14       A.  Yes.
15       Q.  On how many occasion's have you spoken
16   with him?
17       A.  I don't know.
18       Q.  Five, two, three, your best estimate?
19       A.  More than five.
20       Q.  When was the last time you spoke with
21   Mr. Canally?
22       A.  2009.
23       Q.  Have you had any contacts with the media
24   or the press during the year 2010, January,
25   February, March, and we're almost, well, we're
```

Page 137

1    almost at the end of March.  In the last three
2    months, starting in January 1st of 2010, have you
3    had any contact with the press?
4        A.  Not that I recall.
5        Q.  Has the press contacted you, but you have
6    not returned their calls?
7        A.  On hundreds and hundreds of occasions.
8        Q.  Well, my question is since the beginning
9    of, since January 1st of 2010 has the press
10   attempted to contact you?
11       A.  Yes.
12       Q.  And if I understand your testimony, you
13   have not returned any of those calls?
14       A.  To the best of my recollection I, I do not
15   remember speaking with anybody from the press during
16   this year, 2010.
17       Q.  In 2010, do you have a recollection of
18   having spoken with people but saying you can't quote
19   me, i.e., I have no comment or I will tell you off
20   the record?
21       A.  I don't even remember having those
22   conversations with anybody in 2010.  If you know of
23   something and can refresh my recollection, I, you may be
24   able to remind me, but I don't think in 2010 I have had
25   any of those conversations.

Page 138

1        Q.  The conversations you had with George
2    Rush, when you returned his call, what did Mr. Rush
3    ask you?  What was he inquiring about?
4        A.  My response to Jeffrey Epstein's comments.
5        Q.  Which comments?
6        A.  A telephone conversation initiated by Jeffrey
7    Epstein to George Rush related to the various cases and
8    claims against Mr. Epstein.
9        Q.  Did Mr. Rush call you -- I'm sorry, I will
10   improve it.  If I understand correctly when Mr. Rush
11   called you, that's the first time you knew who he
12   was?
13       A.  I didn't know who he was before he called me,
14   correct.
15       Q.  What did Mr. Rush tell you what Jeffrey
16   Epstein had said to him?
17       A.  And I'm not sure that that was the first
18   conversation I had with, with George Rush.  Like I said
19   I think I've talked to him three or four, five times.
20       Q.  Okay.  Well, let me see if I can place,
21   can you give me a point in time when you first spoke
22   to Mr. Rush and when you last spoke with him the
23   approximately five times that you related?
24       A.  Each of those times were in 2009 between,
25   earliest possible, June, I think, yeah, latest possible,

Page 139

1    I believe, November.
2        Q.  And the first time that Mr. Rush called
3    you, what was the subject?
4        A.  Jeffrey Epstein.
5        Q.  Okay.  I assume you never talked with
6    Mr. Rush about any topic other than Mr. Epstein,
7    correct?
8        A.  That's a safe assumption.
9        Q.  When he first contacted you, can you
10   differentiate what he said on the first occasion
11   versus a later occasion?
12       A.  I, I, no, in chronological order I can't right
13   now.  I haven't gone back and thought about this like
14   this before.
15       Q.  Did you ever correspond with Mr. Rush or
16   Mr. Canally by e-mail?
17       A.  Mr. Rush, I believe that answer is no.  With
18   Mr. Canally, yes.
19       Q.  And so do you have copies of the e-mails
20   that you and Mr. Canally exchanged?
21       A.  No.
22       Q.  Okay.  Would they have been while you were
23   at RRA, RRA?
24       A.  Correct.
25       Q.  With regard to Mr. Rush, if you did

Page 140

1    communicate with him by e-mail, would it be during
2    the time you were with RRA?
3        A.  That's correct.
4        Q.  Did you communicate with any other member
5    of the press during the time, we'll come back to
6    Mr. Epstein.  During the time when you were at RRA,
7    did you communicate with anybody else by, by either,
8    first of all, by e-mail?
9        A.  What is your question again?  I'm sorry.
10       Q.  Okay.  Did you -- other than Mr. Rush who
11   you're not sure you communicated by e-mail,
12   Mr. Canally who you are sure you communicated by
13   e-mail during the time you were at RRA, was there
14   any member of the press, TV, written news media,
15   television that you communicated with --
16       A.  I'm sure.
17       Q.  -- by e-mail?
18       A.  I am sure there is.
19       Q.  Okay.  Do you remember any of their names
20   other than Mr. Rush and Mr. Canally as you sit here
21   today?
22       A.  Not as I sit here today, I do not.
23       Q.  Did you ever communicate with Jose
24   Lambiet?
25       A.  I don't know who that is.

35 (Pages 137 to 140)

Page 141

1      Q.  He does a Page 2 or something with the,
2   Page 1, Page 2 of the Palm Beach Post?
3      A.  No.  I'm not, no.
4      Q.  Okay.  Have you ever spoken with Jane
5   Muskrat (phonetic)?
6      A.  Again, I don't know who that is.
7      Q.  Have you ever -- did you ever give or
8   allow one of your clients to give an interview to
9   one of the local TV stations?
10          MR. SCAROLA:  Objection, compound.
11          THE WITNESS:  One of my clients gave an
12      interview to one of the local television
13      stations.
14   BY MR. CRITTON:
15      Q.  Which of your clients gave the interview?
16      A.  Jane Doe.
17      Q.  And did you organize that?
18      A.  I assisted.
19      Q.  Which, which TV station was it?
20      A.  I don't remember.
21      Q.  Do you remember who the person was from
22   the TV station that contacted you?  Let me strike
23   that.  How did it come about that Jane Doe gave an
24   interview to the TV station?
25      A.  Various television stations have been

Page 142

1   interested over the course of these cases in having the
2   clients talk.  I was adamant that that was not going to
3   happen and Jane Doe wanted that to happen.
4      Q.  How did Jane Doe even know that that
5   opportunity existed?  If you didn't want it to
6   happen when the news, when the news people, when the
7   TV stations called you why didn't you just say my
8   clients are not available for interview?
9      A.  What's your question?
10      Q.  The question is, is, with regard to the
11   T.V. station, you said multiple TV stations wanted
12   to do interviews with your clients.  Did I
13   understand you correctly?
14      A.  You did.
15      Q.  And you said you didn't want any of your
16   clients to do interviews, correct?
17      A.  Right.
18      Q.  Okay.  So, why didn't you just say, no, I
19   am not making any of my clients available?
20          MR. SCAROLA:  I am going to object to the
21      extent that that calls for either mental
22      impressions or attorney-client privileged
23      communications and instruct you not to answer.
24          THE WITNESS:  I'm not going to answer
25      based on the privilege.

Page 143

1   BY MR. CRITTON:
2      Q.  Jane Doe, though, did give an interview,
3   correct --
4      A.  That is correct.
5      Q.  -- on TV and they blocked out her face?
6      A.  That is correct.
7      Q.  Were you there, were you present when she
8   gave the interview?
9      A.  Yes.
10      Q.  Okay.  Did you see the interview on TV?
11      A.  No.
12      Q.  Did they give you a copy of the tape of
13   the interview?
14      A.  I believe a copy of the tape was sent to me.
15      Q.  Okay.  Do you still have that in your
16   possession?
17      A.  No.
18      Q.  Who has it?
19      A.  I believe it was destroyed.
20      Q.  Who destroyed it?
21      A.  Nobody destroyed it.
22      Q.  Okay.  You said, I think you said you
23   believe it's destroyed.  How did it come to be
24   destroyed?
25      A.  It was sent to me and it was kept in my house

Page 144

1   as I didn't believe it was any portion of the file and
2   my house flooded and the tape was destroyed.
3      Q.  And did you try to play the tape?
4      A.  I have never watched the tape.
5      Q.  You still have it.  You just think it's
6   destroyed?
7      A.  No, I don't even have it.
8      Q.  You threw it away?
9      A.  It wasn't a matter of throwing anything away.
10   My entire house was full with water, every square inch
11   for 12 inches up the wall, and everything was just in
12   mud and got thrown in these huge bins and trashed so --
13      Q.  All right.  Have you ever spoken with
14   Michelle Daryan?
15      A.  Yes.
16      Q.  On how many occasions have you spoken with
17   her?
18      A.  Several.
19      Q.  Have you e-mailed, exchanged e-mails with
20   her?
21      A.  Yes.
22      Q.  During the time you, only during the time
23   you were with RRA?
24      A.  I believe so.  There, there could have been,
25   there could have been an e-mail.  Oh I only think at RRA

Page 145

1    I believe that's right.
2        Q.  As a result of Jane Doe speaking with the
3    press, did she receive any compensation?
4        A.  No.
5        Q.  Have any interviews been given separate
6    and apart from the TV interview that Jane Doe gave?
7    Did any of the other, did either of your other two
8    clients, E.W. or L.M., ever give an interview to,
9    written to, to the written media, not TV?
10       A.  No.
11       Q.  With regard to, back to George Rush, you
12   said that Mr. Rush, Mr. Rush contacted you.  You
13   recontacted him, correct?
14       A.  That's correct.
15       Q.  Okay.  And what was the subject matter?
16   What was Mr. Rush interested in talking with you
17   about?
18       A.  Jeffrey Epstein.
19       Q.  Okay.  And what, what specifically about
20   Mr. Epstein?  How did he even know you existed, did
21   he say?
22       A.  I don't know.  Or, or if I knew, I don't
23   remember how he knew that.
24       Q.  Okay.  Did you, did you talk to him?
25       A.  Yes, I did talk to him.

Page 146

1        Q.  Approximately, how many, how long have
2    your conversations been?
3        A.  Short.
4        Q.  And with regard to George Rush, what, you
5    said he was interested in talking about Jeffrey
6    Epstein.  What was he interested in?
7        A.  I don't remember specifically the issue, but
8    it seemed to me that he came to me with an issue each
9    time, something related to the case.
10       Q.  Okay.  The case being Mr. Epstein's case
11   or your three cases?
12       A.  I think that it was typically in general
13   related to the various criminal acts committed by
14   Jeffrey Epstein against the large number of girls in
15   each of the states that Jeffrey Epstein has lived in.  I
16   think that was like the gist of his communication to me.
17       Q.  Well, did he?
18       A.  Or why he was interested.
19       Q.  Did he indicate to you that someone had
20   told him that, that certain acts had occurred in
21   other states or locations other than the State of
22   Florida?
23       A.  I can't say with any degree of specificity
24   what was said, but that certainly is the impression that
25   I have right now thinking back.  So, I believe that that

Page 147

1    was something he was conveying to me.
2        Q.  Okay.  Did he tell you that he had any
3    information that Mr. Epstein had been involved with
4    any other individuals in any other states, females?
5        A.  I don't remember.
6        Q.  Did you tell him or did you disclose to
7    him that you were aware of Mr. Epstein having been,
8    having assaulted underage females in other states?
9        A.  I don't remember.
10       MR. CRITTON:  Need to take -- why don't
11   we, why don't you change the tape now?
12       THE VIDEOGRAPHER:  We're now off the video
13   record.  It's 1:02 p.m.
14       (A luncheon recess was held.)
15              * * * * *
16
17
18
19
20
21
22
23
24
25

37 (Pages 145 to 147)

Page 148

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL
CIRCUIT IN AND FOR PALM BEACH COUNTY, FLORIDA
CASE NO. 50 2009CA040800XXXXMB AG
Complex Litigation, Fla.R.Civ.Pro. 1201

JEFFREY EPSTEIN,
     Plaintiff,
-vs-                    VOLUME II OF II

SCOTT ROTHSTEIN, individually,
BRADLEY J. EDWARDS,
individually, and L.M. individually,


     Defendants.
_____

VIDEOTAPED DEPOSITION OF BRADLEY J. EDWARDS, ESQUIRE

Tuesday, March 23, 20010
10:00 - 5:07 p.m.

2139 Palm Beach Lakes, Boulevard
West Palm Beach, Florida 33401


Reported By:
Cynthia Hopkins, RPR, FPR
Notary Public, State of Florida
Prose Court Reporting
Job No.: 1333

---

Page 149

1  APPEARANCES:
2  On behalf of the Plaintiff:
3     ROBERT D. CRITTON, JR., ESQUIRE
       BURMAN, CRITTON, LUTTIER & COLEMAN, LLP
4     303 Banyan Boulevard
       Suite 400
5     West Palm Beach, Florida  33401
       Phone:  561.842.2820
6
7  and
8     JACK ALAN GOLDBERGER, ESQUIRE
       ATTERBURY, GOLDBERGER & WEISS, P.A.
9     250 Australian Avenue South
       Suite 1400
10    West Palm Beach, Florida  33401-5012
       Phone:  561.659.8300
11
12  and
13  On behalf of the Plaintiff:
14    ALAN M. DERSHOWITZ, ESQUIRE
       HARVARD LAW SCHOOL
15    Hauser 520
       Cambridge, Massachusetts  02138
16    Phone:  617.496.2020
17  On behalf of the Defendant:
18    JACK SCAROLA, ESQUIRE
       SEARCY, DENNEY, SCAROLA,
19    BARNHART & SHIPLEY, P.A.
       2139 Palm Beach Lakes Boulevard
20    West Palm Beach, Florida  33409
       Phone:  561.686.6300
21
22  ALSO PRESENT:
23  Jeffrey Epstein
24  Joseph Kozak, Videographer
       Prose Reporting Services
25

---

Page 150

1   <<INDEX START>>
2        _  _  _
3        I N D E X
4        _  _  _
5
6   EXAMINATION   DIRECT   CROSS   REDIRECT
7   CONTINUED EXAMINATION OF
    BRADLEY J. EDWARDS, ESQUIRE
8
    BY MR. CRITTON   151
9
10
11
12       _  _  _
13     E X H I B I T S
14       _  _  _
15
16  EXHIBIT          DESCRIPTION          PAGE
17
    PLAINTIFF'S EX. 1  ALFREDO RODRIGUEZ   211
18       CRIMINAL COMPLAINT
    PLAINTIFF'S EX. 2  COMPLAINT           239
19  PLAINTIFF'S EX. 3  JULY 22, 2009       276
       FACSMILE
20
21
22
23
24
25

---

Page 151

1        P R O C E E D I N G S
2              - - -
3        THE VIDEOGRAPHER:  We're now on the record
4   at 1:54 p.m.  Volume 2.
5        CONTINUED DIRECT EXAMINATION
6   BY MR. CRITTON:
7        Q.  Mr. Edwards, when we broke, we were
8   talking a little bit about, we were talking about
9   George Rush and different, many people that you had
10  spoken with and you said you had spoken with
11  Mr. Rush approximately five times, correct?
12       A.  Correct.
13       Q.  With regard to Mr. Rush, did you ever
14  provide him with any documents?
15       A.  I don't believe so.
16       Q.  Did you tell Mr. Rush, did you EVER advise
17  or did Mr. Rush ever ask you who your clients were,
18  I mean not by name but as to how your clients
19  factored into any of the conversations that you were
20  having?
21       A.  I don't remember that.
22       Q.  Do you recall discussing with Mr. Rush
23  Ghislaine Maxwell?  Or in fact, let me ask it this
24  way:  Did you talk with Mr. Rush about Ghislaine
25  Maxwell in any way?

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)

2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 152

```
1        A.  I'm not sure.
2        Q.  Why would you -- did any of your clients
3   claim or have any of your clients claimed to have
4   any contact with Ghislaine Maxwell at all?
5        A.  That is something that certainly calls for
6   attorney-client privilege and not something that I am
7   going to be answering today.
8        Q.  With regard to at least you have attended
9   the deposition of both Jane Doe and of L.M, correct?
10       A.  Yes.
11       Q.  Okay.  And have you heard them reference
12  Ghislaine Maxwell during the course of those
13  depositions?
14       A.  No.
15       Q.  Would it be a correct statement that none
16  of the three of your clients -- let's take a look at
17  the two that have testified.  Both of the two that
18  have testified, Jane Doe and L.M. have testified
19  that they did not take, travel with or were
20  transported in any way by Mr. Epstein, correct?
21       A.  No, that is incorrect.
22       Q.  Okay.  Did, who, which?
23       A.  I believe.
24       Q.  I am sorry?
25       A.  I guess the transcript will speak for itself.
```

Page 153

```
1   I don't remember their specific --
2        Q.  Is it your belief that Jane Doe ever
3   traveled with Mr. Epstein on his plane?
4            MR. SCAROLA:  Excuse me, is the question
5        limited to the testimony --
6            MR. CRITTON:  Correct.
7            MR. SCAROLA:  -- that has been given?
8            MR. CRITTON:  Correct.
9            THE WITNESS:  No.  I do not believe she
10       testified that she traveled with Mr. Epstein on
11       his plane.
12  BY MR. CRITTON:
13       Q.  All right.  And same would be true with
14  L.M., she did not testify that she traveled with Mr.
15  Epstein on his plane, true?
16       A.  I believe that's true as well.
17       Q.  Okay.  Are you aware of any other
18  information from any other source that either Jane
19  Doe or L.M. traveled on Mr. Epstein's plane?
20       A.  No.
21       Q.  Did, you did you indicate to -- well, let
22  me strike that.  Did you tell Mr. Rush that none of
23  your clients had ever traveled with Mr. Epstein on
24  his plane or any, on his plane or with him in any
25  fashion, in any other manner?
```

Page 154

```
1        A.  I don't remember that subject coming up in the
2   conversations with Mr. Rush.  Had he asked -- I, I don't
3   remember that conversation.
4        Q.  You're not denying it.  You are just
5   saying you don't remember it or are you --
6        A.  Correct.
7        Q.  -- saying it didn't happen?
8        A.  No.  I am saying I just don't remember.
9        Q.  Did you, did you tell Mr. Rush that
10  Mr. Epstein had transported females on his plane for
11  the purposes of having sex with other individuals?
12       A.  I don't know.
13       Q.  Well, why --
14       A.  I just don't remember.
15       Q.  If Mr. Rush would testify that you told
16  him that other females had traveled on Mr. Epstein's
17  plane and had had sex during the time they were on
18  the planes, why would you have had that discussion
19  with him?
20       A.  You're asking a hypothetical if I said that,
21  why would have I have said that?
22       Q.  Well, let me rephrase it this way:  With
23  Mr. Rush, if I asked you to assume that he would
24  testify that you, you told him about the
25  transportation, that Mr. Epstein transported other
```

Page 155

```
1   women on the plane to have sex with them, what
2   information did you have that was the basis for that
3   claim at that time?
4            MR. SCAROLA:  I am going to object to the
5        form of question.  It assumes facts not in
6        evidence.  It has no proper predicate.
7   BY MR. CRITTON:
8        Q.  Mr. Edwards, did you have Ghislaine
9   Maxwell served in this case with a subpoena?
10       A.  Yes.
11       Q.  For what purpose?  I mean, obviously to
12  take her deposition.
13       A.  Exactly, to take her deposition.
14       Q.  All right.  Do you, is she neither, would
15  you agree that neither Jane Doe nor L.M. have
16  testified to any, that they had any connection
17  whatsoever with Ghislaine Maxwell?
18       A.  Yes, I would agree.
19       Q.  And what, what was, what is the purpose;
20  that is, with regard to your three clients and only
21  your three clients is they -- what connection if
22  any, did Ghislaine Maxwell have to those
23  individuals?
24            MR. SCAROLA:  Objection, work-product.
25       Instruct you to not answer.
```

2 (Pages 152 to 155)

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)

2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 156

BY MR. CRITTON:

1   Q.  When you originally started working with
2   the Rothstein firm, did you have any discussions
3   with Mr. Rothstein regarding how your cases would be
4   funded; that is, your personal, your personal injury
5   cases and specifically the cases relating to
6   Mr. Epstein?
7       A.  No.
8       Q.  Okay.  With regard to, prior to taking
9   your cases to, prior to starting at RRA, you were
10  responsible for the funding of your personal injury
11  cases or any contingency fee case, correct?
12      A.  Right.
13      Q.  And I assume you had either your own
14  personal funds or you had a line of credit or both?
15      A.  Right.
16      Q.  And when you came to RRA and you brought
17  the cases with you; that is, the personal injury
18  cases and as well, the Epstein cases, were you
19  reimbursed for the costs that you had already
20  expended thus far on those cases?
21      A.  No.
22      Q.  Did you request that you be reimbursed?
23      A.  Yes.
24      Q.  And with, to whom was the request made?

Page 157

1       A.  Directly to Scott Rothstein.
2       Q.  Was that at the ten minute meeting that
3   you had?
4       A.  Yes.
5       Q.  At BOVA?
6       A.  Yes.
7       Q.  And what did he say?
8       A.  No problem.
9       Q.  He said he would reimburse you?
10      A.  Correct.
11      Q.  And did that, in fact, take place?
12      A.  No.
13      Q.  And how did you attempt to get reimbursed
14  for the costs that you had thus far incurred on your
15  personal injury cases including Mr. Epstein's case
16  when you went, when you started at RRA?
17      A.  What do you mean?
18      Q.  Well, you said that Mr. Rothstein agreed
19  in the ten minute conversation that RRA would
20  reimburse those costs?
21      A.  Correct.
22      Q.  You go to RRA in April of '09, and I
23  assume you had to ask someone and say, look, I had a
24  conversation with Scott Rothstein.  He said he would
25  reimburse my costs.

Page 158

1       A.  I didn't do that.
2       Q.  You didn't.  Did you choose not to do
3   that?
4       A.  No.  I, I, the statement was made to me by
5   Scott Rothstein that the costs would be reimbursed.  And
6   I anticipated that the costs would be reimbursed.  I was
7   there for a fairly short period of time and I didn't
8   know Scott Rothstein personally.  So, I didn't go to him
9   additionally to tell him something that we already had a
10  meeting of the minds about.
11      Q.  Well, how much in costs did you have
12  outstanding at the time from your cases, including
13  the Epstein cases when you went to the firm, RRA, in
14  April of '09?
15      A.  I don't know the total.
16      Q.  Was it $1,000?  Was it $50,000?  Was it
17  $100,000?
18      A.  More than 100.
19      Q.  And did you have that both from, was it,
20  the debt, was that comprised of both your own money
21  and as well as LOC, line of credit money through a
22  bank?
23      A.  Correct.
24      Q.  Was it more than 150?
25      A.  I'm not sure.

Page 159

1       Q.  Was it someplace between 100 and $200,000
2   your best estimate?
3       A.  That is my best estimate.
4       Q.  Did you find that to be a significant
5   amount of money?
6       A.  Of course.
7       Q.  Okay.  And you said you were at RRA for
8   only a short period of time.  In fact, you were
9   there April, May, June, July, August, September,
10  October.  You were there seven months, true?
11      A.  Yes.
12      Q.  Okay.  And at no time, even though
13  Mr. Rothstein said he would reimburse those funds or
14  the firm would reimburse those funds to you, at no
15  time during those seven months which you have
16  described as a short period of time, did you ever
17  make a request that you be reimbursed; is that
18  correct?
19      A.  I never made a, well, I don't know the process
20  for getting reimbursed, but I never made a formal
21  request.  I said it to, at least to Russell Adler on
22  several occasions.  And it was always told to me, don't
23  worry about it; the firm is growing; there is a lot of
24  things to deal with right now; he operates under the
25  system of fairness; you will get reimbursed.

3 (Pages 156 to 159)

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 160

1        And obviously nobody expected the ending
2    to the law firm that ultimately occurred.
3        Q.   With regard to the case, I assume you
4    settled a couple of personal injury cases during the
5    seven months you were there, yes?
6        A.   Yes, you assume that.
7        Q.   That's correct?  Let me ask the question.
8    Did you settle any contingency fee cases during the
9    sevens months that you were at the RRA firm?
10       A.   Yes.
11       Q.   And when you settled those cases did you,
12   and they closed, they were settled through, did you
13   have any control of the trust account?
14       A.   No.
15       Q.   Okay.  Settlement monies come in on a
16   personal injury case.  What did you do with the
17   money once the, once the client had endorsed the
18   check?
19       A.   I, I didn't personally do anything with the
20   money.  It was not handled by me.
21       Q.   Okay.  Were you there --
22       A.   That's why I'm confused.  Did I settle the
23   case?  I mean, Rothstein Rosenfeldt Adler firm settled
24   personal injury cases while I was there.  There were no
25   cases that were solely my cases.  They were firm cases.

Page 161

1        Q.   Let me rephrase the question.  You
2    brought, you brought cases to the firm, correct?
3        A.   That is correct.
4        Q.   Of any of the cases that you brought, did
5    you settle those cases?
6        A.   No.
7        Q.   Okay.  So, you never had an instance -- so
8    there was never a set of circumstances where you
9    would have been reimbursed for costs as a result of
10   a settlement?
11       A.   That's correct.
12       Q.   All right.  And, and so during the seven
13   months that you were there, you were never
14   reimbursed a nickel of the one to $200,000 that you
15   had outstanding in costs?
16       A.   That is correct.
17       Q.   All right.  With regard to the costs that
18   were to be incurred for prosecuting the cases,
19   specifically the Epstein cases, what was your
20   understanding -- was that ever discussed with
21   Mr. Rothstein at the ten-minute meeting?
22       A.   Repeat that.  I'm sorry.
23       Q.   Sure.  How were, how were costs
24   investigation costs, deposition costs, travel
25   expenses to be reimbursed?

Page 162

1        A.   Well, you've thrown a lot of things in there.
2    Travel expenses come back with your receipts, hand them
3    over to, I would hand them over to my secretary.  And
4    she would get them to the appropriate place in the
5    machine known as Rothstein Rosenfeldt Adler.  And in my
6    next -- and I would get a check, I believe.
7        Q.   All right.  How about depositions, I mean
8    during the time that we, we took depositions from
9    the time you were at RRA, transcripts were ordered
10   of depositions.  They were expedited of various
11   hearings.  You took trips.  You took a trip to New
12   York to take the deposition of Mark Epstein,
13   correct; all those things occurred?
14       A.   Yes, all of those things occurred.
15       Q.   So, when you would get a bill in for the
16   trip for to go up and see Mark Epstein, or to take
17   Mark Epstein's deposition, you had travel costs
18   associated with that and you had plane fare,
19   taxicab, hotel, whatever else you had, correct?
20       A.   I had costs associated with that.
21       Q.   All right.  And when you met with Mr.
22   Rothstein initially, what was your understanding or
23   did you have an understanding as to how costs would
24   be handled; that is, how they would be paid on cases
25   that you brought to the firm?

Page 163

1        A.   It was unspoken but I had some understanding
2    just based on logic.
3        Q.   Separate and apart from logic, did anybody
4    tell you that you had; that is, that RRA would pay
5    all of the costs associated with prosecution of the
6    Epstein cases?
7        A.   Did anybody tell me?  No.
8        Q.   Okay.  Were you ever required to draw
9    against either your personal funds or your personal
10   LOC after you started with RRA to fund the Epstein
11   cases?
12       A.   I don't know how to answer your question,
13   Mr. Critton, because if I were to go out of town and
14   purchase a plane ticket, yeah, I would purchase that
15   personally and then I would be reimbursed.  If I ordered
16   a deposition transcript, which is a totally different
17   category, that gets billed to the firm.  I never see the
18   bill or anything else.  So, you're just throwing a bunch
19   of things together that don't necessarily go together.
20   I am trying my best for you.
21       Q.   No, that's fine.  Commonly in a personal
22   injury closing, you would see the recover, you would
23   see a list of the costs.  The costs would include
24   court reporters, investigation fees, subpoenas,
25   things of that nature, correct?

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)                                  2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 164

```
 1        A.  I have seen them before, yes, sir.
 2        Q.  Okay.  And as well there would be
 3   reimbursable expenses such as when you went to New
 4   York and took Mark Epstein's deposition.  You, you
 5   paid for the expense up front but, in fact, it was
 6   then reimbursed by the firm, correct?
 7        A.  Now we're specifically talking,
 8   specifically talking about Mark Epstein's
 9   deposition, yes, that, what you just said is correct.
10        Q.  Okay.  Not only was the, and if I
11   understand your testimony is the deposition was paid
12   for directly by the firm.  With regard to your
13   travel, any hotel, other expenses that you had, you
14   put in a request for reimbursement and the firm
15   would reimburse you?
16        A.  Correct.
17        Q.  All right.  And with regard to those
18   costs, you said you and Mr. Rothstein never had a
19   discussion about that; is that correct?
20        A.  Correct.
21        Q.  All right.  But you did speak with
22   Mr. Adler about how costs would be handled on your
23   cases including Mr. Epstein's case after you started
24   with RRA?
25        A.  Correct.
```

Page 165

```
 1        Q.  Okay.  And is he the only one who
 2   explained what the procedure was?
 3        A.  Yes.
 4        Q.  And what did he tell you?  Well, let me
 5   ask you this:  Did he tell you what; that is, that
 6   the firm would pay for all of the reimbursements
 7   either costs and/or reimbursements for costs that
 8   were incurred in prosecuting the Epstein files and
 9   any other files that you had?
10        A.  Can you split this question up so that we're
11   not talking about reimbursement and costs and things
12   like that.
13        Q.  Sure.  With regard to costs such as
14   depositions --
15        A.  Okay.
16        Q.  -- court reporters, court reporter fees,
17   video depositions, transcripts of hearing, whether
18   they were expedited or whether they were asked on a
19   routine basis?
20        A.  Right.
21        Q.  Where would the -- who was responsible for
22   paying those bills?
23        A.  The bills would, to my to the best of my
24   knowledge would be billed to the law firm of Rothstein
25   Rosenfeldt Adler, and it would be their financial
```

Page 166

```
 1   responsibility to pay those bills.
 2        Q.  And is that what Russell Adler told you?
 3        A.  Yes.
 4        Q.  Did you ever discuss that with anyone else
 5   in the firm or just Russell Adler?
 6        A.  Just Russell Adler.
 7        Q.  So, if the bill came in for one of those
 8   types of costs, you would give to your secretary or
 9   would she handle it automatically?
10        A.  I never would see the bill.  Why would it come
11   into my name?  It just didn't do -- that never happened.
12   It was billed to Rothstein Rosenfeldt Adler.
13        Q.  So, you would never see the bill that came
14   in?
15        A.  Correct.
16        Q.  -- even if it was a RRA attention Brad
17   Edwards, you wouldn't see that?
18        A.  Presuming that happened, attention, Brad
19   Edwards, I still never saw it.  No, I never saw a bill
20   to my recollection right now the whole time I was at
21   Rothstein Rosenfeldt Adler.
22        Q.  Did Mr. Rothstein ever discuss with you
23   whether there would be a budget associated with how
24   much money you could spend on a particular case?
25        A.  No.
```

Page 167

```
 1        Q.  Okay.  Did anyone at the firm ever talk to
 2   you about whether or not there would be a budget
 3   associated with how much you could spend on an
 4   Epstein case or any personal injury case?
 5        A.  No.
 6        Q.  In terms of authorization, if you wanted
 7   to order a deposition expedited or if you wanted to
 8   pay for a specific expense, whether it was an
 9   outside investigator or to send an investigator to a
10   location, whose decision was that?  Is that you and
11   you alone to incur that cost?
12        A.  Which question do you want me to -- you asked
13   a bunch of things there that some of them may have been
14   my decision.  Other parts of that would obviously be
15   somebody else's.  But you're throwing five or six items
16   in there and you want me to give you an answer.
17        Q.  Let me break it them down.  With regard to
18   any costs that you wanted to incur, incur relating
19   to a Jeffrey Epstein matter, was there an
20   authorization process; that is, did you have to get
21   someone's okay before you could spend X amount of
22   dollars?
23        A.  No.
24        Q.  Okay.  It was, and who told you that you
25   never had to get an approval for any expense
```

5 (Pages 164 to 167)

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)

2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 168

1  associated with the Jeffrey Epstein case?
2      A.  I didn't say that anybody did.  So, no,
3  nobody, nobody.
4      Q.  You could just spend whatever money you
5  wanted to in prosecuting your cases; is that
6  correct?
7      A.  No, I didn't say that either.
8      Q.  What was the procedure then?
9      A.  That if I was at a deposition and there was a
10  need in my judgment for the transcript to be expedited
11  then I would order it expedited and nobody ever told me
12  that they had a problem with my judgment as to those
13  things.  And not as to those things.  As to that thing
14  which we were talking about which right now is
15  expediting deposition transcripts.
16      Q.  With regard to -- so any, how about an
17  expense associated with hiring, with either
18  directing -- well, let me strike that.  With regard
19  to Epstein, did, were you ever required or did you
20  ever hire outside investigators to do work
21  associated with the Epstein case?
22          By outside I mean someone who was not an
23  employee of RRA and now I mean dealing with the time
24  that you were at RRA
25      A.  Right.  And your question is did I ever hire

Page 169

1  an outside investigator to perform work on Jeffrey
2  Epstein's case?
3      Q.  Correct?
4      A.  The answer is no.
5      Q.  Were, were all the investigations that
6  were done during the time that you were employed by
7  RRA, were they done by in-house investigators?
8      A.  I don't know.
9      Q.  Well, if you wanted investigation done on
10  Mr. Epstein, how would you go about authorizing that
11  or directing that that be done?
12      A.  I would ask one of the investigators to do it.
13      Q.  So, you would direct the specific
14  investigator?
15      A.  Yeah.  There were plenty of times where I
16  directed the specific investigator.  I want you to talk
17  to this witness or so-and-so, yes, just like you would
18  in any case.
19      Q.  In this particular instance associated
20  with Mr. Epstein, what investigators worked on
21  Mr. Epstein's case during the time you were at RRA?
22      A.  If you want an exclusive list, I don't know.
23      Q.  I want to know?
24      A.  I can tell you Michael Fisten did because I
25  communicated with him directly.

Page 170

1      Q.  Did you meet, did you know Mr. Fisten
2  before you started working at RRA?
3      A.  Same answer, no.
4      Q.  No.  All right.  And Mr. Fisten, did you
5  direct Mr. Fisten to do investigations in Martha's
6  Vineyard?
7      A.  No.
8      Q.  Did you direct Mr. Fisten to do
9  investigations in California?
10      A.  I directed Mr. Fisten to interview people and
11  ultimately it was learned that they lived in California.
12      Q.  And did Mr. Fisten go to California to
13  interview those individuals?
14      A.  To the best of my knowledge he did.
15      Q.  Okay.  And who did he go and interview?
16          MR. SCAROLA:  That is work-product and I
17  instruct you not to answer.
18  BY MR. CRITTON:
19      Q.  Did Mr. Fisten interview a person by the
20  name of Michael Sanka (phonetic)?
21          MR. SCAROLA:  That is work-product and I
22  instruct you not to answer.
23          MR. CRITTON:  Did Mr. Fisten interview a
24  individual by the name of Michael Friedman
25  (phonetic)?

Page 171

1          MR. SCAROLA:  That is work-product and I
2  instruct you not to answer --
3          MR. CRITTON:  Mr. Fisten --
4          MR. SCAROLA:  -- except to the extent as
5  may have already been disclosed to the defense
6  in any of the three cases that are currently
7  pending.  Any and all questions about
8  investigative work will meet with the same
9  objection and same instruction.
10  BY MR. CRITTON:
11      Q.  Did you direct Mr. Fisten that he could
12  represent that he was an agent of the FBI in
13  interviewing individuals in California?
14      A.  Of course not.
15      Q.  Did you -- and if in fact Mr. Fisten
16  represented he was an agent of the FBI, you would
17  find that reprehensible, true?
18      A.  This is some hypothetical question that I do
19  not believe exists.
20      Q.  I'm asking you to assume that Mr. Fisten
21  represented that he was an agent of the FBI.  You
22  would find that type of conduct by the investigator
23  to be inappropriate, correct?
24      A.  I'm not going to render an opinion on a
25  hypothetical that doesn't exist.

6 (Pages 168 to 171)

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)

2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 172

1  Q.  So, you're refusing to answer that
2  question?
3  A.  You're asking me about my definition of
4  reprehensible as it pertains to a specific hypothetical
5  that you've just created.
6  Q.  Let me ask you --
7  A.  Now, you want me to try to analyze that
8  particular hypothetical and tell you whether it meets
9  the definition of reprehensible?
10  Q.  I will let you -- if Mr. Fisten, if I ask
11  you to assume that Mr. Fisten represented to a
12  witness out in California that he was an agent or
13  working for the FBI, would you find that conduct
14  appropriate by Mr. Fisten?
15  MR. SCAROLA:  And I will tell you that you
16  are not obliged to answer hypothetical
17  questions.
18  THE WITNESS:  And therefore I am not going
19  to answer that question.
20  BY MR. CRITTON:
21  Q.  If Mr. Fisten represented that he was
22  associated with the Miami-Dade Police Department,
23  Miami-Dade County Police Department, would you find
24  that conduct inappropriate?
25  MR. SCAROLA:  Same instruction and I would

Page 173

1  also observe with regard to each of the
2  hypothetical questions that you are asked that
3  they are incomplete.  And without knowing all
4  of the surrounding circumstances, it would be
5  impossible for any witness to pass judgment
6  upon what may have occurred.
7  BY MR. CRITTON:
8  Q.  So, Mr.-- would it be a correct statement
9  at least as you understood it, Mr. Edwards, that
10  Mr. Fisten was not an agent, was not an FBI agent
11  during the time that he worked for RRA?
12  A.  You're asking me was he an FBI agent or did he
13  work for RRA  He worked for RRA
14  Q.  Correct.  He was not an FBI agent, true,
15  to the best of your knowledge during the time he
16  worked for RRA
17  A.  Okay.
18  Q.  I am not talking about any other time
19  period right now.
20  A.  Okay.  Then the answer is he was not an FBI
21  agent at the time he was working for RRA
22  Q.  During the time he worked for RRA he as
23  well was not associated with Miami-Dade Police
24  Department, correct?
25  A.  Oh, I don't know that.

Page 174

1  Q.  Could he -- is it your --
2  A.  How would I know associate, he may have been?
3  Q.  Let me ask you this, was he employed by
4  the Miami-Dade Police Department in addition to RRA
5  during the time he worked there?
6  A.  To the best of my knowledge, no.
7  Q.  Did -- with regard to Mr. Epstein's cases
8  was there any type of cost account set up for, for
9  them?
10  A.  I don't know.
11  Q.  Could you access any of the financial
12  files within the RRA firm?
13  A.  No.
14  Q.  Could you access any files that were
15  associated with your specific, excuse me, clients or
16  your specific case such as if you wanted to know how
17  much in costs had been incurred by Mr. Epstein -- on
18  Jane Doe's case while at the RRA firm, could you
19  request that, could you access that information?
20  A.  I don't know.
21  Q.  Did you ever try to access that
22  information?
23  A.  No.
24  Q.  At any time did you request that anybody
25  provide you copies of what the costs were associated

Page 175

1  with Mr. Epstein's cases?
2  A.  No.
3  Q.  Since you left the firm have you requested
4  any type of detailed billing or cost analysis such
5  as to the cost of any of the costs that were
6  incurred on any of Mr. Epstein's cases?
7  A.  Of course.
8  Q.  And did you receive those costs?
9  Did you receive that information?
10  A.  Yes.
11  Q.  And what costs have been incurred in the
12  cases, in the Epstein cases associated up -- let me
13  strike that.  What costs, what is the total amount
14  of costs that were incurred in the Epstein cases
15  during the time that those files existed in the RRA
16  firm?
17  MR. SCAROLA:  If you're able to answer
18  that question with regard only as to amount
19  without specifying any of the specific cost
20  expenditures, then I think we can answer that
21  question only as to amount.
22  THE WITNESS:  And the question as to the
23  aggregate in the three cases?
24  MR. CRITTON:  Correct.
25  THE WITNESS:  Because I can't delineate

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)

2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 176

1    for you.
2        MR. CRITTON:  Your best estimate.
3        THE WITNESS:  Okay.  I believe more than
4    $300,000.
5    BY MR. CRITTON:
6        Q.  With regard to, if investigation was done
7    on, on a Epstein case, was the investigator charged,
8    that is for his time, as an example Mr. Fisten, if
9    he did work in California would his time, I'm not
10   talking about his expenses, would that be billed as
11   a cost to the file?
12       A.  I don't know.
13       Q.  On the cost that you received, well, let
14   me strike that.  If I understood it, up to 300,000
15   approximately $300,000 that's been spent on the
16   Epstein file, were you able to look --
17       A.  It would be more than that.  I am just saying
18   it's at least $300,000.
19       Q.  Something between three and $400,000,
20   could it --
21       A.  Something that I would say is definitely
22   between 300 and $500,000, but I'm not sure.  It could be
23   301.  It could be 450.  I really don't know.
24       Q.  When was the last time that you looked at
25   that ledger or the printout associated with the

Page 177

1    Epstein files?
2        A.  I have never looked at the printout.
3        Q.  Okay.  How, how do you know what is amount
4    is then?  That is how do you have the estimate of it
5    being between 350, I'm sorry between 300 and
6    $500,000, the cost associated with Epstein?
7        A.  I asked a paralegal within my current firm for
8    the total amount of costs on these three cases that is
9    being claimed by Rothstein Rosenfeldt Adler.  And I
10   remember the cost number in the aggregate being given to
11   me reflecting an amount what I just told you.
12       Q.  Have you requested a copy of the -- let me
13   strike that.  Did she say she had, that is did
14   she -- did you actually receive a document that
15   reflects the breakdown of the costs from the
16   trustee?
17       A.  I personally have not seen that.
18       Q.  Okay.  Has your firm received it?
19       A.  I don't know.
20       Q.  I assume -- would it be a correct
21   statement that the three to $500,000 is, includes
22   only the time between April of '09 and October of
23   '09 when you were with the firm?
24       A.  It's a good question.  I, I believe so.
25       Q.  And approximately, prior to joining the

Page 178

1    firm had you, you had spent some of your own money
2    and/or LLC money on the files; is that correct?
3        A.  That's correct.
4        Q.  Approximately how much is that amount?
5        A.  I'm, I'm not sure.  I think as you're aware
6    most of the depositions and costly work that was done on
7    the files happened to have been done during that time
8    period for all of the respective cases or claims against
9    Mr. Epstein during that time period of last summer of
10   2009.
11       Q.  All right.  But in terms of your costs
12   prior to coming to RRA, what's your best estimate of
13   the costs that you have paid either out of pocket or
14   are responsible to a bank to repay?
15       A.  I don't know.
16       Q.  More than 25,000, less than 25,000?
17       A.  I'm not sure.
18       Q.  More than 100,000?
19       A.  No.
20       Q.  More than 50,000?
21       A.  I don't know.
22       Q.  That's a record obviously you could pull
23   up, correct?
24       A.  Correct.
25       Q.  All right.  Now, with regard to, prior to

Page 179

1    your coming to RRA, had there been any investigation
2    work that you had done on the Epstein files -- and
3    let me strike that.  Had you hired or retained an
4    investigator to do any work for you on the Epstein
5    files prior to coming to RRA?
6        A.  I don't think so.
7        Q.  All right.
8        A.  It would have been around that time.  I don't
9    remember whether the initial investigator was hired by
10   me from my previous, from my solo firm or was hired by
11   Rothstein Rosenfeldt Adler.  I can't say.
12       Q.  Who was the first investigator that you
13   believe was involved in investigating the Epstein
14   cases?  Just a name not topic?
15       MR. SCAROLA:  Work-product, instruct you
16   not to answer.
17   BY MR. CRITTON:
18       Q.  Was the first person that was retained as
19   an investigator someone who ultimately became
20   employed by RRA?
21       MR. SCAROLA:  You can answer that.
22       THE WITNESS:  No.
23   BY MR. CRITTON:
24       Q.  The, the person who you hired to -- and by
25   investigation I mean something other than looking up

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)          2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 180

```
 1   an address to serve a subpoena or, or doing some
 2   minimal background.
 3       A.  I am glad you clarified because I am using
 4   that same definition.
 5       Q.  All right.  So, it's, it's your best
 6   recollection that you did or did not hire an
 7   investigator to do real investigative work with,
 8   associated with Mr. Epstein prior to joining RRA?
 9       A.  I believe I did, but it was after a time when
10   I had, I was contemplating or at least to myself had
11   committed to going to RRA  So, it was within that time
12   period I believe that I hired that person prior to RRA
13       Q.  When you then went to -- now you had
14   committed to go to RRA or at least mentally
15   committed to go to RRA  As soon as you started with
16   RRA, did you terminate the services of that
17   investigator?
18       A.  No.
19       Q.  Did that investigator continue to do work?
20       A.  Yes.
21       Q.  Okay.  Has, does he or she or it continue
22   to do work today for you?
23       A.  No.  On Mr. Epstein's case you're asking,
24   right?
25       Q.  Yes, sir.
```

Page 181

```
 1       A.  No.
 2       Q.  Okay.  For how long a time period did that
 3   person continue to do the work before it got
 4   transferred to Mr. Fisten or other investigators?
 5       A.  Question doesn't make sense.
 6       Q.  Okay.  How long did the investigator that
 7   you may have hired prior to joining RRA work on the
 8   Epstein files before you ceased that work after you
 9   started working for Epstein in April of '09?  I'm
10   sorry, for RRA in '09.
11       A.  The person was hired in either March or April
12   of 2009, which is why I can't say with absolute
13   certainty whether I was at RRA or not.  And that person
14   continued to do investigative work in some capacity
15   probably throughout the entire time that I was at RRA
16       Q.  Were all of the bills for that
17   investigator paid by RRA?
18       A.  Yes.
19       Q.  With regard to the payments for the
20   investigators -- well, let me strike that.  Who
21   other than Mr. Fisten from an investigator, from an
22   internal investigator at RRA employee worked on
23   doing investigation on the Epstein files?
24           MR. SCAROLA:  Same objection, same
25       instruction.
```

Page 182

```
 1           MR. CRITTON:  You are claiming
 2   work-product?
 3           MR. SCAROLA:  Yes.
 4   BY MR. CRITTON:
 5       Q.  The investigators, did you understand them
 6   to be salaried employees of RRA?
 7       A.  I really have no idea.
 8       Q.  Did you ever ask them?
 9       A.  No.
10       Q.  Do you know whether the, do you have any
11   knowledge as to whether the investigators kept time
12   records?
13       A.  I do not have that knowledge.
14       Q.  In terms of when an investigator would
15   come back -- well, do you know how the investigators
16   were paid?
17       A.  With money.
18       Q.  From RRA?
19       A.  I would presume.  Totally speculation.
20       Q.  Would the RRA -- were the investigators
21   for RRA bonused?
22       A.  I have no idea.
23       Q.  Did you ever discuss with Mr. Fisten what
24   his financial compensation was associated with RRA?
25       A.  No.
```

Page 183

```
 1       Q.  Did, did you ever promise either
 2   Mr. Fisten or any other investigator that when the
 3   case settled, they would get a bonus from an Epstein
 4   case?
 5       A.  No.
 6       Q.  Okay.  Did Mr. Fisten ever inquire of you
 7   as to whether he would get a bonus if, in fact, the
 8   cases on which he worked including the Epstein cases
 9   settled for a favorable verdict or result came in?
10       A.  No.
11       Q.  Did you have any understanding from either
12   your conversations from Mr. Rothstein whether
13   investigators were bonused based upon the work that
14   they did?
15       A.  Excuse me?
16       Q.  Did you ever have an understanding from
17   Mr. Rothstein that, that investigators would be
18   bonused from cases on which they worked based upon
19   their work product or their contribution?
20       A.  No.  I had no understanding.
21       Q.  Did you, from -- I assume you've read a
22   number of the news reports associated with
23   Mr. Rothstein and the implosion of the firm?
24       A.  Okay.
25       Q.  I assume you have seen a number of them?
```

9 (Pages 180 to 183)

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)

2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 184

```
 1        A.  What do you mean by a number?
 2        Q.  More than one.
 3        A.  Yes, I have seen more than one.
 4        Q.  Have you seen articles were it's alleged
 5   that investigators that were employed by Rothstein,
 6   by RRA would go through the garbage of prospective
 7   Defendants to search for incriminating or favorable,
 8   incriminating evidence against the Defendant or
 9   favorable evidence for a Plaintiff who might be
10   working or who might be a client of the firm?
11        A.  I have not seen an article saying that.  I
12   think I have heard your client say that before.
13        Q.  Separate and apart --
14        A.  Right.
15        Q.  You don't have to rely on anything my
16   client has said before, the testimony --
17        MR. SCAROLA:  I am sure we won't.
18        MR. CRITTON:  I am confident of that.
19   BY MR. CRITTON:
20        Q.  In terms of, were you aware from the
21   articles, did you see in the article -- let me
22   strike that.  Did you ever direct your investigators
23   to go through Mr. Epstein's trash?
24        MR. SCAROLA:  I am going to object,
25        work-product, attorney-client privilege.
```

Page 185

```
 1   BY MR. CRITTON:
 2        Q.  Have you directed, did you ever direct --
 3   this is the investigators during the time you were
 4   at RRA and that's the question you're claiming the
 5   privilege over, correct?
 6        MR. SCAROLA:  I am claiming the privilege
 7        with respect to any action that was taken by
 8        Mr. Edwards or at Mr. Edward's direction in --
 9        MR. CRITTON:  Tell you what, I will
10        withdraw the last question.
11        MR. SCAROLA:  -- in connection with the
12        investigation in prosecution of the claims
13        against Mr. Epstein.
14   BY MR. CRITTON:
15        Q.  Let me make my question clear,
16   Mr. Edwards.  With regard to your investigators, you
17   gave direction with regarding the Epstein cases,
18   during the time you were with RRA did you ever tell
19   them or direct them to go through Mr. Epstein's
20   trash?
21        MR. SCAROLA:  Same objection, same
22        instruction.
23   BY MR. CRITTON:
24        Q.  Did you ever direct the investigators to
25   go through the trash of the lawyers who were
```

Page 186

```
 1   representing Mr. Epstein including myself?
 2        MR. SCAROLA:  Same objection, same
 3        instruction.
 4   BY MR. CRITTON:
 5        Q.  Did you ever?
 6        MR. SCAROLA:  Mr. Edwards will not answer
 7        any questions regarding what he did or didn't
 8        do.
 9        MR. CRITTON:  I understand.  I just want
10        to make it certain it's for the court on some
11        of these issues.
12        MR. SCAROLA:  Well, for the court I am
13        telling you he is not going to answer any of
14        those questions.  And continuing to ask them in
15        light of the fact that we have told you and
16        made it clear the scope of our assertion of
17        privilege serves no useful purpose.
18   BY MR. CRITTON:
19        Q.  Mr. Edwards, at any time, did you -- well,
20   let me strike that.  Did you ever direct the
21   investigators to, during the time you were at RRA,
22   to conduct a surveillance on Mr. Epstein's property?
23        MR. SCAROLA:  Same objection, same
24        instruction.
25
```

Page 187

```
 1   BY MR. CRITTON:
 2        Q.  Since the time you have left RRA in your
 3   current firm, have you conducted surveillance on Mr.
 4   Epstein's property?
 5        MR. SCAROLA:  Same objection, same
 6        instruction.
 7   BY MR. CRITTON:
 8        Q.  Have you instructed anyone, either of the
 9   in-house investigators to conduct surveillance of
10   Mr. Epstein's property?
11        MR. SCAROLA:  Same objection, same
12        instruction.
13   BY MR. CRITTON:
14        Q.  Have you authorized investigators employed
15   by RRA, either employees of the firm or an outside
16   investigation firm, to walk around the perimeter of
17   Mr. Epstein's home on or about March 17th of 2010?
18        MR. SCAROLA:  Same objection, same
19        instruction.
20        THE WITNESS:  What's the date?
21        MR. CRITTON:  March 17th 2010.
22        MR. SCAROLA:  St. Patrick's Day.  Did you
23        employ any leprechauns?
24        THE WITNESS:  Actually --
25
```

10 (Pages 184 to 187)

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)

2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 188

1   BY MR. CRITTON:
2       Q.  With regard to the, with regard to the
3   investigators, with regard to the investigation
4   bills that would come in from outside investigators,
5   specifically the one that you -- well, let me strike
6   that.
7           The investigator that you hired before you
8   went to RRA, I think you testified that bill was
9   paid by RRA, correct?
10      A.  Yes.
11      Q.  All right.  And in terms of the
12  investigators who were employed by RRA for whatever
13  investigation you directed them to do, those
14  individuals were also paid from funds from RRA,
15  correct?
16      A.  During the time period when I was at RRA
17  you're asking about specifically, correct?
18      Q.  Correct.
19      A.  Then the answer is, yes.
20      Q.  Was there any specific cost account that
21  was set up for Mr. Epstein's cases?
22      A.  I don't know.
23      Q.  Did you ever speak with the --
24      A.  Again we're talking about the time period at
25  RRA?

Page 189

1       Q.  At RRA
2       A.  Okay.
3       Q.  During the time you were at RRA did you
4   ever speak with the accounting department or the
5   accounting department ever call you to talk about
6   the amount of costs, assuming they were something
7   between 300 and $500,000 that were being expended on
8   Mr. Epstein files?
9       A.  No.
10      Q.  Did, did anyone at the firm ever call you
11  to discuss the issue of the amount of costs between
12  300 and $500,000 that were being incurred to
13  prosecute Mr. Epstein's cases?
14      A.  No.
15      Q.  Okay.  Who had checked -- did you have any
16  check-signing authority at RRA?
17      A.  No.
18      Q.  Who did sign the checks?
19      A.  I don't know.  I was --
20      Q.  In terms of the, the work that was being
21  done or the, the work that was, that is the costs
22  that were being incurred including reimbursable
23  costs, did you understand that you had a, basically
24  an unlimited budget to prosecute those cases?
25      A.  No.

Page 190

1       Q.  Okay.  Well, if you could authorize any
2   expenditure that you wanted and nobody ever told you
3   not to, that you couldn't spend the particular
4   money, what controls, if any, existed with regard to
5   monies spent on the Epstein cases?
6       A.  The presupposition that you just created is
7   incorrect, so I cannot answer that question.  You began
8   with I have no limit to how I can spend money and that
9   there is no regulation.  I mean, that's just not true,
10  so I don't understand what to tell you.
11      Q.  What limits if any did you have in
12  spending money in prosecuting Mr. Epstein's case?
13      A.  We went through expediting transcripts and I
14  used my own judgment.
15      Q.  I understand that.
16      A.  If we have another specific example, I will
17  address it and I will tell you whether I had that
18  authority or somebody else may have had that authority
19  But specifically related to expediting transcripts and
20  things involving depositions, ordering depositions, I
21  used my judgment and it was never questioned.
22      Q.  Separate and apart from transcripts, if,
23  if -- you've testified that the expenditures for
24  costs that the firm or the trustee is seeking back,
25  at RRA is seeking back, is seeking relating to any

Page 191

1   recovery in any Epstein cases is between three and
2   $500,000, correct?
3       A.  Correct.
4       Q.  All right.  So, separate and apart from
5   expedited transcripts or video depositions or
6   serving subpoenas, that, there has to be, you know,
7   hundreds of thousands of dollars in additional
8   expenses that were associated with prosecuting
9   Mr. Epstein's cases, correct?
10      A.  Correct.
11      Q.  And with regard to those types of
12  expenditures that are in the hundreds of thousands
13  of dollars, who authorized those types of
14  expenditures?
15      A.  I don't know.
16      Q.  Well, you said that you used judgment
17  certainly with regard to transcripts.  So, who, if,
18  if spending an extra two, three, $400,000 separate
19  and apart from transcripts, serving subpoenas is not
20  a limitless budget, how would you describe it; that
21  is, what controls if any did you have in prosecuting
22  the Epstein cases?
23      A.  First, I haven't seen the delineation of that
24  amount and I don't know that we agree with Rothstein
25  Rosenfeldt Adler as to their costs, but that is what

11 (Pages 188 to 191)

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)

2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 192

```
 1   they're claiming.  I never juxtaposed that with what I
 2   believe should be the proper amount.  But beginning with
 3   the fact that I do recognize that as the amount that
 4   they are claiming, I was not aware that the costs were
 5   that high.
 6          The cases were firm cases, paid for by the
 7     firm.  I was simply an employee and I made judgment
 8   calls.  If somebody had told me at any given time,
 9   we shouldn't serve these subpoenas, or we shouldn't
10   take this deposition, I wouldn't have done it.
11       Q.  In fact, with regard to -- well, let me
12   ask you this:  Were any informants, did you
13   authorize your investigators to hire informant,
14   informants?
15       MR. SCAROLA:  Same objection, same
16     instruction.
17   BY MR. CRITTON:
18       Q.  Did you authorize your investigators to do
19   electronic eve's dropping?
20       MR. SCAROLA:  Same objection, same
21     instruction.
22   BY MR. CRITTON:
23       Q.  You indicated that you were just an
24   employee, correct?
25       A.  Yes.
```

Page 193

```
 1       Q.  Okay.  In fact, you, on various documents
 2   reflected that you were a partner of the firm,
 3   correct?
 4       A.  Yes, document, documents do reflect that
 5   title, of course, yeah.
 6       Q.  And if I had asked for a card during the
 7   time that you started at RRA up until the time of
 8   the implosion of the firm in late October of '09,
 9   would your card have also reflected that you were a
10   partner of the firm?
11       A.  I think you did request a card.  I think I
12   gave it to you and I believe that it did say partner on
13   it.
14       Q.  And you would agree that at least up until
15   the time of the implosion of RRA you held yourself
16   out to the public, and including other lawyers, as
17   being a partner of RRA, true?
18       A.  What do you mean by held myself out to the
19   public?
20       Q.  You called yourself a partner.  You didn't
21   say I'm an employee; I'm not a partner, correct?
22   You held yourself out to the public as being a
23   partner?
24       MR. SCAROLA:  I'm going to object to the
25     form of the question to the extent that it
```

Page 194

```
 1   suggests that those terms are mutually
 2   exclusive.
 3       THE WITNESS:  That was a part of my answer
 4   is that, I don't know --
 5       MR. CRITTON:  I am shocked to hear that.
 6       THE WITNESS:  I don't know that being an
 7   employee means that you can't also be a
 8   partner.  There are equity partners and
 9   non-equity partners to nearly every single
10   large firm, so I was a non-equity partner
11   otherwise known as a salaried employee.  That's
12   just the way it was.
13   BY MR. CRITTON:
14       Q.  But your card just reflected partner as
15   did your --
16       A.  Rather than that whole script I just told you.
17       Q.  Right.  Rather than the qualifying
18   provisions.
19       A.  Yes, you're right.  The qualifying positions
20   didn't make the card.
21       Q.  With regard to the monies that was, that
22   were being paid by, by Rothstein, I'm sorry, by the
23   RRA firm for the costs -- let me strike that.
24   During the time that you were at the RRA firm, the
25   seven months that you were there from April through
```

Page 195

```
 1   the end of October, do you recall any significant
 2   settlements that were coming into the firm; that is,
 3   that were publicized?
 4       A.  Do I recall significant settlements --
 5       Q.  Correct.
 6       A.  -- coming into the firm that were publicized?
 7       Q.  Correct?
 8       A.  I believe, I can't say with any degree of
 9   specificity whether I remember anything that falls into
10   all of those categories.
11       Q.  Now, I forgot my question for a minute.
12   If I understand your answer, and assuming I remember
13   my question, Mr. Edwards, you don't recall any
14   significant settlements coming into the firm that
15   were, that were publicized either internally within
16   the firm or within the newspapers; is that a fair
17   statement?
18       A.  Fair statement.
19       Q.  Where did you think all of the money that
20   was coming from -- let me strike that.  At that time
21   how many lawyers were there in the Fort Lauderdale
22   office; that is, during the time you were there?
23       A.  I don't know.
24       Q.  Best estimate?
25       A.  Seventy.
```

12 (Pages 192 to 195)

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)                    2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 196

1      Q.   Okay.  And the support, how many floors
2  did RRA occupy in the Fort Lauderdale --
3      A.   I believe six.
4      Q.   And approximately how many square feet on
5  each floor?
6      A.   I don't know.  A lot.
7      Q.   More than 10,000 square feet on each
8  floor?
9      A.   I don't know.
10     Q.   And what was the support staff at the time
11 that you were there approximately?
12     A.   In quantity or quality?
13     Q.   Quantity, the number of people.
14     A.   I don't know.  A lot of people.
15     Q.   Did you do any hourly billing yourself at
16 all or were you strictly a contingency fee person?
17     A.   90 percent contingency.
18     Q.   And with regard to the monies that were --
19 separate and apart from the Epstein, Epstein cases
20 where at least you now know that they cost between
21 three and $500,000, you were, I assume, incurring
22 other expenses on other cases, true?
23     A.   True.
24     Q.   All right.  And where did you, where did
25 you think that the money was coming from; that is,

Page 197

1  the source of the money to pay the extensive bills
2  that were being incurred on Epstein and other cases?
3      MR. SCAROLA:  I am going to object to the
4  extent the question calls -- excuse me, I'm
5  going to object because there is no proper
6  predicate to the question, and that is that it
7  was a matter that was ever given a thought by
8  Mr. Edwards.
9      MR. CRITTON:  Is that form?  Form is
10 adequate so you don't have to instruct him.
11     MR. SCAROLA:  Thank you.
12     THE WITNESS:  What's the question?
13 BY MR. CRITTON:
14     Q.   What did you consider, what did you
15 believe was the cost; that is, the source of the
16 money that was used to be paying these extensive
17 costs that were being incurred in Epstein and other
18 cases?
19     MR. SCAROLA:  Objection.
20     MR. CRITTON:  Just of yours and yours
21 alone?
22     MR. SCAROLA:  Objection, form and
23 compound.
24     THE WITNESS:  The law firm.
25

Page 198

1  BY MR. CRITTON:
2      Q.   Where did you think the law firm -- let me
3  strike that.  Did you ever discuss with anyone
4  whether it was from current cash that was being used
5  or whether they had a line of credit or both?
6      A.   Didn't know.
7      Q.   Mr. Edwards, did you come to learn that
8  investigators had, that investigators had gone to
9  Mr. Epstein's property on March 17th, 2010?
10     A.   No.
11     Q.   Did you ever authorize any investigators
12 to enter Mr. property (sic), Mr. Epstein's property
13 on March 17th, 2010?
14     MR. SCAROLA:  Objection.  Instruct you not
15 to answer on the basis of work-product
16 privilege.
17 BY MR. CRITTON:
18     Q.   Let me just be clear.  Are, are you aware
19 of any investigators who entered Mr. Epstein's
20 property on March 17th, 2010?
21     MR. SCAROLA:  Same objection as well as
22 attorney-client privilege and instruct you not
23 to answer.
24 BY MR. CRITTON:
25     Q.   Mr. Edwards, did you authorize any

Page 199

1  investigators to trespass on Mr. Epstein's property
2  on March 17th of 2010?
3      MR. SCAROLA:  Same objection and
4  instruction.
5  BY MR. CRITTON:
6      Q.   Mr. Edwards, did you authorize
7  investigators to hide in the bushes at Mr. Epstein's
8  house in order to take photographs of either
9  Mr. Epstein or any associated objects on his
10 property?
11     MR. SCAROLA:  Same objection and
12 instruction.
13 BY MR. CRITTON:
14     Q.   Mr. Epstein -- Mr. Epstein.  Mr. Edwards,
15 do you know a lady name Christina Kitterman?
16     A.   Yes.
17     Q.   Okay.  And who -- how do you know her?
18     A.   She was a lawyer at Rothstein Rosenfeldt Adler
19 when I was a lawyer at Rothstein Rosenfeldt Adler.
20     Q.   Did you have any dealings with her on any
21 of your cases?
22     A.   None.
23     Q.   What did you understand her area of
24 practice?
25     A.   Never knew.

13 (Pages 196 to 199)

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)

2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 200

1      Q.  Did you know an individual by the name of
2  Patrick Roberts?
3      A.  Yes.
4      Q.  Okay.  And who is Mr. Roberts during; that
5  is, what did Mr. Roberts do for RRA?
6      A.  He was an investigator.
7      Q.  Did he ever perform investigation work on
8  any of the Epstein files?
9          MR. SCAROLA:  Same objection, same
10  instruction.
11  BY MR. CRITTON:
12      Q.  Did you ever authorize Mr. Roberts to
13  perform investigation on the Epstein files?
14          MR. SCAROLA:  Same objection and
15  instruction.
16  BY MR. CRITTON:
17      Q.  All right.  I asked you earlier about
18  Richard Fandrey, F-a-n-d-r-e-y.  I think you said
19  you don't know who that -- you knew someone named
20  Rick; is that correct?
21      A.  I know an investigator named Rick.
22      Q.  Did Rick, did Rick perform any
23  investigation on the Epstein, did you authorize Rick
24  to perform any investigation on the Epstein files?
25          MR. SCAROLA:  Same objection and

Page 201

1  instruction.
2  BY MR. CRITTON:
3      Q.  And I believe we talked a little bit
4  about, we certainly talked about Mr. Jenne, did you
5  ever authorize or direct Mr. Jenne to perform any
6  investigation on the Epstein files?
7          MR. SCAROLA:  Same objection and
8  instruction.
9  BY MR. CRITTON:
10      Q.  Are you familiar with the company called
11  Blue Line Research and Development?
12      A.  No.
13      Q.  Are you, are you aware at the current time
14  that there is an entity called Blue Line Research
15  and Development which is composed of Mr. Roberts,
16  Mr. Richard Fandrey, Mr. Michael Fisten and Ken
17  Jenne?
18      A.  No.
19      Q.  If you're unaware of the existence of the
20  entity called Blue Line Research and Development,
21  LLC, would it be a correct statement that you have
22  never authorized anyone from Blue Line Research and
23  Development, LLC, to conduct any investigation of
24  Jeffrey Epstein?
25          MR. SCAROLA:  Same objection, same

Page 202

1  instruction.
2          MR. CRITTON:  Says he doesn't know them.
3  How can that be an instruction?
4          MR. SCAROLA:  Well, because I am not going
5  to tell you, we're not going to permit
6  Mr. Edwards to answer any questions about
7  either what he did or what he didn't do that
8  are part of the work product involved in his
9  representation of the Plaintiffs with claims
10  against Mr. Epstein whom Mr. Edwards is
11  representing.
12          MR. CRITTON:  Did you ever --
13          MR. SCAROLA:  So, in light of that and
14  what I have attempted to make very clear with
15  regard to the scope of our objections, if you
16  continue to ask questions which it is clear
17  fall within the scope of my instructions to
18  Mr. Edwards and my announced intention with
19  regard to the scope of those instructions, then
20  we will terminate this deposition so that I can
21  seek a protective order.
22          My suggestion is that you move onto other
23  areas that are outside the scope of that
24  instruction, if you have any other questions
25  outside the scope.

Page 203

1          MR. CRITTON:  Oh, I have a lot of other
2  questions.
3          MR. SCAROLA:  Okay.
4          MR. CRITTON:  Let me be clear with you
5  with regard to any, for purposes of following,
6  asking any follow-up questions should the court
7  determine that I am entitled to this
8  information, you would agree that should the
9  court determine I am entitled to ask the name
10  of these individuals and possibly other
11  questions is, is that by not asking questions I
12  am in no way waiving my right to ask as many
13  questions as the court ultimately determines as
14  appropriate, proper, and as the court allows,
15  correct?
16          MR. SCAROLA:  I absolutely agree.
17          MR. CRITTON:  All right.
18  BY MR. CRITTON:
19      Q.  Mr. Edwards, are you familiar with a
20  person named Alfredo Rodriguez?
21      A.  Yes.
22      Q.  And how do you know Mr. Rodriguez?
23      A.  Who do I know him to be?  How do I know him?
24  I met him the same -- well, I met him after you did,
25  after you and your investigators pre-deposed him on three

14 (Pages 200 to 203)

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)

2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 204

1   various occasions for a total of about 15 hours before
2   we took this deposition.  I met him for the first time
3   during that deposition.
4           MR. CRITTON:  Let me move to strike as
5       nonresponsive.
6   BY MR. CRITTON:
7       Q.  My question to you is when did you first
8   meet Mr. Rodriguez?
9           MR. SCAROLA:  And you have an answer to
10      that question.
11          THE WITNESS:  It's a very complete answer.
12      I, the day of his deposition.
13  BY MR. CRITTON:
14      Q.  Had you ever spoken with Mr. Rodriguez
15  before that time?
16      A.  No.
17      Q.  Okay.  Had anyone on your behalf spoken
18  with Mr. Rodriguez?
19      A.  No.
20      Q.  Mr. Rodriguez's deposition occurred over a
21  two-day period; is that correct?  Two separate days.
22      A.  I believe that's right.
23      Q.  And you were present for both of those
24  depositions; is that correct?
25      A.  Yes.

Page 205

1       Q.  And the first one I believe at least in
2   looking at the transcript the first one occurred on
3   January 29th of '09?
4       A.  I'm assuming.
5       Q.  And the second, the follow-up was on
6   August 7th, 2009, correct?
7       A.  When was the first, January you said?
8       Q.  Excuse me.  I'm sorry.  July 29th, 2009.
9       A.  Okay.
10      Q.  With the follow-up July, I'm sorry
11  August 7th, 2009.
12      A.  If you say so.  I'm not quarreling with that.
13      Q.  And I will just represent that is what I
14  read off the transcripts.  Between those two dates,
15  that is July 29th and August 7th of '09, did you
16  speak with Mr. Rodriguez at all?
17          MR. SCAROLA:  Same objection, same
18      instruction to the extent that any such
19      conversation may have occurred in connection
20      with your representation of the Plaintiffs and
21      claims against Mr. Epstein.
22  BY MR. CRITTON:
23      Q.  All I am asking right now, not the
24  substance but just so the record is clear I am just
25  asking, did you speak with Mr. Rodriguez between

Page 206

1   July 29th and August 7th?
2       A.  And if I did or if I didn't, either way that's
3   going to be protected by the work-product privilege and
4   I'm not going to give you that information because
5   you're not entitled to it.
6       Q.  I disagree even in a simple
7   attorney-client privilege you also, you identify the
8   date, you don't identify the subject, but you
9   identify the date, who may have been present.
10          MR. SCAROLA:  We understand your position
11      and it's not necessary to articulate it on the
12      record.
13          MR. CRITTON:  I just want to be clear.
14      And your position is the same is you're not
15      talking.
16          MR. SCAROLA:  Work-product.
17          MR. CRITTON:  Work-product, correct?
18          MR. SCAROLA:  That's correct.
19  BY MR. CRITTON:
20      Q.  Mr. Rodriguez was requested to bring
21  documents to his second deposition that he had
22  referenced that he might have.  Do you recall that
23  from the first deposition, Mr. Edwards?
24      A.  I do.
25      Q.  And in fact when he came to the second

Page 207

1   deposition, he didn't bring any documents with him,
2   did he?
3       A.  I don't remember.
4       Q.  Well, do you remember him producing any
5   documents at the second, at his completion of his
6   deposition?
7       A.  I don't remember.
8       Q.  Do you recall him saying that he might
9   have some sort of book or some sort of list of names
10  and addresses and/or names, excuse me, of females
11  who may have come to Mr. Epstein's house along with
12  phone numbers?
13      A.  I don't remember if he said that or it says
14  that in the police report, but I remember that
15  information at some point in time.
16      Q.  All right.  And subsequent, at the
17  conclusion -- well, let me strike that.
18          Do you recall receiving any documents from
19  Mr. Rodriguez that were produced at his deposition
20  that had the names and addresses and/or phone
21  numbers of any other females?
22      A.  I don't know.  Do you?  We were there together
23  I don't remember specifically.  I think the answer is
24  no.
25      Q.  And I think you're right.

15 (Pages 204 to 207)

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)

2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 208

1    A.  Okay.
2    Q.  We agree on that.
3    A.  Okay.
4    Q.  Subsequent to the deposition; that is,
5  after Mr. Rodriguez's deposition, did Mr. Rodriguez
6  contact you?
7        MR. SCAROLA:  Objection, instruct you not
8    to answer.
9        MR. CRITTON:  Well, this is -- okay.  This
10   is a third party contacting Mr. Edwards.  All
11   right.
12       MR. SCAROLA:  It is not --
13       MR. CRITTON:  It's just a yes or no I'm
14   looking for.
15       MR. SCAROLA:  It is a witness in these
16   proceedings.
17       MR. CRITTON:  So.
18       MR. SCAROLA:  So, anything that
19   Mr. Edwards has done or may have done in
20   connection with his investigation and
21   prosecution of the claims against Mr. Rothstein
22   it is our position is not the appropriate
23   subject matter of inquiry in the context of
24   this lawsuit, and is an attempt to invade the
25   attorney-client and work-product privileges.  I

Page 209

1  am instructing him not to answer.
2        If the court, if the court determines that
3    the scope of the privilege permits a response
4    to these questions, we would be happy to
5    respond to them.
6        But we have an obligation to, to
7    Mr. Edward's clients to protect their rights to
8    a fair trial and their rights to
9    confidentiality, and for that reason we are
10   obliged to interpret those privileges in their
11   broadest sense unless and until the court
12   decides that a more restrictive interpretation
13   should be applied.
14 BY MR. CRITTON:
15   Q.  Between the first and second deposition of
16 Mr. Rodriguez, I think you, I think you indicated
17 that you did not speak with him; is that correct?
18   A.  You're asking me if I indicated to you
19 previously during this deposition whether --
20   Q.  Right.
21   A.  -- I spoke to him or not?  I, I don't
22 remember.
23   Q.  Did you speak with Mr. Rodriguez between
24 his first and second.
25       MR. SCAROLA:  Same objection, same

Page 210

1    instruction.
2  BY MR. CRITTON:
3    Q.  Did Mr. Mr. Rodriguez ever make a request
4  of you at any time for any type of monies for
5  testimony, documents, or any other information
6  associated with any existing or potential claimants
7  directed to Mr. Epstein?
8        MR. SCAROLA:  Same objection and
9    instruction.
10 BY MR. CRITTON:
11   Q.  Subsequent, after Mr. Rodriguez or from
12 the time that Mr. Rodriguez completed his deposition
13 on August 7th of 2009, did you have an occasion to
14 speak with either the FBI, well, with the FBI
15 regarding Alfredo Rodriguez?
16       MR. SCAROLA:  Same objection and
17   instruction.
18 BY MR. CRITTON:
19   Q.  Did you after Mr. Rodriguez's completion
20 of his deposition on August 7th, 2009, did you have
21 an occasion to speak with any representative, a
22 professional attorney, professional slash attorney
23 for the U.S. Attorney's Office?
24       MR. SCAROLA:  Same objection and
25   instruction.

Page 211

1  BY MR. CRITTON:
2    Q.  Mr. Edwards, are you familiar with the,
3  the criminal complaint that was filed relating to
4  Alfredo Rodriguez?
5        MR. CRITTON:  Let me show you what I will
6    mark as Exhibit 1 to the deposition.
7        (Plaintiff's Exhibit No. 1 was marked for
8    identification.)
9        MR. SCAROLA:  By that question, does that
10   mean has he seen it before?
11       MR. CRITTON:  First, let me show you
12   Exhibit 1.  Do you -- it's a criminal
13   complaint, the United States of America versus
14   Alfredo Rodriguez.
15       MR. SCAROLA:  Is your question has he seen
16   it before?
17       MR. CRITTON:  Yes.
18       MR. SCAROLA:  I'm not sure what "are you
19   familiar with it" means.
20 BY MR. CRITTON:
21   Q.  Have you seen this criminal complaint
22 before today?
23   A.  Yes.
24   Q.  When did you first see this document?
25   A.  I -- I don't know.

16 (Pages 208 to 211)

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)

2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 212

```
1        Q.  Did you, did you see Exhibit 1, the
2   criminal complaint, prior to the time that it was
3   filed in the United States District Court?
4        A.  Did I see it prior to it being filed?
5        Q.  Yes, sir.
6        A.  No, no.
7        Q.  Okay.  Did you provide an affidavit to any
8   individual at the FBI or the U.S. Attorney's Office
9   in support of, although not attached to this, to
10  Exhibit 1, the criminal complaint?
11       A.  Repeat.
12       Q.  Did you sign any affidavit or give, give
13  any sworn testimony associated with the criminal
14  complaint that was filed by the United States of
15  America versus Mr. Rodriguez?
16       A.  It's obvious to me that you're trying to
17  circumvent the privileges that have been placed on the
18  record.  I will answer that question that, no, I did
19  not, but I am not here to divulge anything that may
20  waive my attorney-client or work-product privilege or
21  otherwise jeopardize the claims that my three clients
22  are pursuing against Jeffrey Epstein for their being
23  sexually molested by him when they were underage minor
24  females.
25       Q.  Mr. Edwards, are you the cooperating
```

Page 213

```
1   witness who was referenced in the criminal
2   complaint, Exhibit 1?
3           MR. SCAROLA:  Could you explain to us for
4       the record, please, how that line of inquiry is
5       reasonably calculated to lead to admissible
6       evidence in this case?
7           MR. CRITTON:  I am not prepared to do that
8       right now.
9           MR. SCAROLA:  Then I am not prepared to
10      allow Mr. Edwards to answer that question
11      outside the presence of an Assistant United
12      States Attorney who can make a judgment as to
13      whether that is information that ought to be
14      disclosed.
15  BY MR. CRITTON:
16       Q.  Mr. Edwards, you knew or you first Marie
17  Villafana through the complaint you filed on behalf
18  of Jane Doe 1 and Jane Doe 2 in July of 2008,
19  correct?
20       A.  No.
21       Q.  Had you spoken with her before that period
22  of time; that is, before the complaint was ever
23  filed?
24       A.  Yes.
25       Q.  And I am now -- did you know Ms. Villafana
```

Page 214

```
1   during your years that you had worked as a State
2   Attorney?
3        A.  No.
4        Q.  Okay.  Did you meet her only as a result
5   of Epstein related matters?
6        A.  Yes, in its broadest sense I suppose.
7        Q.  Did you, did you have, before you began
8   representing E.W., did you know who Marie Villafana
9   was?
10       A.  I don't know.
11       Q.  What, what was your first association or
12  what contact was, what was your first contact with
13  Marie Villafana ever?
14       A.  I don't remember.
15       Q.  But if I understand correctly you only
16  know her through the context of the Jeffrey Epstein
17  matter; is that correct?
18       A.  Her involvement with, yes.
19       Q.  And that you only knew of her involvement
20  in the Jeffrey Epstein matter after you began
21  representing E.W.?
22       A.  I don't believe that to be accurate.
23       Q.  What involvement could you possibly, what
24  involvement would you have had with Mrs. Villafana
25  before you became involved in representing someone
```

Page 215

```
1   associated with the Epstein matter?
2        A.  I believe that I had read her name in the
3   newspaper related to some involvement with Jeffrey
4   Epstein's criminal investigation and/or case.  I think
5   that's the first time I saw her name, I believe.
6        Q.  Before, before you filed a lawsuit against
7   the United States of America, and I may have asked
8   you this earlier, so I apologize, did you ever speak
9   with Mrs. Villafana?
10       A.  I believe that any communications that I would
11  have had with respect to Mrs. Villafana would have only
12  been in the interest of pursuing claims on behalf of the
13  clients that I represented.  And therefore I am going to
14  claim a work-product privilege as to those
15  communications.
16       Q.  Okay.  My, my question was is only did you
17  speak with her prior to filing that complaint?  Just
18  a yes or a no, and I am looking, that question is
19  not asking for the substance.  I am just asking for
20  a yes or no.
21           MR. SCAROLA:  Same objection, same
22      instruction.
23  BY MR. CRITTON:
24       Q.  During the course of the litigation with
25  the United States Attorney's Office, I assume you
```

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)

2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 216

```
 1      had conversations with Mrs. Villafana from time to
 2    time?
 3        A.  Okay.
 4        Q.  Is that true?
 5        A.  Is your assumption true?
 6        Q.  Correct.
 7        A.  I have spoken with Ms. Villafana.
 8        Q.  And when you spoke with Ms. Villafana --
 9    let me strike that.  Have the only conversations
10    that you have had with Mr. Marie Villafana or
11    Villafana, have they only been in the context of
12    Jane Doe 1 and 2 versus United States of America,
13    only in the context of that case?
14        MR. SCAROLA:  Same objection.
15        MR. CRITTON:  And I will separate out to
16        the extent that you were at the June 12th,
17        2009, hearing in front of Judge Marra where she
18        was present.
19        MR. SCAROLA:  Same objection, same
20        instruction.
21    BY MR. CRITTON:
22        Q.  Has Ms.-- have you spoken, have you had an
23    occasion to speak with Ms. Villafana with regard to
24    the criminal complaint, Exhibit No. 1, involving
25    Alfredo Rodriguez, Mr. Rodriguez?
```

Page 217

```
 1        MR. SCAROLA:  Same objection, same
 2        instruction.
 3    BY MR. CRITTON:
 4        Q.  Mr. Edwards, have you ever been
 5    interviewed by the FBI or the U.S. Attorney's office
 6    with regard to any of your clients?
 7        MR. SCAROLA:  Any of the three clients who
 8        have claims against Mr. Epstein?
 9        MR. CRITTON:  Correct.
10        MR. SCAROLA:  Same objection, same
11        instruction.
12    BY MR. CRITTON:
13        Q.  Do you know Agent Nesbitt, sir?
14        A.  Yes.
15        Q.  And how do you know Agent Nesbitt from the
16    FBI?
17        A.  I can answer if you want.
18        MR. SCAROLA:  Okay.  That's fine.
19        MR. CRITTON:  Nesbitt Kirkendahl.
20        THE WITNESS:  I don't know her last name
21        but I do know the first name is, the first name
22        is obviously an unusual name, so I do know who
23        that is.  I met her outside of the courtroom
24        related to the Jane Doe 1 and 2 versus United
25        States of America case.
```

Page 218

```
 1    BY MR. CRITTON:
 2        Q.  Did you speak with Agent Nesbitt at that
 3    time?
 4        A.  Yes.
 5        Q.  Okay.  And what did, what did, did she
 6    initiate the conversation or did you?
 7        A.  The court initiated the conversation.
 8        Q.  Did the court say go outside and talk?
 9        A.  Right.
10        Q.  The court being Judge Marra?
11        A.  Correct.
12        Q.  And who else was present for that
13    conversation?
14        A.  I don't remember.  Marie Villafana.
15        Q.  Okay.  What was the discussion about that
16    the court ordered?
17        A.  The failure of the U.S. Attorney's Office to
18    meaningfully confer with the numerous victims of Jeffrey
19    Epstein's sexual abuse prior to negotiating a plea in
20    his criminal matter.
21        Q.  How long did the conversation last?
22        A.  Less than ten minutes.
23        Q.  Was Agent Jason Richards there as well?
24        A.  There was a male agent there.  I don't know
25    his name, but there was another FBI agent.
```

Page 219

```
 1        Q.  Did Agent Nesbitt Kirkendahl, did she say
 2    anything?  Did she participate in the conversation?
 3        A.  No.
 4        Q.  Okay.  Was it just Mrs. Villafana?
 5        A.  There was another U.S. Attorney there.
 6        Q.  A U.S.A.O. there?
 7        A.  Yes.
 8        Q.  Do you remember a he or a she?
 9        A.  He.
10        Q.  Do you remember his name?
11        A.  Lee.
12        Q.  Lee?
13        A.  I think that's his last name.  Dexter Lee.
14        Q.  Did Mr. -- did Dexter Lee, is he the one
15    who conducted the conversation with you?
16        A.  Yes.
17        Q.  What was his response to your statement?
18        A.  That this conversation is more complicated
19    than the time constraints that we have right now will
20    allow.  We are not going to come to a resolution at this
21    point on any issues that you or your clients believe are
22    pertinent to the case you filed.
23        Q.  That was the end of the conversation?
24        A.  I mean, I am not quoting verbatim, but, yes
25    that was the summary.
```

18 (Pages 216 to 219)

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)

2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 220

1    Q.  And did you go back in front of Judge
2 Marra that same day?
3    A.  I can't remember.
4    Q.  Did he issue an order based upon that
5 hearing?
6    A.  The, the record in the case will speak for
7 itself.  I really, I don't remember right now.
8    Q.  Have you had any other conversations with
9 Nesbitt Kirkendahl other that?  Well, I mean any
10 other face-to-face conversations with her other than
11 that one day back in July of, July or August of
12 2008?
13    A.  No.
14    Q.  Have you seen Nesbitt, Agent Nesbitt
15 Kirkendahl since July, July or August of 2008 during
16 that short conference as physically seen her
17 someplace?
18    A.  Unless she was at the hearing we all attended
19 on your motion to stay that day when there were a lot of
20 people in the courtroom, the answer is no.
21    Q.  Okay.  Have you seen Agent Jason, assuming
22 the male agent's name was Jason Richards or Richard,
23 have you seen him since that day in July or August
24 of 2008?
25    A.  I do not believe I have.

Page 221

1    Q.  Have you spoken with either Nesbitt
2 Kirkendahl or Jason Richard relating to any Epstein
3 related matter since July or August of 2008?
4        MR. SCAROLA:  I am going to instruct you
5    not to answer on the basis of the privilege as
6    previously described.
7 BY MR. CRITTON:
8    Q.  Mr. Edwards, have you spoken with any rep,
9 has any representative of the FBI attempted to speak
10 with you regarding your association with the RRA
11 firm?
12    A.  No.
13    Q.  Has any member of the U.S. Attorney's
14 Office discussed with you any aspect of your tenure
15 or employment at the RRA firm?
16    A.  No.
17    Q.  In any conversations that you, that you
18 had that you've had with the United States
19 Attorney's Office at any time, has anyone ever asked
20 you any questions about Scott Rothstein?
21    A.  You're presupposing that I had conversations,
22 but I will answer the question whether I have or have
23 not had conversations.  Nobody has asked me any
24 questions from the State Attorney's Office, U.S.
25 Attorney Office, FBI, or other agency related to Scott

Page 222

1 Rothstein.
2    Q.  So, it would be a correct, and I am going
3 to expand it, would it be a correct statement that
4 no representative of the federal government and by
5 that I mean the Department of Justice, FBI, any
6 other law enforcement agency nor any state
7 governmental agency has ever asked you or quizzed
8 you or questioned you about your association with
9 Rothstein, Rosenfeldt, and Adler during the seven,
10 approximately seven months you were there; is that
11 correct?
12    A.  That's correct.
13    Q.  Mr. Edwards, has, has anyone from the
14 United States Attorney's Office discussed the
15 topic -- well, let me strike that.  Have you been
16 granted immunity with regard to any aspect of your
17 work associated with either the Epstein files or the
18 Rothstein prosecution?
19    A.  I don't understand your question.
20    Q.  Okay.  You're aware that Mr. --
21    A.  I can answer, no.  I haven't been granted
22 immunity to anything, so it doesn't matter what your
23 question is.
24    Q.  Okay.  Have you ever had any conversations
25 with any of the probation officers in Palm Beach

Page 223

1 County regarding Mr. Epstein?
2    A.  No.
3    Q.  Have you directed that anyone have any
4 discussions with the probation officers in Palm
5 Beach County regarding Mr. Epstein?
6    A.  That is clearly calling for work-product
7 privilege information.  I'm not going to answer the
8 question.
9    Q.  Have you had any discussion with any of
10 the other lawyers who represent clients in the
11 Epstein, in Epstein related matters regarding
12 Mr. Epstein's probation?
13        MR. SCAROLA:  Same objection, same
14    instructions, and I would add to those
15    objections the objection based upon a joint
16    prosecution interest.
17 BY MR. CRITTON:
18    Q.  Mr. Edwards, among the Plaintiffs'
19 lawyers, is there any type of joint prosecution
20 agreement related to Mr. Epstein?
21        MR. SCAROLA:  Same objection, same
22    instruction.
23 BY MR. CRITTON:
24    Q.  Did you have -- did you engage in weekly
25 or monthly meetings among the Plaintiffs' lawyer to

19 (Pages 220 to 223)

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)

2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 224

1    share investigative material regarding, that you had
2    obtained regarding Mr. Epstein?
3         MR. SCAROLA:  Same objections and
4       instructions.
5    BY MR. CRITTON:
6       Q.  Did you provide any of the investigative
7    materials that had been acquired by you to any other
8    person outside of the RRA firm and the Farmer, Jaffe
9    firm up through the current date?
10        MR. SCAROLA:  Would you read that question
11      back?
12   BY MR. CRITTON:
13      Q.  Let me ask it.  During the time that you
14   were with RRA, excuse me, and had investigation done
15   on Mr. Epstein, was any of your investigation that
16   you had performed turned over to any person outside
17   of RRA or your clients?
18        MR. SCAROLA:  Same objection, same
19      instruction to the extent that that would
20      encompass other attorneys with a shared
21      interest in the prosecution of Mr. Epstein.
22        If any of those materials were turned over
23      to persons who did not have a direct interest
24      to lawyers who did not have a direct interest
25      in the prosecution of the claims against

Page 225

1       Mr. Epstein or to clients who did not have, to
2       persons who did not have a direct interest in
3       the pursuit of their claims against
4       Mr. Epstein, then you can answer to that
5       extent.
6         THE WITNESS:  Privileged.
7    BY MR. CRITTON:
8       Q.  And I just want to be clear is, is there
9    any written agreement and I know you, I want to make
10   certain that the objection is there, is as we both
11   know there are a number of claims.  There are a
12   number of claims that are outstanding against
13   Mr. Epstein brought by a number of different
14   lawyers.
15        MR. SCAROLA:  The objection extends to
16      both written agreements and oral agreements.
17        THE WITNESS:  Yes.  We both know that
18      there are a lot of claims against Mr. Epstein
19      for basically the same conduct.
20   BY MR. CRITTON:
21      Q.  And my question to you is is, is there any
22   written agreement between the Plaintiff lawyers who
23   have filed claims against Mr. Epstein regarding the
24   sharing of information?
25        MR. SCAROLA:  Same objection, same

Page 226

1       instruction.
2    BY MR. CRITTON:
3       Q.  Mr. Edwards, do any of the
4    investigators -- let me strike that.  Did any of the
5    investigators who worked for RRA refer any Epstein
6    client to you?
7       A.  What is an Epstein client?
8       Q.  I am sorry.  Did any of the investigators
9    who worked for RRA refer a perspective claimant
10   against Mr. Epstein to you?
11      A.  No.
12      Q.  Did any of your, did any of the RRA
13   investigators ever meet with your three clients?
14        MR. SCAROLA:  Same objection.  Same
15      instruction.
16        MR. CRITTON:  Okay.  And I'm looking for
17      is a yes/no.
18        MR. SCAROLA:  Correct.  Same objection,
19      same instruction.
20   BY MR. CRITTON:
21      Q.  Mr. Edwards, during the time that you were
22   with RRA, did you, your e-mail, was your only e-mail
23   address bedwards@rra-law.com?
24      A.  I only had one e-mail address.
25      Q.  All right.  Did you ever receive any

Page 227

1    information regarding your cases at your home
2    e-mail?
3       A.  I don't remember.
4       Q.  Okay.  What is your home e-mail address,
5    please.
6         THE WITNESS:  Do I give this?
7         MR. SCAROLA:  (Mr. Scarola nods his head.)
8         THE WITNESS:  B-r-a-d-d-6-9@hotmail.com.
9    BY MR. CRITTON:
10      Q.  Did you have a separate fax number at RRA
11   when you were there; that is, just so a fax would
12   come directly to either yours or an area where you
13   were located?
14      A.  No.
15      Q.  In any of the directions that you ever
16   gave to the investigators, did you ever put that in
17   the form of a memo; that is, would you give them
18   written directions?
19        MR. SCAROLA:  Same objection, same
20      instruction.
21   BY MR. CRITTON:
22      Q.  To your knowledge did any of the
23   investigations that were done regarding Mr. Epstein,
24   were they provided to any other person at RRA?
25      A.  Excuse me?

20  (Pages 224 to 227)

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)

2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 228

```
 1      Q.  You have testified that investigations
 2  were done during the time, on Mr., relating to
 3  Mr. Epstein during the time that you were at RRA
 4      A.  Right.
 5      Q.  My question to you is, did you -- first of
 6  all did you receive written reports in addition to
 7  oral reports?
 8      A.  From the investigators?
 9      Q.  Yes, sir.
10      THE WITNESS:  Answer?
11      MR. SCAROLA:  Yeah.
12      THE WITNESS:  The reports were -- yes, I
13  did.
14  BY MR. CRITTON:
15      Q.  And were the reports provided by e-mail or
16  were they provided by, in the form of a memo that
17  would be sent from the investigator to you or both?
18      A.  I, I do not remember there being any in the
19  form of an e-mail.  Does not mean that there was not.  I
20  did communicate by e-mail with other members of the firm
21  and other members of the investigative team on all cases
22  as has been my practice all along practicing law.  There
23  were memos, though, that were given to me that were not
24  e-mail form that were the standard memos that I would
25  incorporate into a witness memo file.
```

Page 229

```
 1      Q.  And again that would just be in your,
 2  would that be in your electronic storage as well as
 3  in the hard copies?
 4      A.  The version I saw was the electronic.
 5      Q.  So, that would be stored in the Fortis
 6  program?
 7      A.  That's correct.
 8      Q.  All right.  And again other individuals in
 9  the firm, other lawyers in the firm might be able to
10  access that program, you just don't know?
11      A.  Right.  Well, the program, obviously that's
12  the program that the firm used.  Now, whether they could
13  access, if you could go across cases that weren't cases
14  you worked on, I really just don't know.
15      Q.  As an example could Mr. Fisten, on the, on
16  the Fortis, could he access your, your file on an
17  Epstein case?
18      A.  I don't know.
19      Q.  If someone accessed your file, accessed
20  your electronic file, would you necessarily know
21  that?
22      A.  No.
23      Q.  All right.  So --
24      A.  I don't believe so.
25      Q.  It wouldn't show up that Michael Fisten,
```

Page 230

```
 1  and I'm using just as an example, is that he came in
 2  or Scott Rothstein came in and looked at a
 3  particular file of yours, whether it related to
 4  Mr. Epstein or not, you don't know?
 5      A.  I can't answer that question accurately.
 6      Q.  Okay.  Did you ever send investigative
 7  reports to other lawyers regarding Mr. Epstein; that
 8  is, if you got an investigative report from
 9  Mr. Fisten or Mr. Jenne or whomever, would you send
10  those on to certain lawyers on a regular basis?
11      MR. SCAROLA:  You can answer that
12  question.
13      THE WITNESS:  No.
14  BY MR. CRITTON:
15      Q.  What lawyers, other than yourself, were
16  involved in the Epstein cases during the time you
17  were associated with RRA?
18      A.  What do you mean by "were involved?"  I guess
19  all.
20      Q.  What, what lawyers actually worked on the
21  file?  I know Mr. Berger worked on the Epstein
22  cases, correct?
23      A.  In some limited capacity, correct.
24      Q.  Okay.  Mr. Adler I know attended
25  Mr. Epstein's deposition, correct?
```

Page 231

```
 1      A.  Correct.
 2      Q.  Did, did any other lawyers other than
 3  Mr. Adler or Mr. Berger attend any depositions?
 4      A.  Your memory is going to be as good as mine
 5  there.  I'm thinking.  Mark Epstein's deposition was
 6  attend by Russell Adler.
 7      Q.  He went with you to New York?
 8      A.  No.  He didn't go with me to New York.  He
 9  attended the deposition, and I also attended the
10  deposition.
11      Q.  Both in person?
12      A.  Right.
13      Q.  Was he there for another file or did he
14  meet you there to specifically attend Mark Epstein's
15  deposition?
16      A.  Coincidence that he was in New York during the
17  time when his deposition was being taken.
18      Q.  Any other lawyer that you can recall being
19  at a deposition other than Adler, Berger and
20  yourself?
21      A.  Not right now.  If you remind me, I, I may
22  remember.  I don't remember right now.
23      Q.  Did other lawyers in the firm at RRA
24  perform services on the files; that is, and by that
25  I mean did they, were they involved in drafting
```

21 (Pages 228 to 231)

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 232

1    motions, research, appeals, pleadings, papers that
2    were filed?
3         MR. SCAROLA:  You can, you can answer
4    whether they were, there were other lawyers
5    involved in drafting tasks without identifying
6    what those may have been.
7         THE WITNESS:  Other lawyers contributed to
8    some extent to the prosecution of those cases.
9    BY MR. CRITTON:
10        Q.  Who?  Names.  I'm not asking for tasks.
11        MR. SCAROLA:  You can answer.
12        MR. CRITTON:  I am asking for names.
13        THE WITNESS:  Bill Berger, Judge Stone,
14   Russell Adler, Rob Buschel.
15   BY MR. CRITTON:
16        Q.  B-o-u-c-h-e-l?
17        A.  I don't know how to spell it.  B-u, I don't
18   know how, B-u-s-c-h-e-l, I believe.
19        Q.  All right.  Is he currently with you now?
20        A.  No.
21        Q.  Any other lawyers?
22        A.  And you're asking for no matter how minimal,
23   just anything done by any lawyers?
24        Q.  Correct.
25        A.  Michael, I think his name is Michael.  It was

Page 233

1    another lawyer.  That's, that's -- those are the ones
2    that I can remember right now.
3         Q.  Were there ever meetings that occurred,
4    well, not -- were there ever specific meetings that
5    were attended by various lawyers to discuss
6    Epstein's cases?
7         MR. SCAROLA:  You can answer whether there
8    were meetings.
9         THE WITNESS:  There were meetings to
10   discuss every case including Jeffrey Epstein's
11   cases.
12   BY MR. CRITTON:
13        Q.  And when you say there were meetings to
14   discuss every case, were there routine meetings that
15   were held to discuss your cases or cases in general?
16        A.  It's how the firm worked.  If you wanted to
17   discuss cases, or the case was a case that was thought
18   to need more than one or more than two attorneys, then a
19   meeting could easily be assembled within RRA to sit
20   around the table and discuss issues related to any case.
21   And yes, that happened with respect to cases filed
22   against Jeffrey Epstein.
23        Q.  And so there could have been additional
24   lawyers in addition to Adler, Stone, Berger, and Rob
25   Buschel and yourself that would have commented on an

Page 234

1    Epstein case?
2         A.  When I was giving you that list of names, I
3    was picturing one of the couple meetings related to
4    Jeffrey Epstein's case.  Could there have been other
5    lawyers in the room, yes, but I think that is the
6    exclusive list.
7         Q.  Did Mr., did anyone ever attend by phone
8    meetings associated --
9         A.  I understand.
10        Q.  -- that involved Mr. Epstein?
11        A.  I understand.  No.
12        Q.  Did Scott Rothstein ever attend any
13   meetings wherein strategy was discussed regarding
14   the Epstein cases?
15        A.  No.
16        Q.  The one meeting that you had in Mr.,
17   Mr. Rothstein's office with Russell Adler and some
18   unknown person on the phone, were you given any
19   direction at that time that certain discovery should
20   be done or certain tactics should be used with
21   regard to prosecuting the Epstein cases?
22        MR. SCAROLA:  Same objection, same
23   instructions.
24   BY MR. CRITTON:
25        Q.  Did you ever receive any e-mail

Page 235

1    correspondence from Scott Rothstein that detailed or
2    that set forth discovery that would be, that should
3    be undertaken with regard to the Epstein cases?
4         MR. SCAROLA:  You can answer that with a
5    yes or no.
6         THE WITNESS:  No.
7    BY MR. CRITTON:
8         Q.  Did you ever have, did you ever receive
9    any correspondence directly, Mr., Mr. Rothstein to
10   you, during the time that you were at RRA?
11        A.  Yes.
12        Q.  Did any of the correspondence ever involve
13   Epstein or communication ever involve Epstein?
14        MR. SCAROLA:  You can answer that.
15        THE WITNESS:  To some extent, yes.
16   BY MR. CRITTON:
17        Q.  Okay.  And what did, what did, what
18   information did Mr. Rothstein send you that involved
19   Mr. Epstein?
20        MR. SCAROLA:  Same objection, same
21   instruction.
22   BY MR. CRITTON:
23        Q.  Is the information that you received or
24   the communication you received from Mr. Rothstein
25   regarding, that involved Mr. Epstein, was that by

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)

2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 236

1   way of e-mail?
2       A.   Yes.
3       Q.   Did you ever receive any memorandum from
4   him; that is, a typewritten memo that was then sent
5   to you through office mail that was not electronic
6   involving Mr. Epstein?
7       A.   No.
8       Q.   At the meetings that you, at the meetings
9   that occurred where these various lawyers, Berger,
10  Adler, Stone, Rob Buschel were present and Epstein
11  was discussed, was the discovery that, discovery
12  and/or investigation regarding Mr. Epstein was that
13  ever discussed?
14          MR. SCAROLA:  Same objection, same
15      instruction.
16  BY MR. CRITTON:
17      Q.   Mr. Edwards, are you aware as a former
18  state prosecutor that there are laws against
19  conducting certain financial transactions in money
20  that's derived from a crime?
21      A.   I don't understand your question.
22      Q.   Okay.  Well, you were a former state
23  prosecutor; is that correct?
24      A.   Right.  Yes.
25      Q.   Right.  Are you aware that there are

Page 237

1   certain laws both state and federal that, that are,
2   that preclude conducting certain financial
3   transaction, transactions in money that is derived
4   from a crime?
5       A.   Still don't understand your question.  But
6   first before I try to answer your question, are you
7   taking me back to a time when I was a State Attorney and
8   asking back then did I know and then your question?
9       Q.   Yes.
10      A.   Back when I was a State Attorney did I know
11  that there are crimes related to money transactions?
12      Q.   No.
13          MR. SCAROLA:  Could I help you?  Do you
14      want to ask him whether he was aware of the
15      existence of a state RICO statute?
16          MR. CRITTON:  No.
17          MR. SCAROLA:  Okay.
18          MR. CRITTON:  I am okay with that first,
19      but I am still going to ask my question.
20  BY MR. CRITTON:
21      Q.   I assume you're aware of the existence of
22  a state RICO statute, correct?
23      A.   I don't know that I was aware of that back
24  then.  I just can't remember whether I knew about RICO
25  back at the State Attorney's Office.  I never prosecuted

Page 238

1   RICO claims.
2       Q.   But you certain have brought RICO claims
3   against Mr. Epstein?
4       A.   I know about one now.
5       Q.   Okay.  At the time that you were at the
6   State Attorney's Office, what kind of -- how long
7   were you there?
8       A.   Three years.
9       Q.   And what kind of crimes did you prosecute?
10      A.   Beginning with DUI's through attempted murders
11  and everything in between.  No -- well, not no, very few
12  economic crimes, some insurance fraud cases but very
13  few, otherwise drugs, guns, robberies, burglaries
14  attempted murder, aggravated batteries, those types of
15  crimes, false imprisonment.
16      Q.   Well, were you ever, do you know what
17  money laundering means in a criminal context?
18      A.   In some basic sense I do know what money
19  laundering means.
20      Q.   What do you understand that to be?
21      A.   That you, that the criminal takes money and
22  through some illegal means attempts to make bad money
23  legitimate.
24          MR. CRITTON:  Let me show you what I will
25      mark as Exhibit 2 which is the complaint that

Page 239

1   was filed against Mr. Rothstein, yourself, and
2   L.M.
3          (Plaintiff's Exhibit No. 2 was marked for
4       identification.)
5   BY MR. CRITTON:
6       Q.   You're familiar with this complaint, sir?
7       A.   Unfortunately I have read this frivolous
8   complaint.
9          MR. CRITTON:  Move to strike as
10      nonresponsive.  You've seen -- all I want is a
11      yes or no.
12      Are you familiar with this document?
13          MR. SCAROLA:  I am going to object to the
14      form of the question.  It is vague and
15      ambiguous.  I don't know what familiarity
16      means.  He has seen it before.
17  BY MR. CRITTON:
18      Q.   Mr. Edwards, you have seen and read the
19  entire complaint along with the attachments,
20  Exhibit 2?
21      A.   I've read the complaint.  I have never read in
22  the entirety Exhibit 2.
23      Q.   Are you familiar, do you know what an
24  information is?
25      A.   Yes.

23 (Pages 236 to 239)

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)

2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 240

1    Q.   And that's Exhibit 1 attached to the
2  complaint, correct?
3    A.   Correct.
4    Q.   And you're aware that, and this is the
5  information that was brought by the United States of
6  America, U.S.A. versus Scott Rothstein, correct?
7    A.   Yes.
8    Q.   And you're aware that within the -- well
9  let me strike that.  Are you aware that
10  Mr. Rothstein has pled guilty to, excuse me, the
11  information that was brought against him by the
12  U.S.A.?
13    A.   I am aware that he pled guilty to something.
14    Q.   With regard to the complaint brought by
15  the U.S.A., I am sorry, the information brought by
16  U.S.A. against Mr. Rothstein, I assume you have read
17  the allegations associated with the racketeering
18  conspiracy, the pattern of racketeering activity,
19  correct?
20    A.   I haven't.
21    Q.   Okay.  If you turn to Page 3, Paragraph 4,
22  were you aware, were you aware prior to coming in
23  here today that Mr. Rothstein was, that the charges
24  that were brought against him were for under, under
25  RICO but with regard to mail fraud, wire fraud,

Page 241

1  laundering of monetary instruments, engaging in
2  monetary transactions, and conspiracy to launder
3  monetary instruments and engage in monetary
4  transactions?
5    A.   I, I have read that in the newspapers.  I have
6  been told that by numerous people.  So, yes, I was aware
7  of that.
8    Q.   And within the complaint at Paragraph 6 it
9  says the Defendant --
10    A.   The information or the complaint?
11    Q.   I'm sorry.  Within the information,
12  Exhibit 1 to the complaint, in Paragraph 6 where it
13  speaks in terms of the Defendant and his
14  co-conspirators, conspirators agreed, agreed to
15  engage in a pattern of racketeering activity through
16  its base of operation at the offices of RRA  Do you
17  see that?
18    A.   Yes.
19    Q.   Okay.  Do you know who the, do you know
20  any of the co-conspirators in addition who are
21  associated with Mr. Rothstein?
22    A.   Assuming that they are former employees of
23  RRA, which I would presume several of them are, I am
24  sure that I probably know them.
25    Q.   And you're aware that the government has

Page 242

1  asserted that the firm was a racketeering
2  enterprise, correct?
3    A.   Not necessarily -- no.
4    Q.   Well, if you look in Paragraph 2, see
5  where the firm is identified as the enterprise of
6  the racketeering conspiracy?
7    A.   Law firm.  Paragraph 2 of the information says
8  Rothstein Rosenfeldt Adler, P.A., was a law firm with
9  offices located at 401 East Las Olas Boulevard, Fort
10  Lauderdale, Florida, and elsewhere.  The law firm
11  employed approximately 70 attorneys and engaged in the
12  practice of law involving a wide range of specialties
13  including labor and employment law.
14    Q.   Are you in Paragraph 2?
15    A.   Of the information, yes.
16    Q.   I'm sorry.  I am looking at -- my
17  apologies.  On Paragraph 2 under Count I, my error.
18    A.   Okay.
19    Q.   See where the law firm is identified as
20  the racketeering enterprise?
21    A.   I'm sorry.  Your question is am I, do I
22  recognize that the law firm is categorized as an
23  enterprise.  Yes, in that paragraph I see that.
24    Q.   Have you had an occasion to discuss with
25  any, with either Mr. Adler or Mr. Rosenfeldt any of

Page 243

1  the allegations directed to Mr. Rothstein --
2    A.   No.
3    Q.   -- in the criminal complaint?
4    A.   No.
5    Q.   Since the implosion at the firm have you
6  had an occasion to talk about or speak or discuss
7  any firm business regarding Mr. Rothstein and the
8  ponzi scheme that he was running at RRA?
9    A.   Have I had an occasion where I could have
10  talked --
11    Q.   No, I'm sorry.  Have you had an occasion
12  to discuss with Mr. Adler since you left the firm or
13  since the implosion any aspects of the, of the ponzi
14  scheme that Mr. Rothstein and his co-conspirators
15  were running through the firm?
16      MR. SCAROLA:  Are you asking whether he
17    did have such a discussion or whether he had an
18    occasion to have such a discussion?
19  BY MR. CRITTON:
20    Q.   Did you have such a discussion?
21    A.   No.
22    Q.   Okay.  Have you discussed that or have you
23  seen Mr. Adler at all other than hi, hello, since --
24    A.   Yes.  So, the occasion existed.  We just
25  didn't have that discussion.

24  (Pages 240 to 243)

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)

2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 244

1    Q.  Have you, and if I understand correctly
2  you haven't discussed any firm business with
3  Mr. Adler since the implosion; is that correct?
4    A.  Firm business?
5    Q.  Any firm RRA business?
6    A.  Right, no.
7    Q.  How about with Mr. Rosenfeldt, have you
8  had any discussions with him --
9    A.  None.
10   Q.  -- since the implosion of the firm in late
11 October of '09?
12   A.  No.
13   Q.  If you wanted, if you had any, other than
14 your existing partners have you had an occasion to
15 speak with any other partners or former partners of
16 the firm regarding the implosion -- well, let me
17 strike that -- regarding the ponzi scheme that was
18 being run by Mr. Rothstein through the firm?
19   A.  I have spoken to my current partners about it.
20   Q.  Are your current partners, are you aware
21 of any of your current partners being a target of an
22 investigation as a potential co-conspirator with
23 Mr. Rothstein?
24   A.  No, way.
25   Q.  You're not aware of or no one has told you

Page 245

1  that, correct?
2    A.  I am not aware of that and nobody has told me
3  that.
4    Q.  Mr. Rothstein founded what was, what
5  ultimately became RRA in approximately 2002.  Were
6  you aware of that fact?
7    A.  No.
8    Q.  How long did you think Mr. Rothstein had
9  been -- well, let me strike that.  How long did you
10 think RRA had been in existence prior to your
11 joining the firm?  What were you told?
12   A.  I don't know what I was ever told.  I think
13 that I learned that information when the implosion, as
14 you call it, occurred.
15   Q.  And were you, in terms of what the
16 revenues of the firm were, were you ever advised
17 what the revenues of the firm were?
18   A.  No.
19   Q.  Okay.  Were you, were you familiar with
20 what the expenses were associated with operating the
21 RRA firm?
22   A.  No.
23   Q.  Were you in anyway -- well, let me strike
24 that.  With regard to -- let me take a five minute
25 break and let me collect my thoughts.

Page 246

1    THE VIDEOGRAPHER:  We are now off video
2  record --
3    MR. SCAROLA:  That will be a refreshing
4  change.
5    THE VIDEOGRAPHER:  We are now off video
6  record at 3:44 p.m.
7    (A brief recess was held.).
8    MR. CRITTON:  Mr. Edwards --
9    THE VIDEOGRAPHER:  We're back on video
10 record.  It is 3:59 p.m.
11 BY MR. CRITTON:
12   Q.  Mr. Edwards, when you joined RRA, if I
13 understood your earlier testimony, with regard to
14 the Epstein cases and your other cases when you came
15 there as far as you were concerned is you had the
16 ability to spend whatever money was necessary to
17 prosecute the Epstein cases, fair statement?
18   A.  I don't know that that's true or it's not true
19 I mean.
20   Q.  Well --
21   A.  My judgment was never questioned.
22   Q.  Correct.  And therefore whatever monies
23 you spent either in investigation, in doing
24 discovery, that was your decision and your decision
25 alone, true?

Page 247

1    A.  Whatever money that I spent was my decision --
2    Q.  No.  Whatever money you spent on
3  investigators, on doing depositions, on requesting
4  transcripts, on doing what was necessary to
5  prosecute the Epstein cases, that was your decision?
6    A.  No.  The actions were my decisions in terms of
7  how to prosecute the case.  The amount of money to spend
8  per exercise was not my decision nor was I privy to that
9  information.
10   Q.  Well, but, you were the one who directed
11 that the particular task be taken, correct?
12   MR. SCAROLA:  This is, this is
13 repetitious.
14   MR. CRITTON:  I am setting a stage.
15   MR. SCAROLA:  This is repetitious of areas
16 of examination that were covered thoroughly in
17 the earlier portions of this deposition.
18   THE WITNESS:  If I wanted a witness
19 interviewed, I could ask an investigator to
20 interview.  The investigator, how they were
21 paid, how much they were paid, whether they
22 were paid is not something that I had any
23 knowledge of at all.
24 BY MR. CRITTON:
25   Q.  Okay.  When you ran your own firm you

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)

2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 248

```
 1   obviously knew what, whether hiring an investigator
 2   or what a particular cost was because you had to pay
 3   it, correct?
 4       A.  Yes.
 5       Q.  Okay.  And I think as you described
 6   earlier is that there had been very little discovery
 7   up until the time you started working for RRA in
 8   your three cases, true?
 9       A.  Not very little discovery.  Obviously we had
10   gone through interrogatories, responses, request for
11   production, responses or lack of responses, however, the
12   majority of the depositions that were taken, the cases
13   just happened to be right last summer for most of those
14   depositions to take place, and that's what happened.
15       Q.  Not only depositions but as well the
16   investigation as you have described, your
17   investigator that you hired as an outside person
18   didn't really start until late March or early April
19   in conjunction with the other investigation that you
20   did during the time you were with RRA, correct?
21       A.  Fair statement.
22       Q.  All right.  And when you were at RRA you
23   described earlier, and I won't belabor it, but you
24   described the compound I think is the word that you
25   used that Mr. Rothstein kept himself in when he was
```

Page 249

```
 1   at the firm, correct?
 2       A.  Correct.
 3       Q.  Right.  And he was not accessible to
 4   everyone else, true?
 5       A.  Right.
 6       Q.  And was he on your floor or was he on a
 7   completely separate floor?
 8           MR. SCAROLA:  As opposed to a partly
 9   separate floor.
10           THE WITNESS:  For the most part he was on
11   a separate floor.
12   BY MR. CRITTON:
13       Q.  Okay.  And were there guards during the
14   time that you were at, at the RRA firm, RRA, were
15   there guards that patrolled the hallways?
16       A.  Yes.
17       Q.  And was that from the day you started?
18       A.  I believe so.
19       Q.  And had you ever been in a firm where --
20   bless you.  Had you ever been in a firm where
21   there -- well, let me strike that.  The guards were
22   what, Broward County Sheriff's Officers?
23       A.  I don't remember the agency but they were
24   armed uniformed police officers.  I believe Fort
25   Lauderdale.
```

Page 250

```
 1       Q.  Okay.  Were they all on the, were they,
 2   were they --
 3       A.  Some were B.S.O as well.  Some were Broward
 4   Sheriff's Office.  Some were from Fort Lauderdale.  It
 5   was both.
 6       Q.  With, with regard to the police officers
 7   and the Sheriffs Deputy's that were present, where
 8   they on every floor of RRA?
 9       A.  It seemed that way.
10       Q.  And had you ever been in a, in a law firm
11   either as a visitor or as an employee or partner
12   where you had seen armed guards from either a
13   Sheriff's Office or a police department roaming the
14   halls?
15       A.  No.
16       Q.  Had you ever been to the RRA offices
17   before you accepted the job?
18       A.  No.
19       Q.  When you got there and you saw the armed
20   guards patrolling the floors, did you ever have a
21   conversation with Russell Adler or anyone else as
22   like what in heaven's name is going on here?
23       A.  I didn't see them when I first got there.
24       Q.  How much time passed before you saw the
25   guards?
```

Page 251

```
 1       A.  When I first started I believe that the people
 2   patrolling, I'm not sure that they initially were
 3   Broward Sheriffs or Fort Lauderdale police.  I think
 4   that may have been a month after I began.  From what I
 5   remember seeing, and I can envision the people in my
 6   head, they were private security people.  At least that
 7   was the appearance or the interpretation that I had.
 8   And I didn't question it at the time who they were.
 9       Q.  Within --
10       A.  I don't think.
11       Q.  Within a short period of time though you
12   recognized that they were either Sheriff's Deputies
13   or police officers?
14       A.  At the point in time where I recognized that
15   they were armed uniformed police officers in the firm,
16   yes, I questioned it not only to Russell Adler but to
17   anybody else, anybody else, because all of the lawyers
18   in the firm thought it was strange.
19       Q.  Okay.  And what did Adler tell you?
20       A.  That Scott Rothstein has a lot of money, prior
21   to you being here, a female attorney was murdered and he
22   wants to make sure that his friends and family are as
23   secured as possible, that while he has this extra money
24   to spend on security, he is going to do that for all of
25   our safety.
```

26 (Pages 248 to 251)

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)

2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 252

```
 1        Q.  Did you understand as well that he had,
 2   that the firm was paying for armed guards to guard
 3   his house 24 hours a day?
 4        A.  No.
 5        Q.  When did you learn that fact?
 6        A.  After the disbandment of RRA
 7        Q.  Did Mr. Adler tell you that Mr. Rothstein
 8   had amazing or substantial wealth?
 9        A.  I don't know in those words, but I, I
10   definitely understood that.
11        Q.  Okay.  In meeting Mr. Rothstein initially,
12   initially for the ten minutes as you were
13   contemplating taking a job and on the two other
14   occasions or the one other occasion when you saw him
15   out in the restaurant, I think you described him as
16   flamboyant?
17        A.  I'm not sure I used that word but probably one
18   synonymous, and, yes, I would describe him as such.
19        Q.  Was he someone that at least -- well, let
20   me strike that.  Were you aware that he had a, a
21   watch collection of hundreds of watches?
22        A.  No.
23        Q.  Did you see him wear expensive jewelry
24   when you saw him; that is, the few occasions that
25   you saw him?
```

Page 253

```
 1        A.  Never.  I didn't take notice of that.
 2        Q.  Okay.  When you saw him, was he dressed in
 3   a suit or was he dressed in business, or in casual,
 4   more casual clothes?
 5        A.  Always a suit.
 6        Q.  And looking like a million bucks?
 7        A.  Looking ridiculous.
 8        Q.  But something that looked very expense,
 9   flashy, showy?
10        A.  I couldn't tell how expensive it was, but
11   flashy and showy, yes.  It may be a pink shirt with a
12   purple tie and a blue suit, something that you would
13   never expect a lawyer to be wearing, yes.
14        Q.  And in terms of the, in terms of the, of
15   his personal wealth or his, his personal assets,
16   were you aware of where he lived?
17        A.  Was I aware when?
18        Q.  During the time you worked for RRA?
19        A.  Yes.
20        Q.  Okay.  And were you aware that he was
21   living in a multi-million dollar house?
22        A.  When, when I went to the house I, I recognized
23   it as such.
24        Q.  You said you want to the house.  Did you
25   go to Mr. Rothstein's house?
```

Page 254

```
 1        A.  I went there one time.
 2        Q.  For what occasion?
 3        A.  I don't remember the occasion, but it was a
 4   gathering that he had at his house and he asked, during
 5   the course of me working there were ten occasions where
 6   everybody was invited to go to his house for various
 7   events and on one occasion, I went.
 8        Q.  Oh, all right.  And from being in his
 9   house did you recognize immediately that this was a
10   multi-million dollar house?
11        A.  Yes.
12        Q.  Okay.  Was it on the water?
13        A.  Yes.
14        Q.  And could you tell from the interior
15   design or the decorations that existed that this was
16   at least a man, a man that had significant wealth?
17        A.  Yes.
18        Q.  All right.  And could you, did you have an
19   opportunity to see his collection of automobiles?
20        A.  No.
21        Q.  During the time that you were in the
22   house, did you have an opportunity, did, did you
23   walk around the house?
24        A.  No.
25        Q.  How many people were there, best estimate?
```

Page 255

```
 1   Are we talking like ten or 12?
 2        A.  No, no, no. 250.
 3        Q.  Did you talk to Mr. Rothstein at all?
 4        A.  Not even for a second.
 5        Q.  Could you walk anyplace in the house that
 6   you wanted?
 7        A.  The party, at least to the extent that I
 8   participated in it, was outside.  So I, I don't know if
 9   I could have walked around the house, but I did not walk
10   around the house nor did I really walk inside the house
11   other than to go in the front door, straight out back,
12   and then leave the exact same pathway that I entered.
13        Q.  What his property located on Castillo
14   Island?
15        A.  I don't know.
16        Q.  Were you aware or did you become aware
17   that Mr., during the time that you were there that
18   Mr. Rothstein had investments in multiple real
19   properties?
20        A.  No.
21        Q.  Were you aware at the time that you met
22   him first at the BOVA restaurant that he had an
23   interest in BOVA restaurant?
24        A.  When I met him, no.
25        Q.  Did he have an interest in BOVA restaurant
```

27 (Pages 252 to 255)

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 256

1    at that time?
2       A.  I heard that sometime after I began working
3    there.  He certainly acted like he did.
4       Q.  Did you learn that he had investments in
5    other business entities, whether they were other
6    restaurants or other business entities --
7       A.  Through --
8       Q.  -- during the time that you worked at RRA?
9       A.  Through rumors.
10      Q.  And rumor was he had his fingers in many
11   different businesses?
12      A.  It sounded like hundreds.
13      Q.  And did you understand that he had a
14   substantial collection of automobiles?
15      A.  What do you mean by substantial selection or
16   collection?
17      Q.  Well, were you, during the time that you
18   were at RRA were you aware that he had Ferraris?
19      A.  No.
20      Q.  Multiple Ferraris?
21      A.  No.
22      Q.  Were you aware that he had a Bentley?
23      A.  Yes.
24      Q.  Were you aware that he had a Bugatti?
25      A.  I heard that.

Page 257

1       Q.  Were you aware that he had a Rolls Royce?
2       A.  No.
3       Q.  Were you aware that he had multiple
4    Corvettes?
5       A.  No.
6       Q.  Either a Corvette or multiple Corvettes?
7       A.  No.
8       Q.  Were you aware that he had multiple
9    Mercedes Benz?
10      A.  No.
11      Q.  Were you aware that he owned a yacht?
12      A.  Yes.
13      Q.  Okay.  And was that parked behind his
14   house?
15      A.  Yes.
16      Q.  Were you aware that he also -- and did it,
17   if I was to say it was approximately an 85 to
18   90-foot yacht or, in fact, an 87-foot yacht?
19      A.  I wouldn't quarrel with that.
20      Q.  Did it also appear that he had a
21   substantial sport fisherman that was parked out
22   there as well?
23      A.  I didn't see that.
24      Q.  Were you aware that he had 33-foot Aqua,
25   Aquaviva?

Page 258

1       A.  No.
2       Q.  Were you aware that he had multiple jet
3    skis?
4       A.  No.
5       Q.  Were you aware that he had a 55-foot Sea
6    Ray?
7       A.  No.
8       Q.  Were you aware that he owned a
9    Lamborghini?
10      A.  No.
11      Q.  Again during the time that you were at
12   RRA?
13      A.  I understand that.  The answer is no.
14      Q.  In addition to the, to the business of
15   owning BOVA what other business ventures did you
16   understand he had?  I think you said you thought he
17   was in hundreds of businesses.
18      A.  Through a rumor.
19      Q.  Right.
20      A.  I understood that he owned a Vodka.  I
21   understood generically that he owned or purchased
22   various patents.  I understood -- I didn't know what the
23   patents were.  I understood that he owned other
24   restaurants.  I understood that he owned or was partial
25   owner of Cafe Iguana.

Page 259

1          At some point in time I learned that he
2    was owner or partial owner of the Versace mansion.
3    And I think in general it was always explained to me
4    or I overheard he had, he has his hands in all of
5    these, this assortment of businesses and those
6    business ventures have done very well, and that is
7    the source of his apparent extreme amount of wealth.
8       Q.  Who told you that?
9       A.  I don't, I don't know.  More, more than one
10   person.  I mean, that was just kind of the word around
11   the campfire so to speak.
12      Q.  Did you inquire as to -- let me strike
13   that.  Did you ever see any documents that reflected
14   or documents or read any information about
15   Mr. Rothstein that preexisted 2002 which was kind of
16   the start of the RRA firm?
17      A.  I don't understand.
18      Q.  Okay.  Well, I think we established
19   earlier that your understanding was that RRA kind of
20   started as a firm in the 2002 time frame.
21      A.  Well, you told me that and I have been told
22   that after the implosion that was the time period
23   that RRA started.  I didn't know anything about Scott
24   Rothstein until the year 2009 at all.
25      Q.  Did you do any research with regard to

28  (Pages 256 to 259)

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)

2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 260

1    Mr. Rothstein prior to going to the firm and by
2    research I mean people Google.  Did you Google him?
3        A.  No.
4        Q.  Did you, did the firm have a brochure?
5        A.  I don't know.
6        Q.  Did you ever see brochures in the waiting
7    room or the reception rooms that described the firm
8    when it was founded, background of the firm, et
9    cetera?
10       A.  No.
11       Q.  Was it on your web site?
12       A.  Was what on my web site?
13       Q.  The history or the background of the firm.
14   Let me strike that.  RRA had a website?
15       A.  RRA had a website.
16       Q.  That's no longer in existence, true?
17       A.  True.
18       Q.  And --
19       A.  To my knowledge.
20       Q.  Did you ever go on the website and
21   checkout the web site for the history or the
22   background of RRA and Mr. Rothstein?
23       A.  I went on the website.  I don't know that the
24   website even had a history.  If it did, I don't remember
25   ever looking at it.

Page 261

1        Q.  Did it, did, at least from what you saw
2    and observed of Mr. Rothstein, did it appear to you
3    that the, his wealth far exceeded the type of
4    business that it appeared to you that the firm was
5    doing?
6        A.  I have no understanding whatsoever.  No,
7    that's not something that ever crossed my mind.
8        Q.  Well, under these circumstances is, is
9    when you went to the firm, you had the ability to
10   your discretion to spend whatever monies you wanted
11   in prosecuting your personal injury and Epstein
12   cases.  You, no one ever turned down a request
13   either for a reimbursement or told you not to expend
14   any money, true?
15       MR. SCAROLA:  Objection, compound and
16   repetitious.
17       THE WITNESS:  I don't understand the
18   question.
19   BY MR. CRITTON:
20       Q.  No one, as to any expenditure that you
21   ever made on an Epstein case --
22       MR. SCAROLA:  Isn't this about the fourth
23   time that you're eliciting exactly the same
24   testimony?  Isn't it very clear the extent to
25   which Mr. Edwards had control over financial

Page 262

1    matters with regard --
2        MR. CRITTON:  Form?
3        MR. SCAROLA:  -- to these cases?
4        MR. CRITTON:  Form?
5        MR. SCAROLA:  No, no.  It's a, it's a
6    speaking inquiry.
7    BY MR. CRITTON:
8        Q.  Mr. Edwards, did you ever have any
9    dealings with Deborah Villegas?
10       A.  No.
11       Q.  Am I saying it right?
12       A.  I don't know.
13       Q.  V-i-l-l-e-g-a-s?
14       A.  I've seen the name.
15       Q.  Did you know who she was?
16       A.  In what way?
17       Q.  As it related --
18       A.  I knew that she worked for the firm.
19       Q.  What did you understand her position was?
20       A.  Rothstein's Sarah Kellen.
21       Q.  Did you understand her to be the COO of
22   the company, of the firm?
23       A.  Right.  I don't know if COO or whatever, but
24   his right-hand man; that's the person who gets him what
25   he wants.  That's at least in a broad term what I

Page 263

1    understood her position to be.
2        Q.  Did you understand she was a financial
3    person?
4        A.  No.
5        Q.  Or an administrative person?
6        A.  My understanding was administrative.
7        Q.  With regard to Mr. Rothstein's; that is,
8    his real property, his vehicles, his boats, his
9    business interests, would it be a correct statement,
10   sir, that you weren't concerned about the source of
11   his wealth?
12       A.  You went through a list of the things that I
13   knew or did not know him to have in terms of assets.
14   And I told you for the most part I didn't even know that
15   he had those things.  In fact, while you were out of the
16   room, I just educated myself by reading the information
17   on some of the things he had and I didn't know until
18   right now that he had those things.  But certainly while
19   I was working at RRA I didn't know that he had those
20   things.
21       Q.  Then let me be specific.  With regard to
22   the, with regard to the house that you knew he had,
23   with regard to the yacht that you knew he had, with
24   regard to the vehicles that you knew he had, with
25   regard to the business interests, at least BOVA and

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)

2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 264

```
 1   at least what was rumored to be his business
 2   interest, did you believe that the source of his, of
 3   his apparent wealth was as a result of the law firm?
 4       A.  I believe that the source of his wealth was
 5   the law firm as well as the, what I have described as an
 6   assortment of businesses that he had his hands in of
 7   which only a fraction I was aware.
 8       Q.  Well, what did you understand to be the
 9   source of the funding of the, of the Epstein cases
10   and the other lawsuits that you had?
11       A.  The checks I believe were written by the law
12   firm.
13       Q.  Okay.  And what did you believe was the
14   source of the monies that the law firm got to expend
15   some, just on the three cases that you had with Mr.
16   Epstein, some three to $500,000, I mean separate and
17   apart from all of the, your other personal injury
18   cases and separate and apart from all of the other
19   69 lawyers who were in the law firm who also had
20   cases?
21       A.  I didn't have a belief at all as to the source
22   of any of the monies that were used for any of the case.
23       Q.  Was it your position it really wasn't your
24   concern; that is, wherever the money came from, it
25   didn't bother you; all you knew is that the firm was
```

Page 265

```
 1   funding your cases?
 2           MR. SCAROLA:  Objection, argumentative.
 3           THE WITNESS:  Yeah.  At the time I believe
 4       that I am working at a well recognized law firm
 5       with good people and that is a successful law
 6       firm and this is the way that law firms at that
 7       level operate, and right, I didn't --
 8   BY MR. CRITTON:
 9       Q.  Didn't care?
10       A.  Right, I didn't care.  I didn't question it.
11       Q.  With, with regard to, let me ask you some
12   names and see if you recognize the names.  Do you
13   know a person by the name of Barry Bekkadan,
14   B-e-k-k-a-d-a-n?
15       A.  Never heard the name until right now.
16       Q.  A.J. Discala?
17       A.  Again same answer.
18       Q.  Clockwork Capital Advisers?
19       A.  No, never heard of them.
20       Q.  Razorback Funding?
21       A.  Nerve heard of it.
22       Q.  Michael Szafranski, S-z-a-f-r-a-n-s-k-i?
23       A.  Heard that name --
24       Q.  And --
25       A.  -- only after implosion and through papers and
```

Page 266

```
 1   things of that nature.
 2       Q.  And that's my question to you:  Did you
 3   hear these names before or during the time that you
 4   were at RRA as distinct from now?
 5       A.  Of that list you just read until right this
 6   second, Michael Szafranski is the only one that I have
 7   ever heard of and that was after implosion of RRA
 8       Q.  And again this question is specific to the
 9   time frame --
10       A.  Sure.
11       Q.  -- that you were there?  Dominic
12   Ponatchio, P-o-n-a-t-c-h-i-o.
13       A.  No.
14       Q.  Moto, M-o-t-o, Ban, B-a-n, Adon, A-d-o-n?
15       A.  No.
16       Q.  Ever heard of Benozon (phonetic) Varon,
17   V-a-r-o-n?
18       A.  No.
19       Q.  Onyx Capital?
20       A.  No.
21       Q.  Onyx Options Consultants?
22       A.  No.
23       Q.  BWS Investments?
24       A.  No.
25       Q.  Pirulin, P-i-r-u-l-i-n, Group?
```

Page 267

```
 1       A.  No.
 2       Q.  Shimone (phonetic) Levy, L-e-v-y?
 3       A.  No.
 4       Q.  Obidia Levy, O-b-i-d-e, I'm sorry, d-i-a?
 5       A.  No.
 6       Q.  Daniel Minkowitz, M-i-n-k-o-w-i-t-z?
 7       A.  No.
 8       Q.  Fortress, an entity know as Fortress
 9   Investments or Fortress Capital?
10       A.  No.
11       Q.  Drawbridge?
12       A.  No.
13       Q.  Capital or funding?
14       A.  No.
15       Q.  Do you know an individual by the name of,
16   have you ever heard of, heard during that time
17   period, did you hear of or know a person named
18   George Levin, L-e-v-i-n?
19       A.  No.
20       Q.  Banyan Investment Fund?
21       A.  No.
22       Q.  Did you know or hear of the name Frank
23   Preve, P-r-e-v-e?
24       A.  No.
25       Q.  Okay.  Mr. Preve is purportedly, was
```

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)

2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 268

```
 1    purported to have an office within RRA's offices.
 2    Have you seen that?
 3         A.  Have I seen what?
 4         Q.  Have you seen that in any of the news
 5    media, that Mr. Preve had an office within RRA?
 6         A.  That name doesn't sound familiar at all.  So,
 7    no, the answer to your question is no, I haven't seen
 8    that.
 9         Q.  Bill Brock?
10         A.  Yes.
11         Q.  Okay.  Who is Mr. Brock?
12         A.  In the law firm he went by the name Uncle
13    Bill.
14         Q.  Okay.  All right.  Who is Uncle Bill?
15         A.  Who do I understand him to be?  I don't know
16    who he really was.  At this point in time looking back,
17    there is no telling what anyone, what anyone or anything
18    was.  But at the time I believe that he was a relative
19    of Scott Rothstein's.
20         Q.  What did he do?  What did, what did Uncle
21    Bill do --
22         A.  Some --
23         Q.  -- at the firm?
24         A.  Something with money.
25         Q.  Did he have an office at the firm?
```

Page 269

```
 1         A.  I think the trustees are still trying to
 2    figure out what he exactly did do.
 3         Q.  Did you have any dealings with him?
 4         A.  Dealings, no, I didn't have dealings.
 5         Q.  Dealings of any kind?
 6         A.  I talked to him.
 7         Q.  Did you ever discuss any of your cases?
 8    Was he -- he wasn't a lawyer?
 9         A.  Far from it.
10         Q.  All right.  Did you ever discuss any of
11    your cases with him?
12         A.  No.
13         Q.  Just a hi, hello?
14         A.  Hi, hello, and I was one of the lawyers who
15    would come in often and work on weekends and he would be
16    there.  That's when I would see him, and he would kind
17    of, hey, how are you doing on a weekend.
18         Q.  And do you know a Dean Kretchmar,
19    K-r-e-t-c-h-m-a-r?
20         A.  No.
21         Q.  Same question again, do, these names
22    during the time period, Doug Van Allman,
23    A-l-l-m-a-n?
24         A.  No.
25         Q.  Ted Morse?
```

Page 270

```
 1         A.  No.
 2         Q.  Ed Morse?
 3         A.  No.
 4         Q.  Richard Pearson, P-e-a-r-s-o-n?
 5         A.  No.
 6         Q.  Steven Levin, L-e-v-i-n?
 7         A.  No.
 8         Q.  Ira Sochet?  S-h or Sochet, S-o-c-h-e-t?
 9         A.  No.
10         Q.  Mark Melvin?
11         A.  No.
12         Q.  Jack Samoney (phonetic)?
13         A.  No.
14         Q.  Lawrence King?
15         A.  No.
16         Q.  Steve Jackel?
17         A.  No.
18         Q.  Have you ever heard an attorney name
19    Michael Legamaro?
20         A.  No.
21         Q.  Kevin Draher, D-r-a-h-e-r?
22         A.  No.
23         Q.  David Boden, do you know David Boden?
24         A.  Yes.
25         Q.  Okay.  Who is Mr. Boden, an associate --
```

Page 271

```
 1         A.  Are you asking me what I know now or what I
 2    thought then?
 3         Q.  Who did you understand Mr. Boden, David
 4    Boden to be when you became employed or associated
 5    with RRA in April of '09?
 6         A.  In April of '09 I had not heard the name but
 7    let's just skip to it.  Sometime in let's say June or
 8    July, I am guessing, sometime during the summer, I
 9    understood him to be a lawyer at the firm.
10         Q.  Did you understand, did you understand he
11    was a Florida lawyer or you just understood he was a
12    lawyer?
13         A.  I understood he was a lawyer.  I made the
14    presumption or assumption at that time that since he was
15    a lawyer for RRA that he was a Florida lawyer.  I have
16    subsequently learned otherwise.
17         Q.  Did you know, did you ever have any
18    business dealings with Mr. Boden?
19         A.  Never spoke a word to the guy.
20         Q.  What did you understand that he actually
21    did at the firm?
22         A.  Had no idea.
23         Q.  How about Andrew Barnett?
24         A.  Don't know who that is.
25         Q.  There was an individual, he is described
```

31 (Pages 268 to 271)

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)

2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 272

1    as the director of Corporate Development for RRA
2        A.  I don't know even know what that means.
3        Q.  Have you ever heard of the Centurion
4    Credit Fund or the Platinum Management Fund?
5        A.  No.
6        Q.  Alan Sakowitz?
7        A.  No.  Wait.  Alan Sakowitz.  I have heard that
8    name recently.  I don't know why.  I believe I actually
9    heard that name in a response.  Never mind.  In some
10   nonresponsive answer that your client gave, I heard that
11   name.
12       MR. SCAROLA:  Keep going.
13   BY MR. CRITTON:
14       Q.  Mr. Edwards, with regard to your phone,
15   did you have a direct line at RRA?
16       A.  Yes.
17       Q.  What was that phone number?
18       A.  I don't remember.
19       Q.  And is your cellphone today same as it
20   was back then?
21       A.  Yes.
22       Q.  And what's that number, please?
23       MR. SCAROLA:  Cellphone number?
24       THE WITNESS:  954-294-9544.
25

Page 273

1    BY MR. CRITTON:
2        Q.  Did you ever have a firm cellphone or just
3    your own personal cellphone?
4        A.  No.  Just my own personal cellphone.
5        Q.  During the time that you were at the firm,
6    were you ever involved in making any type of a
7    presentation to anyone regarding the Epstein cases?
8        A.  Including other lawyers within the firm?
9        Q.  Let me rephrase it.  I am going to
10   rephrase.  You already told us that you have talked
11   about the Epstein cases with other lawyers, correct?
12       A.  Right.
13       Q.  Were you ever present in a meeting where
14   there was a person whom you did not know wherein the
15   Epstein, where the Epstein cases were discussed?
16       A.  No.
17       Q.  At the, 0when you met with Mr. Rothstein
18   in his office when Mr. Adler or whoever asked you to
19   come up that one time and there was Adler, Rothstein
20   and yourself, you said there was an individual on
21   the phone?
22       A.  Right.  It was another lawyer with the firm.
23       Q.  And how do you know it was another lawyer
24   with the firm?
25       A.  It was either Marc Nurik or Mark Fistos, Mark

Page 274

1    Fistos is my partner now.  Marc Nurik is the lawyer who
2    represents Scott Rothstein now.  I don't know which it
3    was, but it was one of the two.
4        Q.  Okay.  Were you ever present at a meeting
5    where someone who you didn't know was present when
6    the Epstein case was discussed?
7        A.  No.
8        Q.  Were you ever asked to get on a phone call
9    where the Epstein cases were discussed that you
10   didn't, that you couldn't confirm who, you may have
11   someone who may have said this is Joe Smith on the
12   other line, but where you discussed the Epstein case
13   over the phone with another lawyer from your firm?
14       A.  I don't understand that question.
15       Q.  Did you ever make a phone call or did you
16   ever receive a phone call where you discussed the
17   Epstein case with another lawyer in your firm; that
18   is, that person --
19       A.  Yes.
20       Q.  -- outside of the office?
21       A.  What?
22       Q.  Okay.  Obviously you would get calls
23   within --
24       A.  Even you.
25       Q.  -- the confines of your office.  Right.  I

Page 275

1    understand that.
2        A.  You fall in that category.  I am having a hard
3    time.
4        Q.  The question is did you ever have, were
5    you ever conferenced in on a call that was supposed
6    to be among RRA lawyers regarding an Epstein case?
7        A.  No.
8        Q.  Did anyone ever request that you prepare a
9    summary of any of your Epstein cases that you in
10   turn sent by either e-mail or memo to anyone else?
11       A.  I don't believe so.
12       Q.  After you joined the RRA firm in April of
13   '09, did there come a point in time when you
14   requested that, that you requested the depositions
15   be taken out of state of a number of witness?  Well,
16   let me ask you this question.
17       MR. CRITTON:  Let me, let make it easy.
18   Let me show what I will mark as Exhibit 3.
19       (Plaintiff's Exhibit No. 3 was marked for
20       identification.)
21   BY MR. CRITTON:
22       Q.  Before I get to that, Mr. Edwards, were
23   you aware of any cases that Mr. Rothstein himself
24   settled for over $5 million while you were employed
25   at the firm?

32 (Pages 272 to 275)

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)

2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 276

1    A.  I was never aware of any cases that Rothstein
2  even handled much less settled.
3    Q.  Were you aware of whether, did anyone ever
4  tell you whether Mr. Rothstein even did legal work
5  at the firm or whether he was just a rainmaker?
6    A.  I -- no, no one ever told me one way or the
7  other.
8    Q.  Would it be a correct statement that you
9  never saw him perform any legal work during the time
10 you were at the firm?
11   A.  That's a correct statement.
12   Q.  Would it be a correct statement as far as
13 you knew he was kind of a gadfly going to his
14 various business ventures and then he would hole
15 himself up in the office.
16   A.  He was the guy on the billboards and at the
17 Triple A arena and everything else marketing the firm
18 and bringing business in, and that's at least what I
19 believe he did.  If it's true or not, I don't know to
20 this day.
21   Q.  With regard to Exhibit 3, do you recognize
22 this e-mail?
23   A.  I, I don't recognize the e-mail.
24   Q.  Do you recognize, and I will represent to
25 you that I received the e-mail.  It was sent to me

Page 277

1  as well although I am not shown as a recipient, I
2  received e-mail.
3    THE WITNESS:  Are you talking about the
4  fax?
5    MR. CRITTON:  I am sorry, the fax.
6    MR. SCAROLA:  Exhibit, Exhibit 3.
7    MR. CRITTON:  Exhibit 3.  Let me start
8  again.  Exhibit 3 is a fax.
9    THE WITNESS:  Correct.
10   MR. CRITTON:  Dated July 22nd, 2009.
11   THE WITNESS:  I recognize that.
12 BY MR. CRITTON:
13   Q.  And do you recognize on Page 2, it says
14 very truly yours, Rothstein, Rosenfeldt, Alder and
15 then there is a, what appears to be a signature and
16 under that it says Bradley J. Edwards, Esquire,
17 partner fort (sic) the firm.  Do you see that?
18   A.  Yes, I see that.
19   Q.  Do you recognize the signature?
20   A.  No.
21   Q.  Is that how you sign your name?
22   A.  No.
23   Q.  Do you know whose signature that is or
24 purports to be?
25   A.  I have absolutely no idea.

Page 278

1    Q.  Do you recall sending or directing that
2  this facsimile be sent.  Or let me strike that.  Who
3  was your secretary at that time?  Who is, well, BJE
4  is you.  Who is the MGL?
5    A.  Who is the MGL?  Let's see.
6    Q.  On Page 2.  There are your initials,
7  Bradley J. Edwards, BJE, and then MGL.  Do you
8  recognize that?
9    A.  No.  I mean, as you are very aware problems
10 with secretaries during that period of time, I, I had
11 more than my share and that could have been a time
12 period where I did not have a legal assistant at all.
13 And I do not recognize the initials MGL to identify
14 anybody that I know.
15   Q.  With regard to the individuals who were
16 listed in Exhibit 3, specifically Donald Trump,
17 Leslie Wexner, Bill Clinton, with those individuals,
18 you sent out this facsimile or at least your office
19 sent out the fax, Exhibit 3, requesting dates for
20 these individuals to be deposed, correct?
21   A.  Yes.
22   Q.  All right.  Prior to your joining RRA you
23 had never requested either that the deposition of
24 Mr. Trump be taken, Mr. Wexner, nor Bill Clinton,
25 correct?

Page 279

1    A.  I never requested a deposition to be taken
2  including any deposition of those three individuals.
3    Q.  I understand but all right.
4    A.  The answer to your question is, yes.
5    Q.  All right.  Thank you.  Paula Heil, do you
6  know who that person is?
7    A.  Do I know who it is?  I know that it's
8  somebody who was involved with Bear Sterns at some point
9  in time.
10   Q.  You also requested dates, and in fact
11 served a subpoena on Alan Dershowitz, the Harvard
12 law professor, correct?
13   A.  Correct.
14   Q.  And Mr. Dershowitz you were aware was one
15 of Mr. Epstein's criminal defense lawyers, correct?
16   A.  At some point in time, I knew that in the past
17 he had been an attorney of Mr. Epstein.
18   Q.  Well, you had, you had certain records
19 from the State Attorney's Office, didn't you, or
20 from the police report?
21   A.  And that's what I'm saying, yes, involved in
22 the civil cases with us, no, I didn't know that he had
23 involvement.  But, yes, I did know he was a former --
24   Q.  I'm sorry, go ahead --
25   A.  I did know that he was a former attorney of

33 (Pages 276 to 279)

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)

2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 280

```
1   Jeff Epstein.
2       Q.  Well, you also understood Mr. Epstein has
3   had ongoing criminal law issues even during the time
4   of the civil case, correct?
5       A.  No.
6       Q.  Sure.  Well, you were aware that
7   Mr. Epstein was operating under the nonprosecution
8   agreement, that he was bound by the, a
9   nonprosecution agreement, correct?
10      A.  I'm aware of the existence of a nonprosecution
11  agreement.
12      Q.  Well, and in fact you came into possession
13  of the nonprosecution agreement sometime in 2008
14  because Judge Marra ordered that, ordered the United
15  States Government to turn over to all of the
16  attorneys and the clients who were listed as alleged
17  victims, correct?
18      A.  Yes.
19      Q.  So, you had possession of the N.P.A. as of
20  sometime in the year 2008, correct?
21      A.  Right.
22      Q.  All right.  And so you, and you were aware
23  that under the nonprosecution agreement Mr. Epstein
24  was required to meet certain requirements, that
25  Mr. Epstein had a requirement to meet certain
```

Page 281

```
1   standards or certain provisions of the agreement
2   otherwise the U.S.A. could potentially declare there
3   was a breach of the agreement, true?
4       A.  I suppose.
5       Q.  Well, you're a former prosecutors too, so
6   you knew what a nonprosecution agreement was, true?
7       A.  No, I had never seen a nonprosecution
8   agreement in my life before this one.
9       Q.  When you got the nonprosecution agreement,
10  you reviewed it?
11      A.  Yes, I did.
12      Q.  So, you were familiar with?
13      A.  Right.
14      Q.  And you understood from at least looking
15  at the police report that you had access to, that
16  Mr. Dershowitz had represented Mr. Epstein with
17  regard to negotiating his plea that ultimately was
18  reached in negotiations with the federal government,
19  true?
20      A.  I knew he played a role.
21      Q.  Now, with regard to Mr., with regard to
22  the depositions of -- well, let me strike that.
23  Also listed both on your, on Jane Doe's and L.W.'s
24  and E.W.'s updated interrogatory answers which were
25  provided during the year 2009, an individual named
```

Page 282

```
1   Tommy Mottola was listed.  Do you know who
2   Mr. Mottola is?
3       A.  Generally I think I know who that is.
4       Q.  Who did you understand Mr. Mottola was?
5       A.  Something to do with the music industry.
6       Q.  All right.  And the name David Copperfield
7   was also referenced as a potential witness in the
8   case, correct?
9       A.  That is correct.
10      Q.  All right.  And did you -- and you, in
11  fact, attempted to coordinate a deposition for
12  Mr. Copperfield; is that correct?
13          MR. SCAROLA:  Are you asking about whether
14  communications occurred with you --
15          MR. CRITTON:  Sure.
16          MR. SCAROLA:  -- regarding such a
17  deposition.
18  BY MR. CRITTON:
19      Q.  Let me rephrase it.  With regard to the
20  lawyers in the case, including myself, you attempted
21  to coordinate a time for completing or taking the
22  deposition of Mr. Copperfield, Mr. Mottola, who I
23  will represent is the former president of Sony
24  Records, former president Bill Clinton, Alan
25  Dershowitz, Donald Trump, and Leslie Wexner, true?
```

Page 283

```
1       A.  False.
2       Q.  Which of those, as to which one of those
3   is that false?
4       A.  Tommy Mottola.
5       Q.  So, but you did attempt to coordinate the
6   depositions of Donald Trump, Mr. Dershowitz former
7   president Clinton, David Copperfield, and Leslie
8   Wexner, correct?
9       A.  I believe so.
10      Q.  And with regard to Mr., well, let me
11  strike that.  In setting these depositions; that is,
12  in requesting these deposition be taken sometime in
13  June and July of 2009 or requesting dates for them,
14  did you have discussions with other attorneys in
15  your firm as to the benefits that would exist in
16  your case, your three cases against Mr. Epstein by
17  taking these individuals' depositions?
18          MR. SCAROLA:  Objection.  Same as grounds
19  previously stated; instruct you not to answer.
20  BY MR. CRITTON:
21      Q.  Mr. Edwards, were you involved in the
22  discussions regarding the deposing of any of the
23  people of these individuals, Mr. Trump; that is, in
24  discussions with any other lawyers in your firm
25  including Scott Rothstein?
```

34 (Pages 280 to 283)

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 284

1      MR. SCAROLA:  Same objection, same
2  instruction.
3  BY MR. CRITTON:
4      Q.   Same question with regard to
5  Mr. Dershowitz, former president Clinton, Tommy
6  Mottola, David Copperfield, and Leslie Wexner.
7      THE WITNESS:  No.
8      MR. SCAROLA:  Same objection, same
9  instruction?
10      THE WITNESS:  And with respect to Tommy
11  Mottola, I, that was not my firm that was a
12  separate law firm that intended to take his
13  deposition.
14  BY MR. CRITTON:
15      Q.   Who was it that you understood was taking
16  Mr. Mottola's deposition?
17      A.   Searcy, Denney.
18      Q.   Did you ever discuss with Mr. Rothstein or
19  anyone on his behalf the value of taking the
20  depositions of Trump, Dershowitz, former president
21  Clinton, David Copperfield, and Leslie Wexner as an
22  inducement to get Mr. Epstein to settle his
23  lawsuits?
24      MR. SCAROLA:  You have already inquired of
25  Mr. Edwards about the communications that he

Page 285

1  had with Mr. Epstein.  He has responded to
2  those questions previously.  So, any further
3  questioning along those lines is entirely
4  repetitious.
5  BY MR. CRITTON:
6      Q.   Can you answer that question, sir?  Would
7  you like it read back?
8      MR. SCAROLA:  Beyond what he has already
9  responded, we would object on the basis of
10  work-product and attorney-client privilege and
11  I instruct you not to answer.
12      THE WITNESS:  Okay.
13  BY MR. CRITTON:
14      Q.   Were you involved in any of the decision
15  to pursue obtaining flight data from Mr. Epstein?
16  Well, let me strike that.  Were you involved in the
17  decision to pursue flight data associated with any
18  planes that were purportedly owned by Mr. Epstein?
19      MR. SCAROLA:  I will allow Mr. Edwards to
20  acknowledge whether he did or did not
21  communicate about such matters with opposing
22  counsel.  But beyond that I would assert
23  attorney-client and work-product privileges and
24  instruct you not to answer.
25

Page 286

1  BY MR. CRITTON:
2      Q.   First, my question in the broad sense.
3  Were you involved in the decision to pursue flight
4  data associated with any planes purportedly own by
5  Mr. Epstein?
6      MR. SCAROLA:  My objection --
7      MR. CRITTON:  In terms of the discussions
8  within your firm.
9      MR. SCAROLA:  My objection and my
10  instruction stands.
11  BY MR. CRITTON:
12      Q.   Did you have discussions within your firm
13  with regard to taking the depositions of celebrities
14  or famous people who were on, purportedly on
15  Mr. Epstein's planes so that they could be deposed
16  such that that would be an inducement to Mr. Epstein
17  to settle his lawsuit?
18      MR. SCAROLA:  Same objection, same
19  instruction.
20  BY MR. CRITTON:
21      Q.   Isn't it true, Mr. Edwards, that in taking
22  the deposition or in attempting to take the
23  deposition of Donald Trump, you had no information
24  that Mr. Trump had any knowledge of any female
25  having; that is, underage female ever having been on

Page 287

1  Mr. Epstein's plane and been, and having been
2  assaulted by him?
3      MR. SCAROLA:  What Mr. Edwards knew or
4  didn't know in connection with this prosecution
5  of pending claims is protected by a privilege.
6  I instruct him not to answer.
7  BY MR. CRITTON:
8      Q.   Mr. Edwards, did you know Officer Recarey?
9  I mean, I know you have meet him now because you
10  have seen him at his deposition, correct?
11      A.   Correct.
12      Q.   Did you ever meet with, did you ever meet
13  Mr. or Officer Recarey at any time prior to his
14  deposition in person?
15      A.   No.
16      Q.   Have you ever spoken with Officer Recarey
17  at any time prior to his deposition, by phone or
18  otherwise?
19      A.   Yes.
20      Q.   Okay.  And what context were you speaking
21  with Officer Recarey?
22      THE WITNESS:  Answer?
23  BY MR. CRITTON:
24      Q.   Well, first of all, let me withdraw that
25  question.  Excuse me.  On how many occasions have

35 (Pages 284 to 287)

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)

2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 288

1    you spoken with Officer Recarey prior to his
2    deposition?
3         A.  One time.
4         Q.  And when was that?
5         A.  2008.
6         Q.  What was the purpose of the -- let me
7    strike that.  Did you initiate the conversation or
8    did he?
9              THE WITNESS:  Answer?
10             MR. SCAROLA:  You can answer that.
11             THE WITNESS:  I did.
12   BY MR. CRITTON:
13        Q.  Okay.  What was the purpose of your
14   conversation?
15             MR. SCAROLA:  To the extent that the
16        purpose of your conversation was unrelated to
17        any pending legal matter, including in
18        particular the claims against Mr. Epstein, you
19        may answer.  To the extent that it had anything
20        at all to do with Mr. Epstein, you should not
21        respond on the basis of privilege.
22             THE WITNESS:  Privilege.
23   BY MR. CRITTON:
24        Q.  Did you ever speak with Chief Reiter at
25   any time -- well, let me strike that.  You were not

Page 289

1    at his deposition, were you?
2         A.  No.
3         Q.  Okay.  Have you ever spoken with Chief
4    Reiter at any time for any purpose as it relates to
5    Mr. Epstein?
6              THE WITNESS:  Answer?
7              MR. SCAROLA:  Only to the extent that --
8         well, you asked specifically whether the
9         conversation related to Epstein?
10             THE WITNESS:  Did the conversation occur
11        is the question.
12             MR. SCAROLA:  Relating to Epstein.  Read
13        the question back if you would, please.
14             MR. CRITTON:  Let me rephrase it.
15             MR. SCAROLA:  Okay.
16   BY MR. CRITTON:
17        Q.  With regard to Chief Reiter, have you ever
18   spoken with Chief Reiter or now former Chief Reiter
19   from the Palm Beach Police Department for any
20   reason?
21             MR. SCAROLA:  You can answer the "for any
22        reason" part.
23             THE WITNESS:  No.
24   BY MR. CRITTON:
25        Q.  Have you ever testified in a grand jury

Page 290

1    proceeding relating to any matter during the year
2    2008 or 2009?
3              MR. SCAROLA:  You may answer.
4              THE WITNESS:  No.
5    BY MR. CRITTON:
6         Q.  Did Jane Doe ever come -- let me strike
7    that.  Did Jane Doe ever come to your firm, the RRA
8    firm for any reason?
9         A.  Yes.
10        Q.  On how many occasions did she come to your
11   firm, to RRA?
12        A.  I believe one time.
13        Q.  In addition to, I assume you met with her
14   on that occasion?
15        A.  Right.
16        Q.  Was anyone else present?
17        A.  I don't believe so.
18        Q.  Did L.M. ever come to your firm at RRA?
19        A.  No.
20        Q.  Did E.W. ever come to your firm at RRA?
21        A.  Yes.
22        Q.  On how many occasions?
23        A.  One time.
24        Q.  Did anyone meet with her other than
25   yourself?

Page 291

1         A.  Yes.
2         Q.  Who was present?
3         A.  Bill Berger.
4         Q.  Did any RRA lawyer ever have an occasion
5    to meet with Jane Doe at, at a location other than
6    your office; that is, did you ever request that some
7    other lawyer meet with her, Jane Doe, for a specific
8    reason?  Don't want to know the reason just whether
9    another lawyer met with her.
10        A.  No.
11        Q.  Did any other RRA lawyer meet with L.M.
12   separate, at any time?
13        A.  No.
14        Q.  Did any other lawyer ever met with E.W.
15   separate and apart from the one meeting that you had
16   with Bill Berger and yourself in 2000 -- I'm sorry
17   did --
18        A.  We're talking always about the time period at
19   RRA  I understand that.
20        Q.  Correct.  Did any lawyer from RRA ever
21   meet with E.W. separate from the single occasion
22   that you and Mr. Berger met with her at RRA's
23   office?
24        A.  No.
25        Q.  Did, did you ever have any type of

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)                                    2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 292

1   communication, and by that I mean either a
2   conversation or any writing with Mr. Scott Rothstein
3   about the value of the J -- of the Jeffrey Epstein
4   cases?
5        MR. SCAROLA: You can answer yes or no.
6        THE WITNESS: No.
7   BY MR. CRITTON:
8        Q.  Did you ever have a conversation or
9   communication where Scott Rothstein was present and
10   the value of the Epstein cases was discussed?
11       A.  No.
12       Q.  Did you ever have a conversation with
13   other attorneys at RRA regarding the value of the J,
14   of the Epstein cases that you had?
15       A.  Yes.
16       Q.  Okay.  With whom?
17       A.  Russell Adler, Bill Berger.  I believe that's
18   it.
19       Q.  From, from your observations when you were
20   at RRA, did it appear that certain individuals had
21   access to Mr. Rothstein; that is, other lawyers in
22   the firm had access to him?
23       A.  It appeared to me like nobody had access to
24   him.
25       Q.  In the particular instance that you got

Page 293

1   called up to his office, Mr. Adler was present along
2   with Mr. Rothstein and either Mr. Nurik or somebody
3   else who was on the phone, correct?  We already
4   established that?
5        A.  Correct.
6        Q.  From your observations and or your
7   conversations with Mr. Adler, did you get the
8   impression that Mr. Adler could have or would have
9   access to Mr. Rothstein?
10       MR. SCAROLA: By that I assume you mean
11   unfettered access?
12       MR. CRITTON: No, just easy access.
13   Unfettered suggests someone can walk in and out
14   of the office and you already told me it was a
15   compound.  Let me reask my question.
16   BY MR. CRITTON:
17       Q.  From what Mr. Adler told you, if you had a
18   conversation with Mr. Adler about a particular,
19   whether it was an Epstein case or another case, was
20   it your understanding that Mr. Adler had regular,
21   some form of regular communication with
22   Mr. Rothstein?
23       A.  No.
24       Q.  Okay.  Did you understand that he didn't
25   have any communication with Mr. Rothstein or did you

Page 294

1   not, just did you just not have an understanding?
2        A.  I had an understanding.
3        Q.  Okay.  What was your understanding and
4   what was it based on?
5        A.  Based on numerous conversations with Russell
6   Adler that even he had a very difficult time gaining
7   access to Scott Rothstein for any reason.
8        Q.  Did Mr. Adler, did you ever ask Mr. Adler
9   to pass on information to Mr. Rothstein about the
10   Epstein cases?
11       A.  No.
12       Q.  Other than Mr. Jenne who would make, I
13   think you indicated earlier, on eight to ten
14   occasions ask you about the Rothstein, I am sorry,
15   asked you about the Epstein cases, did any other
16   person inquire on a somewhat regular basis or even
17   an irregular basis as to the status of the Epstein
18   cases?
19       A.  Yes.
20       Q.  Who?
21       MR. SCAROLA:  Again I assume you're
22   talking about persons within the firm?
23       MR. CRITTON:  Correct.  I'm back to only
24   within RRA  You understood that, didn't you,
25   Mr. Edwards?

Page 295

1        THE WITNESS:  No, I didn't.  I thought you
2   meant anybody.
3   BY MR. CRITTON:
4        Q.  Okay.  Then I am back within RRA because I
5   had asked you about Mr. Jenne.
6        A.  Got it.
7        Q.  So, I wouldn't go out.  I want to stay
8   within the firm.  Did anyone ask you or inquire of
9   you about the status of the RRA cases; it was either
10   a lawyer or an investigator within the firm?
11       A.  Maybe but, but none that I can really picture
12   as somebody who would do it regularly.  If I was talking
13   in some lawyer's office about any case or any issue,
14   there were times where I remember generally how is this
15   specific case going or that specific case, and at times
16   it was Jeffrey Epstein case.
17       Q.  With regard to Mr. Jenne, what did you
18   understand with regard to what his position was in
19   the firm?
20       A.  Something to do with the investigative
21   department.
22       Q.  Okay.  What did you understand about
23   Mr. Jenne's background.  Let me strike that.  Were
24   you a State Attorney's when Mr. Jenne was a Broward
25   County Sheriff?

37 (Pages 292 to 295)

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)

2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 296

1    A.  I believe so.
2    Q.  Were you still a State Attorney when
3  Mr. Jenne was indicted and then eventually ended up
4  in jail?
5    A.  No.
6    Q.  Were you in private practice at that
7  point?
8    A.  Correct.
9    Q.  But you lived then in Broward County, so
10  you followed the developments of Mr. Jenne's
11  downfall in becoming a convicted felon?
12    A.  I was aware.
13    Q.  All right.  Was Mr. Jenne, would it be a
14  correct statement that Mr. Jenne and Mr. Fisten and
15  Mr. Roberts were all at the RRA firm when you
16  started in April of '09?
17    A.  I don't believe so.
18    Q.  Which one was there when you started?
19  When I say "there," was already employed by RRA when
20  you started?
21    A.  I am not sure if any of the three were there
22  but perhaps all of them were there.
23    Q.  All you know is at some point you came to
24  be involved with them as investigators?
25    A.  Correct.

Page 297

1    Q.  All right.  With regard to Mr. Jenne, was
2  his office on the same floor as yours?
3    A.  No.
4    Q.  Where, was his office in any way near
5  Mr. Rothstein's?
6      MR. SCAROLA:  What does any way near Mr.
7    Rothstein's mean?
8      MR. CRITTON:  Same floor.
9      THE WITNESS:  No.
10  BY MR. CRITTON:
11    Q.  Did it appear to you that -- well, let me
12  strike that.  You said that Mr. Jenne had something
13  to do with investigation, correct?
14    A.  Correct.
15    Q.  Okay.  Did he ever describe for you what
16  he did for the firm?
17    A.  No.
18    Q.  And I think you said, did you say what his
19  title was?
20    A.  I didn't know his title.  I don't know what
21  his title is now.
22    Q.  Did you ever ask Mr. Jenne why he was
23  asking you questions about the Epstein case or
24  engaging you in a dialogue regarding the Epstein
25  cases?

Page 298

1    A.  No.
2    Q.  Did you ever find it strange that
3  Mr. Jenne was asking you questions about the Epstein
4  cases?
5    A.  No.
6    Q.  Did you ever ask Russell Adler as to why
7  Mr. Jenne would be asking you questions about the
8  Epstein cases?
9    A.  No.
10    Q.  And I think you told me earlier, but I may
11  be wrong so I want to clear this up.  I don't want
12  to be repetitious here.  Did Mr. --
13      MR. SCAROLA:  When did you change your
14    mind about that?
15      MR. CRITTON:  Earlier.
16  BY MR. CRITTON:
17    Q.  Did Mr. Jenne, did you ever direct
18  Mr. Jenne to do any investigation on the Epstein
19  cases?
20      MR. SCAROLA:  Objection, work-product.
21  BY MR. CRITTON:
22    Q.  Did Mr. Jenne ever do any investigation on
23  the Epstein files?
24      MR. SCAROLA:  Objection, work-product.
25

Page 299

1  BY MR. CRITTON:
2    Q.  Did Mr., were you aware that Mr. Jenne was
3  attempting to shop the Epstein cases to investors
4  during the time you were at the RRA firm?
5      MR. SCAROLA:  Objection, assumes facts.
6      THE WITNESS:  No.
7      MR. SCAROLA:  That's all right.
8  BY MR. CRITTON:
9    Q.  Do you know Bill Scherer, Attorney Bill
10  Scherer?
11    A.  No, I know of him.
12    Q.  You are aware that he has a pending
13  lawsuit against various individuals including TD
14  Bank and other Defendants on behalf of various
15  investors; is that a fair statement?
16    A.  I remember when that first came out.  I have
17  not followed it.  I don't know if it's active, if it's
18  still pending, or what the status is at all.  But I do
19  remember a lawsuit being filed on behalf of somebody
20  against Scott Rothstein and others.
21    Q.  All right.  And do you remember, it's
22  within Paragraph 20 of the complaint it's a --
23    A.  Of?
24    Q.  Of, I'm sorry, of Exhibit No. 2.  And it
25  states Fort Lauderdale attorney William Scherer

38  (Pages 296 to 299)

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)

2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 300

1    represents multiple Rothstein related investors. He
2    indicated in an article that RRA, slash, Rothstein
3    had used the Epstein ploy as a showpiece, as a
4    showpiece, as bait. That's, and the quote is,
5    Epstein ploy, as a showpiece, as bait. That's the
6    way he raised all the money.
7        He would use cases as bait for luring
8    investors into fictional cases. All the cases he
9    allegedly structured were fictional. I don't
10   believe there was a real one there.
11       Okay. If I asked you to assume that that
12   quote is accurate from Mr. Scherer, would it be a
13   correct, would it be a correct statement -- well,
14   let me strike that.
15       Were you aware that Rothstein and other
16   individuals were using the Epstein ploy; that is,
17   the Epstein cases in order to, as bait in order to
18   raise money for, for the firm and Mr. Rothstein?
19       MR. SCAROLA: I am going to object to the
20   form of the question, but you can certainly
21   answer it.
22       THE WITNESS: Okay. I am going to answer
23   it to the extent that I understand it. No, I
24   was not aware that the Epstein cases were being
25   used as a showpiece, as bait. But you are also

Page 301

1    asked me to assume that the statement that you
2    have injected as Paragraph 20 of the complaint
3    is true and it begins with, or ends with I
4    don't believe there was a real one in there,
5    talks, speaking as to all the cases. And you
6    know and I know that that statement is
7    absolutely false in that you know each and
8    every one of the claims that have been asserted
9    against Mr. Epstein related to his molestation
10   of children, they are all true including the
11   three that I have against Mr. Epstein.
12       So, if you're asking me to assume that
13   this is it true, no, I did not know that they
14   were being used for anything.
15   BY MR. CRITTON:
16       Q. Okay. Well, as to whether Mr. Scherer was
17   aware as to whether there were three pending cases
18   or he assumed that they were all just made-up cases,
19   neither you nor I know what he was thinking,
20   correct?
21       A. Yeah, I don't know.
22       Q. All right. With regard to the Epstein
23   ploy, with regard to Epstein cases, were you aware
24   that Scott Rothstein was trying to market Epstein
25   cases; that is, three, three cases that existed?

Page 302

1        A. No.
2        Q. Okay. Were you aware that Scott Rothstein
3    had represented to other individuals that he had
4    multiple other cases, multiple other Jane Doe's
5    which he was trying to market to investors?
6        A. No.
7        Q. Were you aware that -- do you have any
8    knowledge that Ken -- let me strike that.
9        Were you aware that Ken Jenne was
10   attempting to market or shop non-existent Epstein
11   cases to investors?
12       A. I wasn't aware then nor am I aware of that
13   now, so, no.
14       Q. Do you have any knowledge that Mr. Fisten
15   and/or Mr. Jenne would cart boxes of Epstein related
16   materials; that is, existing Epstein related
17   materials relating to Jane Doe and show those to
18   other investors?
19       A. Do I have knowledge that somebody carted?
20       Q. Yeah, are you aware that Mr. Fisten or do
21   you have any knowledge that Mr. Fisten brought boxes
22   of Epstein-related materials to show perspective
23   investors?
24       A. No.
25       MR. SCAROLA: Objection, assumes, Assumes

Page 303

1    facts not in evidence, no proper predicate.
2    BY MR. CRITTON:
3        Q. Do you have any knowledge that Mr. Jenne
4    either directly or directed someone else to bring
5    boxes of Epstein-related materials to show
6    investors?
7        MR. SCAROLA: Objection, assumes facts not
8    in evidence, no proper predicate.
9        THE WITNESS: No.
10   BY MR. CRITTON:
11       Q. If, based on your earlier testimony, if
12   there were boxes of Epstein materials on existing
13   cases, Jane Doe, L.M. and E.W., again if I
14   understood your testimony, that information would
15   have been available someplace in the firm and
16   someone who had access to the room could have
17   grabbed those files or taken those files and done
18   whatever they wanted to them, with them, and then
19   brought them back for storage, correct, and you
20   wouldn't know?
21       A. As is the case with every case in every law
22   firm in America, yes.
23       Q. With regard to the three cases that you
24   have now, does any law firm other than your current
25   firm, which is Farmer, Jaffe?

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)

2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 304

1     A.  Weissing.
2     Q.  Or RRA, Mr. Howell, or Mr. Cassell have
3 any interest in those cases?
4     A.  No.
5     Q.  At any time -- let me strike that.  You
6 are aware that Mr. Alfredo Garcia has pled guilty to
7 an obstruction of justice charge based on the news?
8     A.  I don't know Alfredo Garcia at all.
9     Q.  Sorry about that.  The head of Alfredo
10 Garcia.  With regard Mr. Rodriguez, Alfredo
11 Rodriguez, are you aware through news reports that
12 he pled guilty to obstruction of justice?
13     A.  Yes.
14     Q.  At any time have you been given access to
15 the pamphlet book and/or any of the yellow pages
16 that have been referenced in the criminal
17 indictment?
18        MR. SCAROLA:  I am going to instruct you
19     not answer that question on the basis of
20     attorney-client and work-product privilege.
21 BY MR. CRITTON:
22     Q.  Has the, have you been, have you had any
23 contact with the criminal defense lawyer for
24 Mr. Rodriguez?
25        MR. SCAROLA:  You can answer yes or no.

Page 305

1        THE WITNESS:  No.
2 BY MR. CRITTON:
3     Q.  Have you had any communication, not a
4 conversation but any communication with the criminal
5 defense lawyer about obtaining a copy of the
6 pamphlet and/or the pamphlet book or the yellow
7 pages that are referenced in the criminal indictment
8 that were at one time in the possession of Mr.
9 Rodriguez and that he apparently was trying to sell
10 to the cooperating witness?
11        MR. SCAROLA:  I am going to instruct you
12     not to answer any question about anything that
13     you may have done in connection with the
14     fulfillment of your responsibilities as counsel
15     for the Plaintiffs in the three pending cases.
16 BY MR. CRITTON:
17     Q.  Again, of course you're going to continue
18 to follow Mr. Scarola's direction?
19     A.  On what I have done or what I have not done,
20 all of that is work-product.
21     Q.  Well, you have filed a motion to obtain a
22 copy of the pamphlet book and the yellow pages of
23 Mr. Rodriguez, correct?  I am sorry, either a
24 motion -- well, strike that.  You have filed a
25 motion in federal court to obtain a copy of the, of

Page 306

1 the information that is held by the FBI which would
2 include the pamphlet and the yellow, the pamphlet
3 and the yellow pages, true?
4     A.  I have.  Adam Horowitz has, and I may or may
5 not have piggybacked his motion.  But as sitting here
6 right now, I, I don't remember drafting that motion.
7     Q.  Are you sure he hasn't piggybacked your
8 motion?
9     A.  I'm not sure.  If you show me my motion, I can
10 tell you whether I drafted it or not.
11     Q.  Have you --
12     A.  That, that was certainly an idea.
13     Q.  Have, have you also -- you have also
14 served a motion to obtain FBI files that relate to
15 Mr. Epstein; is that correct?
16     A.  Correct.
17     Q.  Okay.  Have you spoken as a result of the
18 motion that you filed, has the government, have you
19 spoken with the United States Attorney's Office or
20 representatives for the FBI with regard to the
21 motion which you filed?
22        MR. SCAROLA:  Objection, privilege and
23     instruct you not to answer.
24 BY MR. CRITTON:
25     Q.  Have you received any type of response

Page 307

1 from the United States Attorney's Office or the FBI
2 with regard to the motion that you have filed?
3        MR. SCAROLA:  You may answer that only
4     with respect to those matters that are matters
5     of public record; that is, if a response has
6     been filed with the court or provided to you in
7     the form of a pleading, you may respond.
8        THE WITNESS:  I cannot respond to that
9     question.
10        MR. CRITTON:  All right.  We're going to
11     quit at 5.  I don't want to go on.
12        MR. SCAROLA:  You already, you already
13     missed that.
14        MR. CRITTON:  All right.  Well, let's,
15     I'll adjourn the deposition today, and I will
16     arrange with you for a time to finish.
17        MR. SCAROLA:  Well, so that the record is
18     clear, it is our position that you have had
19     more than adequate time to conduct an
20     appropriate examination of Mr. Edwards, and we
21     will resist any further effort to depose him.
22        MR. CRITTON:  I understand your position.
23     Disagree with it but understand it.
24        MR. SCAROLA:  Thank you.
25        THE VIDEOGRAPHER:  This concludes today's

40  (Pages 304 to 307)

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)

2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 308

1   videotape deposition of Scott Rothstein.  The
2   time is --
3       THE WITNESS:  Whoa, whoa.
4       THE COURT REPORTER:  Yes.  Bradley
5   Edwards.
6       THE WITNESS:  Please don't lump me in with
7   that guy, man.
8       MR. SCAROLA:  This concludes the
9   deposition of Mr. Bradley Edwards.
10      THE VIDEOGRAPHER:  Oh, I'm sorry.  This
11  concludes the deposition of Mr. Bradley
12  Edwards.  The time is 5:07 p.m.
13      (A discussion was held off the record.)
14      THE COURT REPORTER:  Did you want to order
15  this?
16      MR. CRITTON:  Ask me tomorrow.
17      MR. SCAROLA:  I will take a copy of it.
18  Let's stay on the record.  We don't need to be
19  on the video record but I want to make the
20  statement that we would consider it entirely
21  inappropriate for any portion of this
22  deposition to be used for any reason whatsoever
23  that is not directly connected with the
24  prosecution of the pending claim against
25  Mr. Edwards or the defense of the

Page 309

1   counterclaims.  Thank you.
2       MR. CRITTON:  Bye.
3       MR. SCAROLA:  Bye.
4       (Witness excused.)
5       (Deposition was concluded.)

Page 310

1               CERTIFICATE OF OATH
2   THE STATE OF FLORIDA
3   COUNTY OF PALM BEACH
4
5
6       I, the undersigned authority, certify that
7   BRADLEY J. EDWARDS, ESQUIRE personally appeared
8   before me and was duly sworn on the 23rd day of
9   March, 2010.
10
11      Dated this 5th day of April, 2010.
12
13
14
15
16   Cynthia Hopkins, RPR, FPR
17   Notary Public - State of Florida
     My Commission Expires:  February 25, 2011
18   My Commission No.:  DD 643788
19

Page 311

1            C E R T I F I C A T E
2   THE STATE OF FLORIDA
3   COUNTY OF PALM BEACH
4
5       I, Cynthia Hopkins, Registered Professional
    Reporter, Florida Professional Reporter and Notary
6   Public in and for the State of Florida at large, do
    hereby certify that I was authorized to and did
7   report said deposition in stenotype; and that the
    foregoing pages are a true and correct transcription
8   of my shorthand notes of said deposition.
9       I further certify that said deposition was
    taken at the time and place hereinabove set forth
10  and that the taking of said deposition was commenced
    and completed as hereinabove set out.
11
12      I further certify that I am not attorney or
    counsel of any of the parties, nor am I a relative
13  or employee of any attorney or counsel of party
    connected with the action, nor am I financially
14  interested in the action.
15      The foregoing certification of this transcript
    does not apply to any reproduction of the same by
16  any means unless under the direct control and/or
    direction of the certifying reporter.
17      Dated this 5th day of April, 2010.
18
19
20
21   Cynthia Hopkins, RPR, FPR
22

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)

2d39412d-67f2-4170-9d82-0511ff76c2ea

Page 312

```
1   DATE:   April 5th, 2010
2   TO:    BRADLEY J. EDWARDS, ESQUIRE
           c/o Jack Scarola, Esquire
3          SEARCY, DENNEY, SCAROLA,
           BARNHART & SHIPLEY, P.A.
4          2139 Palm Beach Lakes Boulevard
           West Palm Beach, Florida  33409
5
    IN RE:   Epstein vs. Rothstein
6
    CASE NO.:  50 2009CA040800XXXXMB AG
7
         Please take notice that on Tuesday, the 23rd of
8   March, 2010, you gave your deposition in the
    above-referred matter.  At that time, you did not
9   waive signature.  It is now necessary that you sign
    your deposition.
10       As previously agreed to, the transcript will be
    furnished to you through your counsel.  Please read
11  the following instructions carefully:
         At the end of the transcript you will find an
12  errata sheet.  As you read your deposition, any
    changes or corrections that you wish to make should
13  be noted on the errata sheet, citing page and line
    number of said change.  DO NOT write on the
14  transcript itself.  Once you have read the
    transcript and noted any changes, be sure to sign
15  and date the errata sheet and return these pages to
    me.
16       If you do not read and sign the deposition
    within a reasonable time, the original, which has
17  already been forwarded to the ordering attorney, may
    be filed with the Clerk of the Court.  If you wish
18  to waive your signature, sign your name in the blank
    at the bottom of this letter and return it to us.
19
         Very truly yours,
20
21          Cynthia J. Hopkins
22          Cynthia Hopkins, RPR, FPR
23  I do hereby waive my signature.
24  _____
25  BRADLEY J. EDWARDS, ESQUIRE
```

Page 314

```
1               E R R A T A  S H E E T
2   IN RE:      EPSTEIN VS. ROTHSTEIN
    CR:         Cynthia Hopkins, RPR, FPR
3   DEPOSITION OF: BRADLEY J. EDWARDS, ESQUIRE
    TAKEN:      March 23, 2010
4   JOB NO.:    1333
5    DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
    PAGE #  LINE #  CHANGE          REASON
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16
17  Please forward the original signed errata sheet to
    this office so that copies may be distributed to all
18  parties.
19  Under penalty of perjury, I declare that I have read
    my deposition and that it is true and correct
20  subject to any changes in form or substance entered
    here.
21
22  DATE: _____
23
24  SIGNATURE OF
    DEPONENT:_____
25
```

Page 313

```
1            C E R T I F I C A T E
2                 - - -
3   THE STATE OF FLORIDA
4   COUNTY OF PALM BEACH
5        I hereby certify that I have read the foregoing
6   deposition by me given, and that the statements
7   contained herein are true and correct to the best of
8   my knowledge and belief, with the exception of any
9   corrections or notations made on the errata sheet,
10  if one was executed.
11
12       Dated this ____ day of _____,
13  2010.
14
15
16
17
18  _____
19  BRADLEY J. EDWARDS, ESQUIRE
20  Job #1333
21
22
23
24
25
```

42 (Pages 312 to 314)

Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)
Electronically signed by cynthia hopkins (601-051-976-2934)

2d39412d-67f2-4170-9d82-0511ff76c2ea