UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 08-CIV- 80893 – MARRA/JOHNSON

JANE DOE,

            Plaintiff,

v.

JEFFREY EPSTEIN,

            Defendants.
_____/

### EPSTEIN'S MOTION IN LIMINE TO EXCLUDE CERTAIN TESTIMONY AND OPINIONS OF JANE DOE'S EXPERT WITNESS

    Defendant, JEFFREY EPSTEIN ("Epstein"), moves in limine to exclude certain testimony and opinions of Plaintiff's, JANE DOE ("Jane Doe"), expert witness, L. Dennison Reed, Psy.D., and in support states:

    1.    Epstein requests the Court exclude the following testimony and/or opinions of Jane Doe's expert witness, L. Dennison Reed, Psy.D:

        a.    Any testimony related to the "grooming" process as the evidence contradicts the notion that Epstein "groomed" Jane Doe and the issue is therefore irrelevant;

        b.    Any testimony or opinions that Epstein "groomed" Jane Doe, or any opinion regarding Epstein for that matter as Dr. Reed has not examined Epstein and has no basis to offer any such opinions;

        c.    Any testimony regarding the Palm Beach Police Report or Probable Cause Affidavits as they do not mention or refer to Jane Doe and are therefore irrelevant. They also constitute inadmissible hearsay and double-hearsay;

        d.    Any testimony or opinions that Jane Doe has been damaged by the criminal justice system, that Epstein received a "lenient" sentence and that Epstein would have died in prison if convicted of all he crimes committed.  These issues are irrelevant and any purported relevance is substantially outweighed by the danger of unfair prejudice, confusions of issues, misleading the jury, undue delay and

waste of time. More importantly, Dr. Reed is not an expert on the criminal justice system. He is merely parroting Plaintiff's counsel's theme;

e. Any testimony criticizing or disparaging Epstein's counsel's deposition questioning or any suggestion that Epstein's counsel acted improperly during discovery;

f. Any testimony or opinions regarding a diagnosis of Jane Doe as Dr. Reed testified he did not make any diagnoses;

g. Any testimony or opinions regarding the cost of future care or treatment of Jane Doe as Dr. Reed testified he did not make any such determination.

### Applicable Legal Principals Regarding Expert Testimony

2. For expert testimony to be admissible, the proponent must demonstrate that: (1) the expert is qualified to testify regarding matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. See Corwin v. Walt Disney, 475 F.3d 1239, 1250 (11th Cir. 2007).

3. The Supreme Court's Daubert decision requires that the trial court act as "gatekeepers" to ensure that speculative, unreliable expert testimony does not reach the jury. See McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1256 (11th Cir. 2002).

4. Since expert testimony may be assigned talismanic significance in the eyes of lay jurors, the district court must take care to weigh the value of such evidence against its potential to mislead or confuse. See Owaki v. City of Miami, 491 F. Supp.2d 1140, 1161 (S.D. Fla. 2007). Expert testimony will not assist the jury when it offers nothing more than what lawyers for the parties can argue in closing argument. Id. at 1160 (internal citations omitted).

5. A district court may exclude expert testimony if the analytical gap between the data and opinion offered is too great. See Norfolk Southern Corp. v. Chevron U.S.A., Inc., 279 F. Supp.2d 1250, 1269 (M.D. Fla. 2003), *rev'd on other grounds* 371 F.3d 1285 (11th Cir. 2004).

6. An expert may rely on inadmissible evidence in forming his or her opinion if the evidence is of a type reasonably relied upon by experts in the particular field. See Fed. R. Evid. 703. However, the court should examine trustworthiness and reliability of inadmissible hearsay statements relied upon by an expert before permitting expert to testify regarding such hearsay statements. See Vann v. St. Paul Fire and Marine Ins. Co., 173 B.R. 759, 768 (N.D. Fla. 1994).

7. On the other hand, an expert cannot not "reasonably rely" exclusively on inadmissible facts or data. See Carratell v. State, 832 So. 2d 850, 861 (Fla. 4th DCA 2002). For example, it would be impermissible for an accident reconstruction expert to opine on the point of impact based only on the hearsay statements of bystanders. Id. at 862

### Dr. Reed's Evaluation of Jane Doe

8. Dr. Reed was retained by Jane Doe on March 8, 2010, less than one month before expert reports were due and over one and half years after Jane Doe filed her case. See 6/22/10 Deposition of L. Dennison Reed, Psy.D. ("Reed Dep") at 102.

9. Jane Doe was scheduled to meet with Dr. Reed on March 20, 2010, but cancelled on March 19th due to a "scheduling conflict." Id. at 195. Jane Doe's cancellation concerned Dr. Reed because his report was due in thirteen days, on April 2, 2010, or Jane Doe wouldn't have an expert. Id.

10. The appointment was rescheduled for March 22, 2010, from 9:00 a.m. to 5:00 p.m. Id. at 199. However, Jane Doe arrived at Dr. Reed's office at 11:45 a.m., two hours and forty-five minutes late. When she finally arrived, Jane Doe said "quite honestly, the evaluation

wasn't the first thing on my mind when I woke up this morning [which was one hour after the evaluation was scheduled to begin]." Id.

11. Dr. Reed admitted that due to the time constraints, if he came to an adverse conclusion regarding Jane Doe, she would essentially be locked in to said opinion because Dr. Reed was the only expert retained by Jane Doe. Id. at 105.

### The Court Should Exclude Testimony Regarding "Grooming"

12. In his report (attached as **Exhibit A**), Dr. Reed dedicates eight (8) pages to describing Epstein's modus operandi of "grooming" Jane Doe.

13. Dr. Reed describes grooming as a "manner of psychologically manipulating children so that they will be compliant victims." See Exhibit A at 9.

14. Importantly, grooming is a "process" that occurs "**over a period of time.**" See Reed Dep at 229-30.

15. Dr. Reed compares grooming to adult courting:

> the adult seducer ... tries to impress the prospective romantic partner ... shows concern for the partner's well-being; responds empathically to the partner's expressed difficulties; and showers the partner with material enticements and rewards, e.g. taking the partner out to dinner, buying the partner gifts, and so on. If these seduction strategies are successful, the prospective partner freely chooses to reciprocate in a fashion that pleases the seducer; for example by becoming sexually responsive, or by becoming a loyal partner.

See Exhibit A at 9-10.

16. "The forging of an emotional bond through grooming leads to physical contact. Predators use the grooming process to break down a child's defenses and increase the child's acceptance of touch. The first physical contact ... is often nonsexual touching." See Gregory M. Weber, *Grooming Children for Sexual Molestation*,

4

http://www.vachss.com/guest_dispatches/grooming.html (emphasis added).  Mr. Weber, the author of the foregoing article, is an Assistant Attorney General for the State of Wisconsin specializing in the prosecution of crimes committed against children.

17. Since grooming is a process that occurs "over a period of time" and "leads to physical contact," it clearly does not apply in the instant case.

18. Jane Doe asserts that "Epstein **unexpectedly** began making sexual advances towards her the **first time** that she went to his home...." See Exhibit A at 14 (emphasis added). She explained, "I just didn't want to do anything to upset somebody who had total control over me in that situation" and that "saying 'no' to this powerful adult was not an option." Id. at 13-14.

19. This description is directly at odds with the grooming process and does not support the theory that Epstein was trying to impress Jane Doe or obtain her trust "over a period of time" so she would "freely choose to reciprocate ... by becoming sexually responsive." See Exhibit A at 9-10.

20. Instead, Jane Doe plainly asserts that Epstein unexpectedly made sexual advances towards her the first time she went to his house. Jane Doe also testified that Epstein introduced himself, shook her hand and then told her to take her clothes off. See 9/30/09 Deposition of Jane Doe ("Doe Dep.") at 224. Jane Doe clearly was not groomed by Epstein; she took off her clothes within minutes of shaking his hand.

21. Moreover, Jane Doe was not "psychologically manipulated" to become a "compliant victim" because she refused to comply with Epstein's alleged request for oral sex and/or intercourse. Dr. Reed's assertion in his report that Jane Doe "felt as though resisting or say 'no' to this powerful adult was not an option," is contradicted on the following page later by

the assertion that Jane Doe "declined ... to engage in oral sex or intercourse with Epstein." See Exhibit A at 13-15.

22. Thus, the issue of grooming is irrelevant to Jane Doe's claims and any testimony by Dr. Reed in that regard should be excluded as the "analytical gap between the data and opinion offered is too great" and since it would confuse the issues, mislead the jury and unfairly prejudice Epstein. See Norfolk Southern Corp., 279 F. Supp.2d 1250; Owaki, 491 F. Supp.2d 1140.

### Dr. Reed Has No Basis to Offer Opinions Regarding Epstein

23. In addition, Dr. Reed never examined or interviewed Epstein nor did he review any of Epstein's medical or psychological records. The basis of Dr. Reed's opinion regarding Epstein's modus operandi of grooming is based solely on inadmissible hearsay - his single interview with Jane Doe, conversations and e-mails with Jane Doe's counsel, the First Amended Complaint (with RICO statement)[1], a redacted[2] version of the Palm Beach Police Report ("Police Report") and redacted Probable Cause Affidavits. Dr. Reed lacks any credible basis for his opinion and it should therefore be excluded.

24. In Land v. State, 156 So. 2d 8, 11 (Fla. 1963), the court found that an expert's opinion "based solely upon information offered by third persons would be of little to no value and inadmissible." See also 24A Fla.Jur.2d, Evidence and Witnesses, §1092 (noting that "[a]n opinion founded on an expert's scientific examination of the subject and conversations with third

---

[1] Jane Doe's claim pursuant to Fla. Stat. §772.104, Civil Remedies for Criminal Practices ("RICO") was dismissed with prejudice by the Court on March 3, 2010 (DE #125). Thus, Dr. Reed's reliance on the portion of the First Amended Complaint containing the RICO statement is misplaced, and therefore one of the significant bases for his testimony is non-existent.
[2] The fact Dr. Reed reviewed the *redacted* Police Report and Probable Cause Affidavits is significant because he necessarily would be unable to attribute the statements of the alleged victims to the particular individuals, thereby preventing Epstein from cross-examining Dr. Reed regarding his knowledge of other facts and evidence relative to the other alleged victims.

6

persons is not inadmissible, in the absence of a showing that the expert's conclusion is based substantially upon such conversations.").

25. As stated above, Dr. Reed did not examine or interview Epstein and has not reviewed any medical or psychological records. Any deposition testimony he *may* have reviewed is of little value given that Epstein invoked his Fifth Amendment right against self-incrimination in response to a majority of questions. The only basis for Dr. Reed's opinion regarding Epstein's modus operandi is inadmissible hearsay – statements of Jane Doe, conversations and e-mails with Jane Doe's counsel, the First Amended Complaint (with RICO statement), redacted versions of the Police Report and Probable Cause Affidavits. Since Dr. Reed's opinion is based solely upon information offered by third persons, and since he failed to interview or conduct any psychological tests of Epstein, the Court should exclude his opinion regarding Epstein's modus operandi or any other opinions regarding Epstein. See Land, supra.

26. Telephone conversations and e-mails communications between Dr. Reed and Jane Doe's counsel (an inherently biased individual) are certainly not trustworthy and reliable sources of information from which to formulate an opinion regarding Epstein.

27. The redacted Police Report and Probable Cause Affidavits are similarly unreliable and also irrelevant since Dr. Reed concedes that Jane Doe was not part of the Palm Beach Police Department's investigation and not mentioned in the Report or Affidavits. See Reed Dep at 123-26. What other females might have said to police officers, which was summarized in the Police Report has no bearing on Jane Doe's claims. It is also contains double hearsay – out of court statements from law enforcement officers purporting to summarize out of court statements of alleged victims.

28. Dr. Reed did not review the actual statements given by the alleged victims to the Palm Beach Police and agreed that "there is no way for [him] to know whether or not the information as reported by the police officer is correct." See Reed Dep at 126-27. Dr. Reed also agreed that the accounts given by the females as recorded in the police report "...may have been [the officer's] interpretation" of what was said. Id. at 130. He also did not review any "deposition testimony, sworn testimony or medical records that relate to any other person that may have gone to Mr. Epstein's home...." Id. at 131.

29. Accordingly, the basis for Dr. Reed's testimony regarding Epstein's modus operandi of grooming is "based solely upon information offered by third persons [and is therefore] of little to no value and inadmissible." See Land, 156 So. 2d at 11; Carratell, 832 So. 2d 850.

30. Dr. Reed's entire theory about grooming is pure speculation. He did not interview any other females, read their statements, depositions, medical records or CME reports. While Dr. Reed attempts to explain that Epstein's alleged grooming of other females is relevant to Jane Doe's damages because victims have "an unwarranted sense of guilt or responsibility that they feel for being sexually abused themselves," which is an "aspect of [Jane Doe's] symptomatology (see Reed Dep at 225 – 26), Dr. Reed never explains how the alleged grooming of **other** females (gleaned from the hearsay police report and the double hearsay statements contained therein) relates in any way to Jane Doe. On the other hand, in Jane Doe's June 29, 2010 Motion for Writ of Habeus Corpus (DE #175), she asserted "Epstein used the fact that other minor girls were returning as a basis for psychologically coercing Jane Doe into returning." See DE#175 at 5-6. Interestingly, this novel theory was never referenced in Dr. Reed's report and he did not mention it in his deposition. Moreover, there is no testimony by Jane Doe that

8

she was aware of how Epstein acted with other females, save for possibly LM and EW. Thus, the entire issue of Epstein allegedly grooming other females is irrelevant.

31. For the foregoing reasons, the Court should exclude any opinions by Dr. Reed concerning Epstein, including that Epstein groomed Jane Doe or any other female, as he lacks any basis to offer any such opinion.

### Any Testimony Regarding the Police Report or Probable Cause Affidavits Should Be Excluded Since They Have No Bearing on Dr. Reed's Opinions

32. The Court should prohibit Dr. Reed from testifying regarding the contents of the Police Report or Probable Cause Affidavits as neither has any bearing on his opinions.

33. Dr. Reed testified that he relied on the Police Report and Probable Cause Affidavits in support of his opinion regarding Epstein's purported modus operandi of grooming. As stated above, testimony regarding grooming and any testimony or opinion that Epstein "groomed" any of the alleged victims should be excluded. The Police Report would therefore be of no probative value if Dr. Reed is prohibited from testifying regarding grooming.

34. On the other hand, if the Court is inclined to permit Dr. Reed to testify regarding grooming, he should nevertheless be prohibited from testifying to substance of the Police Report as he would merely be a conduit for inadmissible hearsay and double hearsay.

35. Dr. Reed did not review the actual statements given by the alleged victims to the Palm Beach Police and agreed that "there is no way for [him] to know whether or not the information as reported by the police officer is correct." See Reed Dep at 126-27. Dr. Reed also agreed that the accounts given by the females as recorded in the police report "…may have been [the officer's] interpretation" of what was said. Id. at 130. He also did not review any "deposition testimony, sworn testimony or medical records that relate to any other person that may have gone to Mr. Epstein's home…." Id. at 131.

9

36. Moreover, Dr. Reed reviewed a redacted version of the Police Report, so he is unaware of the identities of the other alleged victims. As a practical matter, how could Epstein's counsel cross-examine Dr. Reed regarding statements in the Police Report if Dr. Reed cannot even identify the person who allegedly made the statement?

37. In Royale Green Condo Ass'n v. Aspen Specialty Ins. Co., 2009 WL 2208166 *2 (S.D. Fla. 2009), the court held that defendant's expert could not testify regarding the statements of unavailable witnesses as "admission of this hearsay evidence would undermine the rules of evidence because it 'impermissibly permits the testifying experts to bolster their opinions and creates the danger that the testifying expert will in fact serve as conduits for the opinions of others who are not subject to cross examination.'" Moreover, the court reasoned that the allowing the expert to testify regarding such statements would be duplicative of other testimony from similar witnesses who have been deposed. Id.

38. The instant case is even more problematic because Dr. Reed has not relied on the statements of witnesses, as in Royal Green, but rather summaries/interpretations of witness statements contained in the police report – double hearsay. See Williams v. Consolidated City of Jacksonville, 2006 WL 305916 *7 (M.D. Fla. 2006) (granting motion in limine to prohibit expert from testifying to double and triple hearsay statements as they lacked reliability and were unduly prejudicial).

39. For the foregoing reasons, the Court should prohibit Dr. Reed from testifying regarding the contents of the Police Report or Probable Cause Affidavits.

### Dr. Reed Should Be Prohibited from Criticizing the Criminal Justice System and Testifying that Epstein Received a "Lenient" Sentence

40. The Court should exclude any testimony by Dr. Reed criticizing the criminal justice system, the state attorney, the U.S. Attorney, the Department of Justice or any other

10

governmental agency, the plea agreement between Epstein and the state attorney, or the Non-Prosecution Agreement ("NPA") between Epstein and the U.S. Attorney's Office ("USAO"), as such testimony relates to collateral issues, is not relevant to any issue in this case, would confuse the issues and mislead the jury, would waste the court's time and would be unfairly prejudicial to Epstein.

41.     In his report, Dr. Reed states "[t]he criminal justice system's response ... has been remarkably unsupportive, as evidenced by the extraordinary lenient please agreement the government entered into with Epstein." See Reed Report at 19. Dr. Reed concludes that the "unsupportive" response of the criminal justice system "have served to significantly exacerbate the harm done to [Jane Doe]..." Id. at 19. Dr. Reed also asserts, without any basis, that had Epstein "been convicted of all the criminal acts that [Jane Doe] has alleged, he very well likely would have died in prison." Id. at 16-17.

42.     First and foremost, Dr. Reed has no basis to opine on leniency of Epstein's sentence. Dr. Reed is not an expert on the criminal justice system and admitted he has no information regarding the circumstances surrounding Epstein's plea agreement, whether the State Attorney was inclined to prosecute Epstein, whether a grand jury was convened or the findings of the grand jury. See Reed Dep at 255-57. The only information Dr. Reed was privy to was that Epstein entered into a plea agreement and that 34 other victims were identified – information obtained from Jane Doe's counsel. Id. at 258. Nor has Dr. Reed ever spoken with the USAO or attempted to determine why they entered into the NPA with Epstein. Id. at 263. Dr. Reed's conclusion that Epstein's sentence was "extraordinarily lenient" was based on conversations with Jane Doe's counsel and conversations with a Broward County assistant state attorney who prosecutes sex crimes and the Palm Beach Police Report. Id. Simply put, Dr.

11

Reed has no basis to opine on Epstein's plea agreement or the NPA; and Dr. Reed's assertion that Epstein would have died in prison if convicted of all the criminal acts against Jane Doe is pure speculation.

43.     Next, the alleged "unsupportive" response of the criminal justice system or the "extraordinarily lenient" sentence is not relevant to any issue in this case.  The government is not a party to this civil action.  Nevertheless, if the government was a party, testimony criticizing the government would likely be inadmissible.  See U.S. v. Shields, 1991 WL 236492 *3 – 5 (N.D. Ill. 1991) (excluding evidence and argument regarding alleged government misconduct in course of investigation and other related investigations as said matters "would appear to have no bearing upon the events at issue in this case, and would serve only to bog the trial down in collateral matters.").

44.     Even if it was relevant, this evidence would only serve to improperly inflame the jury and cause them to compensate for the purported "lenient sentence" by awarding more compensatory damages than are supported by the evidence.

45.     It would also confuse the issues and mislead the jury by implying that the government's actions (and the resulting plea agreement and the NPA) in the prior criminal case are somehow relevant and should be considered by the jury in determining the issues in the instant case.

46.     Similarly, any evidence or argument that Epstein received a lenient sentence because he is wealthy (a theme echoed in numerous media reports), should also be excluded. Permitting this evidence would have the same unfairly prejudicial effect – implying that the jury should consider the government's purported leniency in determining the issues in this case.

47. In <u>Williams v. Consolidated City of Jacksonville</u>, 2006 WL 305916 *9 (M.D. Fla. 2006), an employment discrimination case against the City of Jacksonville's Fire Chief, plaintiffs sought to introduce evidence of a prior similar lawsuit filed against the defendant to prove the defendant's motive for placing them on administrative leave and requiring psychological examinations. The court granted the defendant's motion in limine to exclude evidence of the prior litigation concluding that it was "a collateral matter, which could confuse the issues, mislead the jury, and lead to a mini-trial on collateral issues causing undue delay in the trial of this case which would not relate to the discrimination alleged in Plaintiffs' claims." <u>Id.</u> at *10. S

48. Analogous to the prior litigation against the defendant in <u>Williams</u>, Epstein's prior criminal case is an irrelevant collateral issue; allowing Jane Doe to present evidence and argument critical of the government's handling of the criminal case would confuse the issues and mislead the jury.

49. If criticism of the government and the purported lenient sentence were permitted, it would open the door to a host of irrelevant issues and "lead to a mini-trial on collateral issues causing undue delay in the trial of this case which would not relate to the [issues] alleged in Plaintiffs' claims." See <u>Williams</u>, <u>supra</u>. Epstein would have to put on evidence to rebut the implication of leniency and delve into the minutiae of the prior criminal case to support his position, clearly a waste of the Court's time given the complete lack of relevance to Jane Doe's claims.

50. Accordingly, any evidence or argument criticizing the criminal justice system and any comments or arguments suggesting that Epstein received a lenient sentence should be excluded pursuant to Rules 401, 402 and 403, Fed. R. Evid., as it is irrelevant, and any possible

relevance (which Epstein contends is none) is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, undue delay and waste of time.

### Any Criticism of Epstein's Counsel Should be Prohibited

51.     Dr. Reed also condemned Epstein' counsel, stating that "Mr. Critton was remarkably accusatory in his manner of grilling [Jane Doe]..." and that the deposition questions were "grossly insensitive and unapologetically hostile...." See Reed Report at 4, 19. Dr. Reed asserts that the deposition questions "have served to significantly exacerbate the harm done to [Jane Doe]..." See Reed Report at 19.

52.     Had Jane Doe's counsel believed the questioning of Jane Doe was inappropriate, he could have adjourned the deposition and sought appropriate sanctions or directions from the court. Alternatively, he could have filed a motion before the completion of her deposition, five months later, or filed a motion post-deposition. No such motions were ever filed. In essence, if Jane Doe's own lawyer didn't believe the questioning was inappropriate, how can Dr. Reed offer such an opinon?

53.     In Emerson Elec. Co. v. Garcia, 623 So. 2d 523, 525 (Fla. 3d DCA 1993), the court ordered a new trial where plaintiff's counsel, in the presence of the jury, accused defendant's counsel of, among other things, unethical conduct during discovery. The court held that no pretrial discovery violation was established "and, even if there had been evidence of a violation, an appropriate sanction was **a matter for the court and not for the jury**. We have ordered new trials and roundly condemned equally egregious conduct and arguments in other cases." Id. (Emphasis added).

54.     Jane Doe is attempting to paint Epstein's attorneys as defendants themselves. Indeed, in his report, Dr. Reed remarks "[t]hese grossly insensitive and unapologetically hostile

14

actions [deposition questions] by Jeffrey Epstein **and his attorney** have served to significantly exacerbate the harm done to Jane Doe...." See Reed Report at 19 (emphasis added). Not only is it improper, Dr. Reed has no basis to make such a conclusion as he is not a lawyer, judge or legal expert and cannot opine on the propriety of counsel's deposition questions. This is an irrelevant and collateral issue intended to unduly prejudice Epstein and should therefore be excluded.

### Dr. Reed Did Not Diagnose Jane Doe and Should Be Prohibited From Offering An Opinions that She Suffers from Any Mental Health Disorder, or the Cost of Future Care or Treatment

55. With respect to Jane Doe's alleged psychological damages, Dr. Reed testified:

> Q. All right. So, with regard to Jane Doe, you have reached -- your, your opinion contains no diagnosis. It's merely a description of symptoms which you relate to her contact with Mr. Epstein; is that a correct statement?
>
> A. Yes. I haven't, in my report, made a specific diagnosis. Certainly her symptom pattern is highly consistent with posttraumatic stress disorder.
>
> Q. But you haven't diagnosed posttraumatic stress disorder?
>
> A. No, I haven't elected to.

See Reed Dep at 155-156.

56. Thus, Dr. Reed should be prohibited at trial from offering any diagnoses of Jane Doe or opining that she has post-traumatic stress disorder as he clearly did not make any diagnoses.

57. In addition, Dr. Reed did not "come up with any type of opinion as to the cost of future care for Jane Doe [and] ha[s] no opinion as to what that cost would be nor what the present value of that cost would be." He should therefore be prohibited from testifying regarding the cost of future care. See Reed Dep at168.

15

WHEREFORE, JEFFREY EPSTEIN respectfully requests the Court exclude the following testimony and/or opinions of Plaintiff's, JANE DOE, expert witness, L. Dennison Reed, Psy.D and grant any additional relief the Court deems just and proper:

a. Any testimony related to the "grooming" process as the evidence contradicts the notion that Epstein "groomed" Jane Doe and the issue is therefore irrelevant;

b. Any testimony or opinions that Epstein "groomed" Jane Doe, or any opinion regarding Epstein for that matter as Dr. Reed has not examined Epstein and has no basis to offer any such opinions;

c. Any testimony regarding the Palm Beach Police Report or Probable Cause Affidavits as they do not mention or refer to Jane Doe and are therefore irrelevant. They also constitute inadmissible hearsay and double-hearsay;

d. Any testimony or opinions that Jane Doe has been damaged by the criminal justice system, that Epstein received a "lenient" sentence and that Epstein would have died in prison if convicted of all he crimes committed. These issues are irrelevant and any purported relevance is substantially outweighed by the danger of unfair prejudice, confusions of issues, misleading the jury, undue delay and waste of time. More importantly, Dr. Reed is not an expert on the criminal justice system;

e. Any testimony criticizing or disparaging Epstein's counsel deposition questions or suggesting that Epstein's counsel acted improperly during discovery;

f. Any testimony or opinions regarding a diagnosis of Jane Doe as Dr. Reed testified he did not make any diagnoses;

g. Any testimony or opinions regarding the cost of future care or treatment of Jane Doe as Dr. Reed testified he did not make any such determination.

### Local Rule 7.1 Statement

I hereby certify that counsel for the respective parties communicated in a good faith effort to resolve the issues prior to the filing of this motion to continue. Plaintiff opposes this motion.

Respectfully submitted,

By: /s/ Robert D. Critton, Jr.
ROBERT D. CRITTON, JR., ESQ.
Florida Bar No. 224162

## Certificate of Service

I HEREBY CERTIFY that a true copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the following service list in the manner specified via transmission of Notices of Electronic Filing generated by CM/ECF on this 5th day of July, 2010:

Brad Edwards, Esq.
Farmer, Jaffe, Weissing, Edwards, Fistos & Lehrman, PL
425 N. Andrews Ave.
Suite #2
Fort Lauderdale, FL 33301
Phone: 954-524-2820
Fax: 954-524-2822
Brad@pathtojustice.com

Paul G. Cassell, Esq.
*Pro Hac Vice*
332 South 1400 E, Room 101
Salt Lake City, UT 84112
801-585-5202
801-585-6833 Fax
cassellp@law.utah.edu
*Co-counsel for Plaintiff*

Jack Alan Goldberger, Esq.
Atterbury Goldberger & Weiss, P.A.
250 Australian Avenue South
Suite 1400
West Palm Beach, FL 33401-5012
561-659-8300
561-835-8691 Fax
jagesq@bellsouth.net
*Co-Counsel for Defendant Jeffrey Epstein*

By: /s/ Robert D. Critton, Jr.
ROBERT D. CRITTON, JR., ESQ.
Florida Bar No. 224162
rcrit@bclclaw.com
MICHAEL J. PIKE, ESQ.
Florida Bar #617296
mpike@bclclaw.com
BURMAN, CRITTON, LUTTIER & COLEMAN, LLP
303 Banyan Boulevard, Suite 400
West Palm Beach, FL 33401
561/842-2820 Phone
561/243-0164 Fax
*(Co-Counsel for Defendant Jeffrey Epstein)*